IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

MICHAEL T., a person with diminished capacity;

ERIC D., by his guardian CONNIE D.;

SARA F., by her guardians REBECCA F. and DAVID F.;

JEREMY C., by his guardian, JO C.; and

TARA R., by her guardian HARV CHRISTIAN R.;

ON THEIR OWN BEHALF AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs,

                                      CLASS ACTION
v.                                      2:15-cv-09655

KAREN BOWLING, in her official capacity as
Secretary of the WEST VIRGINIA DEPARTMENT
OF HEALTH AND HUMAN RESOURCES,

                                      DEMAND FOR
            Defendant.                    PRELIMINARY RELIEF

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### PRELIMINARY STATEMENT

1.      This is an action on behalf of West Virginia residents with intellectual and developmental disabilities dependent on West Virginia's Intellectual/Developmental Disabilities Home and Community Based Services Waiver program (I/DD Waiver Program) to continue to live in the community-integrated settings they have enjoyed for many years.

2.      Since the 1980s, the State of West Virginia has operated a Medicaid home and community-based care program under a special Medicaid waiver plan allowing a limited number of persons with intellectual and developmental disabilities to receive ICF/IID-level services

while living at home or in home-like settings.

3.      Individuals with intellectual and developmental disabilities who qualify to receive home and community-based services receive an annual amount of waiver benefits represented by a budget for waiver services. The allotment of waiver benefits by law must (i) be based on that person's individual need for care according to the local care provider team most familiar with the individual's needs, and (ii) be sufficient to maintain the recipient in a safe, healthy, and humane condition within an integrated community and home-like setting.

4.      In contrast, each year APS generates these benefit amounts arbitrarily through a secret and proprietary computer algorithm that does not give appropriate weight to recipient need and the amount of waiver benefits actually authorized in prior years.

5.      Plaintiffs seek class-wide relief for themselves and similarly-situated West Virginia I/DD waiver program recipients who have had the waiver services they need to live in an integrated setting unjustifiably reduced or terminated, or who are imminently threatened with such reductions or terminations. The cause of these reductions and terminations is an unpublished and unlawful policy implemented without due process by Defendant Secretary Bowling in her capacity as the executive head of the West Virginia Department of Health and Human Resources (DHHR).

6.      That policy, which has not been approved by either the West Virginia Legislature or federal Medicaid officials, has been instituted because of alleged budgetary shortfalls.

7.      A recent press report questions whether DHHR is inflating the alleged budget problems by including non-waiver Medicaid expenditures in the waiver program expenses. Moreover, any shortfalls have been caused or exacerbated by DHHR's politically-motivated

refusal to ask the West Virginia Legislature for additional funding for the waiver program at any time over the last several state budget cycles.

8.      Through general application of the challenged policy, over the past few months DHHR has greatly reduced the waiver benefits of uncounted waiver recipients from levels it previously authorized through its waiver administrator, Innovative Resource Group d/b/a APS Healthcare, Inc. (APS), as being the amount of benefits that individual needed to maintain safe, healthy, and humane care in an integrated community and home-like setting.

9.      DHHR has implemented these massive reductions and terminations of the waiver benefits needed by plaintiffs and the class unjustifiably, arbitrarily, and unlawfully, despite the lack of any meaningful change in an individual's actual need for services; without DHHR first proving a change in the recipient's needs for services; and without providing adequate prior notice and a meaningful, impartial hearing at which a decision is reached based on the controlling law and regulations, as required by the Constitution and the fair hearing provisions of the federal Medicaid regulations.

10.      Pursuant to this policy, on information and belief, DHHR has directed APS to deny every request for necessary services over and above an arbitrarily-calculated APS budget "regardless of the situation or setting."

11.      Similarly, DHHR has instructed the local care provider teams which coordinate and manage an individual recipient's waiver services not to request necessary services previously provided if doing so would exceed the budget arbitrarily assigned that individual by APS.

12.      Hearing Officers of the West Virginia Board of Review are routinely denying fair hearing appeals contesting these reductions or terminations, despite proof of continuing need for

previously authorized services and the requirements of controlling law, on the basis that DHHR "has been directed to operate within budgetary guidelines while providing services . . . [so] individual program budgets cannot be exceeded."

13.    As a result, plaintiffs and the absent members of the plaintiff class are suffering loss of the waiver benefits needed for long-term maintenance of their integrated living arrangements, and/or face imminent peril of such loss as soon as 2015 budgets are implemented for them.

14.    In consequence, save for plaintiff Tara R., the named plaintiffs and all others similarly situated face a heightened and serious risk of being forced from long-term home and community living arrangements into segregated, institutionalized settings.

15.    Plaintiff Tara R. in fact has already been forced from the home at which she has lived all her life, and faces imminent risk that she will not even be able to avoid institutionalization by remaining at her current placement.

16.    Plaintiffs and the absent members of the plaintiff class therefore are suffering or imminently face irreparable harm for which they have no adequate remedy at law

17.    Plaintiffs therefore seek class-wide preliminary and permanent declaratory and injunctive relief to remedy DHHR's continuing violation of due process, Medicaid regulations, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and implementing regulations of these anti-discrimination laws.

## JURISDICTION

18.    This action arises under the Civil Rights Act, 42 U.S.C. §1983; Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12131, *et seq*.; and Section 504 of

the Rehabilitation Act of 1973, 29 U.S.C. §794.

19.      This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §1343(a)

(3) - (4) and 28 U.S.C. § 1331.

20.      Declaratory and injunctive relief are authorized pursuant to 28 U.S.C. § 2201 and

§2202, and Federal Rules of Civil Procedure 57 and 65.

21.      Venue is proper because a substantial part of the acts and omissions of which

Plaintiffs complain occurred in this District. *See* 28 U.S.C. § 1391(b).

## PARTIES

A.      **Defendant**

22.      Karen Bowling is the Secretary of the West Virginia Department of Health and

Human Resources (DHHR). In that capacity, Ms. Bowling has full executive authority and

responsibility for the operation, control, and administration of the DHHR in West Virginia,

including the West Virginia Bureau of Medical Services (BMS), a subdivision of DHHR. BMS

oversees the general administration and operation of the state's I/DD waiver program.

23.      Ms. Bowling is sued only in her official capacity as the governmental official with

overall executive authority over DHHR and its various bureaus and contracting agencies, such as

BMS and Innovative Resources Group LLC, d/b/a APS Healthcare, Inc. (APS). No claims are

asserted personally against Secretary Bowling. For that reason, this complaint will refer to the

defendant generically as "DHHR."

24.      West Virginia has designated DHHR as the "single state agency" with direct

responsibility for administration of all aspects of the state's Medicaid plan, including all

Medicaid Waiver programs. *See* 42 U.S.C. § 1396a (a)(5); W. Va. Code § 29-15-6.

25.     DHHR is a recipient of federal funding used to operate and administer all aspects of West Virginia's Medicaid program, including the I/DD Waiver program. The I/DD Waiver program DHHR in West Virginia is therefore a "program or activity" subject to the requirements and prohibitions of Section 504 of the Rehabilitation Act of 1973. *See* 29 U.S.C. §794(b).

26.     In exchange for that federal funding, DHHR and contracting agencies such as APS must operate all programs in compliance with the statutes and regulations governing the Medicaid program, and with federal laws prohibiting discrimination in the operation of federally-funded programs.

27.     Since DHHR is a governmental department of the state of West Virginia, it is a "public entity" as defined by 42 U.S.C. §12131 (1) of Title II of the ADA.

**B.     Plaintiff Michael T.**

28.     Plaintiff Michael T. is a 55 year old man living in Poca, Putnam County, West Virginia, in an Intensively Supported Setting (ISS) residential group home. Michael T. shares this group home with another adult who also needs intensive care services.

29.     Michael T. has cerebral palsy, a moderate intellectual disability, a seizure disorder, and a vision impairment. In addition, Michael has been diagnosed with a mood disorder and many medical conditions. He is non-ambulatory, incontinent, and requires assistance with virtually all tasks of daily living.

30.     Michael's most recent adaptive behavior assessment places his overall functioning at an age equivalent of one year, two months.

31.     That same assessment, dated March 13, 2015, shows that not only has Michael's functioning not improved, it has somewhat decreased from the prior year, indicating marginally

greater service needs than in previous years.

32.     Michael T. does not have a legal guardian, nor does he have living relatives involved in his care.

33.     DHHR has assigned a Health Care Surrogate solely to make decisions for Michael T. about his medical care. The Health Care Surrogate is now a representative from the Kanawha County Office of Adult Protective Services. Adult Protective Services is a division of the DHHR, run by waiver program administrator APS. The Health Surrogate is defendant's employee.

34.     Although Michael T.'s waiver benefits have been substantially reduced through application of DHHR's challenged policy, his Health Surrogate has taken no action to contest that reduction nor sought restoration of the services he needs, even though restoring the benefit level previously received is crucial to protecting and maintaining Michael T.'s ability to avoid institutionalization.

35.     No court has yet determined Michael T. to be incompetent. However, counsel advises the Court that Michael T. is of greatly diminished capacity and requires the immediate appointment of a guardian ad litem.

36.     Michael has received services through the I/DD waiver program for approximately twenty years.

37.     As is typical of many adult I/DD waiver recipients, Michael's levels of functioning and ability have not improved to any meaningful degree since he was a teenager.

38.     The continuing receipt of necessary waiver services throughout the last twenty years has allowed Michael to live in the community at home-like residences like his current ISS residential group home, rather than in an institution.

39.    Continuing to live in the more-integrated setting is medically appropriate for Michael, so long as the DHHR does not reduce or terminate the community-based waiver benefits he needs to reside there in health and safety.

40.    Michael T. has no understanding of the waiver program, DHHR's reduction of his waiver benefits, or the nature of a lawsuit. Michael T. understands that he will have to leave his home, and he wants to stay where he is.

41.    Michael T. is a qualified individual with a disability as defined by 42 U.S.C. §12131(2) of Title II of the ADA.

42.    Michael T. is entitled to continue to receive waiver benefits at levels previously authorized as necessary to meet his needs unless his circumstances change, as those benefits provide the services needed for him to live in the most integrated setting appropriate to his needs.

43.    Beginning at least in 2013, APS's proprietary computer algorithm generated a yearly waiver budget for Michael allocating approximately $170,000 to $174,000 in waiver benefits, regardless of the amount of waiver benefits authorized and expended to meet Michael's actual care needs in the previous year.

44.    Upon receipt of that computer-allocated budget, Michael's service coordinator would each year communicate to APS about Michael's individual needs, including his past history of authorized services and his individual requirements, explaining why the algorithm-generated budget was not sufficient to provide all the services he needed to maintain his health, his safety, and prevent an increased risk of institutionalization.

45.    Prior to 2015, in each year that communication resulted in APS authorizing an additional $39,000 to $70,000 of benefits, so as to provide Michael the services necessary to

meet his actual needs in the community setting in which he lives.

46.    In past years, Michael was authorized to and received waiver benefits totaling in the range of $209,000 - $243,000.

47.    For the 2015 budget year, APS's algorithm assigned Michael a benefit level of about $174,000, well below the amount of waiver benefits previously received.

48.    Michael's Health Surrogate was told of that allocation through a standardized form letter DHHR and APS routinely use to announce the results of the algorithm calculation to every West Virginia waiver recipient. True, redacted exemplars of the letter form customarily employed are compiled in Exhibit 1 to this complaint and incorporated here by reference.

49.    When no action was taken, REM stepped in as in years past to help Michael continue to receive the amount of waiver benefits he needed and had previously received.

50.    Michael's service coordinator submitted to APS a request to return benefits to the previous year's authorized level to maintain the services necessary to meet Michael's actual needs.

51.    As in years past, that request was supported by documentation of Michael's circumstances, his service needs, and a review of the type, amount, and cost of services APS had authorized previously as necessary to meet Michael's needs and avoid increasing his risk of institutionalization.

52.    However, pursuant to DHHR's new, unpublished policy, this time APS rejected the submission because paying waiver benefits at the levels previously received would exceed the algorithm-generated budget.

53.    Michael's service coordinator has filed a second level negotiation request, asking

BMS to review APS's denial of additional services for Michael. To date, there has been no response to this request.

54.    As a result of DHHR's new policy, Michael T.'s services have been greatly reduced despite the appeal lodged on his behalf.

55.    Michael T. is no longer authorized to receive 24 hours of daily care services as provided under his previously-authorized benefit level. The algorithm-assigned budget means his available hours of care are reduced by 25%, to 18 hours each day.

56.    Michael T.'s need for 24 hour care has not changed. He cannot care for himself. Without 24 hour care, he cannot remain where he now lives.

57.    Consequently, Michael T. is at a serious risk of being institutionalized as a direct result of the Medicaid waiver benefit reduction imposed on him by the challenged policy.

**C.    Plaintiff Eric D.**

58.    Plaintiff Eric D. is a 28 year old man living in Mason, Mason County, West Virginia, with his parents. Eric D. is represented in this suit by his mother and legal guardian, Connie D.

59.    Eric D. has a moderate to severe intellectual disability, a seizure disorder, agenesis of the corpus callosum, Crohn's disease, and Hirschsprung's disease. He is non-verbal, incontinent, and requires assistance with all tasks of daily living.

60.    Eric's most recent adaptive behavior assessment places his overall functioning at an age equivalent of one year, four months. This same report, dated January 30, 2015, shows no meaningful change in his care needs from the prior year.

61.    Eric's levels of functioning and ability have not improved to any meaningful

degree since he was a teenager.

62.     Eric has received services through the I/DD waiver program for approximately twelve years.

63.     The continuing receipt of necessary waiver services throughout this period has allowed Eric D. to live his entire life with his parents, who both work fulltime.

64.     Continuing to live in that integrated setting is medically appropriate for Eric, so long as the DHHR does not reduce or terminate the community-based waiver benefits he needs to reside there in health and safety.

65.     Eric wants to remain in his family home, and his parents want him to continue to live there.

66.     Eric D. is a qualified individual with a disability as defined by 42 U.S.C. §12131(2) of Title II of the ADA.

67.     Eric D. is entitled to continue to receive waiver benefits at levels previously authorized as necessary to meet his needs unless his circumstances change, as those benefits provide the services needed for him to live in the most integrated setting appropriate to his needs.

68.     Beginning at least in 2013, APS's computer algorithm has generated a yearly waiver budget for Eric of approximately $64,000 to $65,500, regardless of the amount of waiver benefits authorized and expended to meet Eric's actual care needs in the previous year.

69.     Upon receipt of that computer-allocated budget, Eric's service coordinator would each year communicate to APS about Eric's individual needs, including his past history of authorized benefits and his individual requirements, explaining why the algorithm-generated budget was not sufficient to meet his needs and prevent an increased risk of institutionalization.

70.    Prior to 2015, in each year that communication resulted in APS authorizing an additional $17,000 to $19,000 of benefits each year, so as to provide Eric the waiver benefits necessary to meet his actual needs.

71.    In past years, Eric was authorized to and received waiver benefits totaling in the range of $82,000 - $84,000.

72.    For the 2015 budget year, APS's algorithm assigned Eric a benefit level of about $65,900, well below the amount of waiver benefits he previously received. *See* Eric D. notice in Exhibit 1.

73.    As in the past, Eric's service coordinator provided APS with a request to return benefits to the previous year's level as necessary to meet Eric's actual needs. As in years past, that request was supported by documentation of Eric's circumstances, his service needs, and a review of the type, amount, and cost of services APS had authorized in 2014 as necessary to meet Eric's needs and avoid increasing his risk of institutionalization.

74.    However, pursuant to the challenged policy, APS denied the submission on the basis that Eric could not receive waiver benefits exceeding the amount of his algorithm-generated budget.

75.    In common with other class members seeking relief from benefit reductions or terminations pursuant to the policy at issue, Eric's legal guardian, Connie D. asked BMS to review APS's reduction of Eric's previously received waiver benefits and the resulting termination of needed care services.

76.    BMS denied Eric D.'s request to restore his previously authorized benefits, despite Eric's continued need for those benefits and the absence of any change in Eric's

circumstances, because restoring the lost benefits would cause Eric to exceed his algorithm-assigned budget. *See* true, redacted exemplars of BMS second level decisions as to named plaintiffs or absent class members, attached as Exhibit 2 and incorporated here by reference.

77.    Eric's mother further appealed the reduction in previously authorized benefits and termination of needed waiver services on Eric's behalf, knowing that without the same level of waiver benefits and services Eric had received in previous years, she and her husband would be unable to maintain Eric in the only living situation he has ever known.

78.    Eric's Medicaid fair hearing has not yet been held, but the family has not been allowed to continue to receive waiver benefits at the previously authorized level pending that hearing.

79.    As a result, Eric D.'s services have been greatly reduced. Consequently, Eric D. is at a serious risk of being institutionalized.

80.    Eric's negative behaviors, including hitting, pulling hair, and pinching (many of which are directed towards himself), have gotten worse as his services have been cut.

81.    The reduction in plaintiff Eric D.'s total waiver benefit level has required a reduction of available personal-care services by approximately ten hours per week.

82.    DHHR denied a request even to restore benefits just enough to allow five additional hours of care per week, so a caregiver could remain with Eric until his parents arrived home from work each evening.

83.    The reduction in personal care services now threatens his parents' ability to continue working full-time.

84.    In addition, Eric's respite care services have been drastically reduced.

85.    "Respite" care is "specifically designed to provide temporary substitute care normally provided by a family member" . . . "to be used for relief of the primary care-giver(s) to help prevent the breakdown of the primary care-giver(s) due to the physical burden and emotional stress of providing continuous support and care to the dependent member." *West Virginia Title XIX I/DD Waiver Home and Community-Based Services Program Operations Manual* (I/DD Op. Man.) at Chapter 513.9.1.10.1.

86.    Loss of respite services means Eric's parents are the sole source of care for Eric – day in, day out, without weekend, holiday, vacation, or days off - whenever his personal care hours have been exhausted for the day.

87.    As a result of these benefit cuts and the strain it is placing on Eric's parents, Eric risks being moved to an institutional setting.

**D.    Plaintiff Sara F.**

88.    Plaintiff Sara F. is a 32 year old woman who lives in Lewisburg, Greenbrier County, West Virginia, with her parents. Sara F. is represented in this suit by her parents and legal guardians, Rebecca F. and David F.

89.    Sara F. has intellectual and physical disabilities as the result of traumatic brain injury, a moderate intellectual disability, scoliosis, a seizure disorder, partial left-side paralysis, dementia, anxiety, and a severe vision impairment. Sara is non-ambulatory, incontinent, and requires assistance with all tasks of daily living.

90.    Sara's most recent adaptive behavior assessment places her overall functioning at an age equivalent of eleven months. This same report, dated October 14, 2014, shows no

meaningful change in her overall service needs from the prior year.

91.    Sara's levels of functioning and ability have not improved to any meaningful degree since she was a teenager.

92.    Sara has received services through the I/DD waiver program for approximately 30 years. The continuing receipt of necessary waiver services throughout this period has allowed her to live her entire life with her parents.

93.    Continuing to live in that integrated setting is medically appropriate for Sara, so long as the DHHR does not reduce or terminate the community-based waiver benefits she needs to reside there in health and safety.

94.    Sara F. wants to remain in her family home, and her parents want her to continue to live there.

95.    Sara is a qualified individual with a disability as defined by 42 U.S.C. §12131(2) of Title II of the ADA.

96.    Sara F. is entitled to continue to receive waiver benefits at levels previously authorized as necessary to meet her needs unless her circumstances change, as those benefits provide the services needed for her to live in the most integrated setting appropriate to her needs.

97.    Beginning at least in 2013, APS's computer algorithm has generated a yearly waiver budget for Sara of approximately $71,000 to $73,000, regardless of the amount of waiver benefits authorized and expended to meet Sara's actual care needs in the previous year.

98.    Upon receipt of that computer-allocated budget, Sara's service coordinator would each year communicate to APS about Sara's individual needs, including her past history of authorized services and her individual requirements, explaining why the algorithm-generated

budget was not sufficient to meet her needs and prevent an increased risk of institutionalization.

99.     Prior to 2015, in each year that communication resulted in APS authorizing an additional $35,000 or so of benefits, so as to provide Sara a level of waiver benefits actually necessary to meet her needs.

100.    In these past years, Sara received authorized waiver benefits in amounts totaling $100,000 - $107,000.

101.    For the 2015 budget year, APS' algorithm assigned Sara a benefit level of $72,000, well below the amount of waiver benefits previously received. *See* Sara F. notice in Exhibit 1.

102.    As in the past, Sara's service coordinator provided APS with a request to return benefits to the previous year's level as necessary to meet Sara's actual needs. As in years past, that request was supported by documentation of Sara's circumstances, her service needs, and a review of the type, amount, and cost of services APS had authorized in 2014 as necessary to meet Sara's needs and avoid increasing her risk of institutionalization.

103.    However, pursuant to the challenged policy, this time APS denied the submission because Sara could not receive waiver benefits exceeding the amount of the algorithm-generated budget.

104.    Sara's mother and legal guardian, Rebecca F., requested a second level review, asking BMS to restore the previously authorized level of benefits for Sara.

105.    BMS refused to do so, despite Sara's continued need for those benefits and the absence of any change in her circumstances, stating only "[r]equest denied as approval would exceed or has exceeded the member's Individualized Waiver Budget." *See* Sara F. BMS decision

in Exhibit 2.

106.    Sara's mother then sought on Sara's behalf a Medicaid fair hearing to contest the

benefit reduction, knowing that without the same level of waiver benefits Sara had received in

prior years, she and Sara's father would be unable to continue to maintain Sara in the only living

situation she has ever known.

107.    In her request for a hearing, Sara's mother stated "Sara requires this [previously

authorized] level of service need and has so for many years. Precedence was set by the States

approval in prior years."

108.    At Sara's Medicaid fair hearing before a Hearing Officer of the West Virginia

State Board of Review, DHHR argued that "due to budgetary restraints, all participants of the

I/DD waiver program must stay within their respective budget amounts, unless there was a

change in the individual's assessed needs."

109.    The focus of the case presented by Sara's parents in the fair hearing was that

Sara's needs were exactly the same as in previous years when APS had authorized waiver

benefits up to approximately $107,000.

110.    DHHR did not dispute the testimony of Sara's continuing needs, nor did it present

any evidence that Sara's circumstances had changed to any significant degree since 2014.

111.    Nonetheless, the Hearing Officer affirmed DHHR's refusal to restore Sara's

benefits, finding that because Sara's needs had *not* significantly changed, the Hearing Officer

could not approve benefits beyond the algorithm-calculated figure. *See* April 1, 2015 Hearing

Decision, Action No. 15-BOR-1114, a true but redacted copy of which is attached as Exhibit 3,

incorporated by reference.

112.    Sara F.'s care services have been greatly reduced, placing a significant strain on her aging parents to provide 16 hours of personal care each week day, and 24 hours per day of care on weekends.

113.    As a result of the approximately $35,000 reduction in Sara's waiver benefits, her parents have been able to hire only one assistant to care for Sara. That assistant provides care for eight hours each day, five days each week. Previously, Sara had two to three care staff working various schedules to cover her needs most of her waking day and weekends.

114.    Sara's parents are now the sole source of care to make up the lost benefits for sixteen hours each workday, and every hour of the weekends.

115.    But Sara's parents, who are each in their sixties, lack the physical ability to care for Sara at this level continuously for a long term.

116.    For example, Sara's caregivers must transfer Sara, who weighs approximately 160 pounds, in and out of her bed and wheelchair a minimum of twelve times each day.

117.    Manual transfers have taken a physical toll on both of her parents in the past. Sara's father has required surgery for a hernia and requires regular injections in both knees as a result of strain from transferring Sara.

118.    Sara's mother requires regular chiropractic care to help with back pain. They simply lack the physical ability to transfer and move Sara safely.

119.    Because Sara's aging parents will be physically unable to sustain this intense and demanding care schedule for much longer, Sara is at risk of institutionalization.

**E.    Plaintiff Jeremy C.**

120.    Plaintiff Jeremy C. is a 32 year-old man who lives in Charleston, Kanawha

County, West Virginia, with his parents. Jeremy C. is represented in this suit by his mother and legal guardian, Jo C.

121.    Jeremy C. has intellectual and physical disabilities since birth. These include severe cerebral palsy, chronic joint arthrosis, chronic muscle spasms in upper and lower extremities, severe muscle spasticity, moderate autism, severe anxiety disorder with cycles of depression, oppositional defiant behavioral disorder, rage reaction seizure disorder, complex partial seizure disorder, ataxia, poor gross motor ability, and non-functional fine motor skills.

122.    Jeremy is non-verbal, non-ambulatory, and requires that all daily living tasks be performed for him.

123.    Jeremy's most recent adaptive behavior assessment places his overall functioning at an age equivalent of seven months.   This same report, dated January 2, 2015, shows a worsening of his medical condition and an increase in his overall service needs, inasmuch as his ICAP Service Score was determined to be 1 (the lowest possible score), while in 2014 it was 11.

124.    Jeremy's levels of functioning and ability otherwise have not changed to any meaningful degree since he was a teenager.

125.    Jeremy has received services through the I/DD waiver program since April 29, 1996.

126.    The continuing receipt of necessary waiver services throughout this period has allowed Jeremy to live with his parents, Jo Anne C. and Todd C., despite their increasing age and their own health problems.

127.    Continuing to live in that integrated setting is medically appropriate for Jeremy, so long as the DHHR does not reduce or terminate the community-based waiver benefits he

needs to reside there in health and safety.

128.    Jeremy wants to remain in his family home, and his parents want him to continue to live there with them.

129.    Jeremy C. is a qualified individual with a disability as defined by 42 U.S.C. §12131(2) of Title II of the ADA.

130.    Jeremy C. is entitled to continue to receive waiver benefits at levels previously authorized as necessary to meet his needs unless his circumstances change, as those benefits provide the services needed for him to live in the most integrated setting appropriate to his needs.

131.    Beginning at least in 2012, APS's computer algorithm has generated a yearly waiver budget for Jeremy ranging from approximately $69,000 to $92,000, regardless of the amount of waiver benefits authorized and expended to meet Jeremy's actual care needs in the previous year.

132.    Upon receipt of that computer-allocated benefit allocation, Jeremy's service coordinator would each year communicate to APS about Jeremy's individual needs, including his past history of authorized services and his individual requirements, explaining why the algorithm-generated budget was not sufficient to meet his needs and prevent an increased risk of institutionalization.

133.    In budget years 2012, 2013 and 2014, that communication resulted in APS authorizing additional benefits of approximately $28,000 each year, so as to provide Jeremy the services necessary actually to meet his needs.

134.    In these three years, Jeremy received authorized waiver benefits in amounts totaling $98,000 - $111,000.

135.    DHHR's Patricia S. Nisbet, one of the main executors of the challenged policy, personally authorized providing waiver benefits to Jeremy at these levels in 2012 and 2013.

136.    For the 2015 budget year, the algorithm assigned Jeremy a benefit level well below the amount of waiver benefits previously received, setting his budget at approximately $92,000. *See* Jeremy C. notice in Exhibit 1.

137.    As in the past, Jeremy's service coordinator requested benefits at the level of prior years, as necessary to meet Jeremy's actual, on-going, service needs. As in years past, that request was supported by documentation of Jeremy's circumstances, his service needs, and a review of the type, amount, and cost of services APS had authorized in 2014 as necessary to meet Jeremy's needs and avoid increasing his risk of institutionalization.

138.    However, pursuant to the challenged policy, this time APS denied the submission because Jeremy could not receive waiver benefits exceeding the amount of the algorithm-generated budget.

139.    Jeremy's mother and legal guardian, Jo C., asked BMS to restore Jeremy's reduced waiver benefits so as to prevent termination of necessary services.

140.    BMS refused to do so, despite Jeremy's continued need for those benefits and the absence of any improvement in his circumstances, stating that "[y]our assessed annual budget would have been exceeded or has been exceeded and therefore this request is denied." *See* Jeremy C. decision in Exhibit 2.

141.    Jeremy's mother then appealed the benefit reduction on Jeremy's behalf, knowing that without the same level of waiver benefits Jeremy had received previously, she and her husband would eventually be unable to continue to maintain Jeremy in the only living situation

he has ever known.

142.    The family was not allowed to continue to receive waiver benefits at the previously authorized level pending that hearing

143.    On June 17, 2015, before a State Hearing Officer of the West Virginia State Board of Review, DHHR's lead witness, Patricia S. Nisbet, conceded that the sole reason for reducing Jeremy's waiver benefits below the amount authorized in prior years was DHHR's budgetary concerns. Ms. Nisbet admitted there had been no substantial improvement in Jeremy's circumstances or reduction in his service needs.

144.    Pursuant to the challenged policy, DHHR and Ms. Nisbet maintained during the fair hearing that although Jeremy's needs had *not* changed from prior years, due to budget issues DHHR could reduce Jeremy's waiver benefits from the authorized levels he had received in prior years to the level set by APS' algorithm-generated budget.

145.    As a result, Jeremy C.'s benefits have been greatly reduced, requiring substantial cuts in Personal Care services and the respite care hours necessary to give Jeremy's parents a break from Jeremy's 24 hour-per-day needs.

146.    His parents, who are aging and have their own serious health issues, lack the long-term physical ability to provide care at the intense level Jeremy needs, in the absence of the care services Jeremy's waiver benefits have provided him continuously throughout the last few years.

147.    For example, Jeremy has a very irregular sleep pattern and is awake often throughout the night. His parents therefore have used generally utilized respite services during the night so that they can get much-needed and necessary sleep to ready themselves for the care and other demands of regular daily life.

148.    DHHR's wrongful reduction of Jeremy's waiver benefits means Jeremy's parents now have to care for him during the nighttime as well, denying them the sleep needed to maintain their own health and energy.

149.    Jeremy's parents simply cannot sustain this type of schedule for much longer, putting Jeremy at an increased risk of institutionalization.

**F.    Plaintiff Tara R.**

150.    Plaintiff Tara R. is a 27 year old woman living in Parkersburg, Wood County, West Virginia. Tara R. is represented in this suit by her father and legal guardian, Harv Christian R.

151.    Tara R. has cerebral palsy, a severe intellectual disability, and limited hand functioning. She is non-verbal, non-ambulatory, and incontinent. Tara R. requires assistance with all tasks of daily living.

152.    Tara's most recent adaptive behavior assessment places her overall functioning at an age equivalent of nine months. This same report, dated September 29, 2014, shows no meaningful change in her overall service needs from prior years.

153.    In fact, Tara's levels of functioning and ability have not changed to any meaningful degree since she reached adulthood.

154.    For approximately fifteen years, the I/DD waiver program provided Tara with the waiver benefits she needed to live with her father.

155.    Because those benefits were provided at a level that met her actual needs, Tara R. was able throughout this period to live in a family home with her father, who works fulltime, and her step-mother, who has significant physical disabilities.

156.    Continuing to live in that integrated setting is medically appropriate for Tara, so long as the DHHR does not reduce or terminate the community-based waiver benefits she needs to reside there in health and safety.

157.    Tara wanted to remain in her family home, and her father wanted her to continue to live there.

158.    Tara R. is a qualified individual with a disability as defined by 42 U.S.C. §12131(2) of Title II of the ADA.

159.    Tara R. is entitled to continue to receive waiver benefits at levels previously authorized as necessary to meet her needs unless her circumstances change, as those benefits provide the services needed for her to live in the most integrated setting appropriate to her needs.

160.    Beginning at least in 2013, APS's computer algorithm has generated a yearly waiver budget for Tara of approximately $58,000 to $62,000, regardless of the amount of waiver benefits authorized and expended to meet Tara's actual care needs in the previous year.

161.    Upon receipt of that computer-allocated budget, Tara's service coordinator would each year communicate to APS about Tara's individual needs, including her past history of authorized services and her individual requirements, explaining why the algorithm-generated budget was not sufficient to meet her needs and prevent an increased risk of institutionalization.

162.    Prior to 2015, in each year that communication resulted in APS authorizing $70,000 to $71,000 in additional benefits, so as to provide Tara the waiver services necessary to meet her actual needs.

163.    In these past years, Tara received authorized waiver benefits in amounts totaling $130,000 - $133,000.

164.    For the 2015 budget year, APS's algorithm assigned Tara a benefit amount of about $72,000, well below the benefit levels previously authorized and those necessary to meet her needs.

165.    As in the past, Tara's service coordinator submitted to APS a request to restore benefits to the level of prior years, as necessary to meet Tara's actual needs.

166.    As in years past, that request was supported by documentation of Tara's circumstances, her service needs, and a review of the type, amount, and cost of services APS had authorized in 2014 as necessary to meet Tara's needs and avoid increasing her risk of institutionalization.

167.    However, pursuant to the challenged policy, this time APS denied that submission because Tara could not be provided benefits above the amount of the algorithm-generated budget.

168.    Tara's legal guardian appealed the benefit reduction on Tara's behalf, knowing that without the same level of benefits and care services Tara had received in prior years, he would be unable to continue to maintain Tara in the only living situation she had ever known.

169.    Tara's Medicaid fair hearing was conducted on March 4, 2014. At that hearing, Tara's representative gave evidence that her needs had not changed since the prior year and that she needed the same amount of waiver benefits she had received previously if she was to remain in her home.

170.    Nonetheless, the Hearing Officer denied Tara's appeal for restoration of DHHR's reduction in her waiver benefits, finding that DHHR

>    ". . . acknowledged that the Claimant received the requested amount of combined units of PCS-Agency and Respite in the previous year, but noted that the Claimant exceeded

her individualized budget . . . by $71,430.89. Moreover, the IDD Waiver program as a whole exceeded its budget by more than fifty ($50) million in the previous year, and because Respondent has been directed to operate within budgetary guidelines while providing services to 4,364 recipients, individualized program budgets cannot be exceeded."

*See* March 9, 2014 Hearing Decision, Action No. 15-BOR-1083, a true but redacted copy of which is attached as Exhibit 4, incorporated here by reference.

171.    DHHR's reduction of Tara's waiver benefits by approximately $60,000 was upheld although DHHR offered no evidence that Tara's circumstances had changed such that she no longer needed the same level of waiver benefits she had previously received.

172.    DHHR's wrongful reduction in plaintiff Tara R.'s waiver benefits has caused major disruptions to her life.

173.    The reduction of Tara R.'s benefits through application of the challenged policy meant her father no longer had the care services needed to keep her safe, healthy, and cared for in the family home.

174.    After the hearing, Tara was moved for approximately one month to an emergency care facility while her service provider searched out a more permanent home.

175.    Tara R. now shares an ISS group home with an elderly married couple, both of whom are wheelchair bound and require intensive services. DHHR has currently assigned Tara approximately $126,000 in waiver benefits to provide services in the ISS facility.

176.    The that level of benefits is significantly more than the amount of benefits assigned by APS' secret algorithm in 2015 to meet her needs at her father's house.

177.    Had DHHR not reduced Tara's benefits below the $126,000 amount now authorized for her group home care, it might have been some time before Tara would have had to

leave her family home for the less-integrated ISS facility.

178.    Tara's service coordinator reports that the move has had a negative impact on Tara; where she was previously a very happy individual, she is now lethargic and unwilling to engage with others. He further reports that Tara's roommates are not quiet during the night, and Tara is not getting enough sleep on a regular basis.

179.    Moreover, the amount of one to one direct care services authorized for Tara under the ISS waiver benefit allotment is insufficient to fully meet all Tara's care needs this year.

180.    Tara no longer receives the same level of one to one staff care and support that she previously received in her home. As a result, she spends significantly less time in the community than she did previously.

181.    Moreover, the termination of one to one staff service places Tara and her ISS housemates at a heightened risk of danger.

182.    The authorized waiver benefit level is sufficient only to provide one staff person in the ISS home to care for two individuals, though the facility actually houses three severely disabled waiver recipients.

183.    The available staff is not sufficient to properly care for all three, especially since that staff level could not provide all three the individual assistance they would need to escape in the event of a fire or other emergency.

184.    As a result, Tara's ISS placement does not provide the waiver benefits necessary to meet her needs and she is at risk of institutionalization.

## CLASS ALLEGATIONS

185.    Plaintiffs bring this action on their own behalf and on behalf of all others similarly

situated, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

186.    The class includes all persons who are now or will be qualified individuals with disabilities resident in West Virginia who (a) are eligible recipients of I/DD Home and Community-Based Waiver program services; (b) in risk of institutionalization; (c) due to actual or imminent reduction, termination, or denial of previously authorized waiver benefits; (d) though DHHR has not first proven a significant change in the recipient's circumstances such that the benefits previously received are no longer needed.

187.    The class is so numerous that joinder of all members is impracticable. More than fifty class members have already lost needed services as the result of DHHR's challenged policy, and hundreds or thousands more face imminent risk of such loss as 2015 budgets are implemented.

188.    Moreover, class members are geographically dispersed throughout the length and breadth of the state, and membership is fluid as individual recipients come on to and leave the waiver program.

189.    There are questions of law or fact common to the class.

190.    Common questions of fact include the precise nature and operation of the challenged policy, and DHHR's justifications for the manner in which it has been adopted and implemented.

191.    Common questions of law include whether DHHR has thereby violated (i) the due process clause of the United States Constitution, (ii) Medicaid fair hearing regulations, (iii) Title II of the Americans with Disabilities Act, (iv) Section 504 of the Rehabilitation Act, and/or (v) otherwise illegally discriminated against plaintiffs and the absent class members under the rules

upheld in *Olmstead v. L.C.*, 527 U.S. 581 (1999), and subsequent federal cases applying

*Olmstead.*

192.    The claims of the named plaintiffs are typical of the claims of the class as a whole. They have been subjected to and suffered injury as the result of the same policy challenged for absent class members.

193.    The named plaintiffs will fairly and adequately represent and advance the interests of the class. By filing this action, the named plaintiffs, through their guardians or next friend, displayed a strong interest in vindicating the rights of all who have been similarly harmed by DHHR's arbitrary and illegal actions. Plaintiffs must prevail if they are to maintain an integrated, community-based quality of life and avoid segregated institutionalization. By doing so, the named plaintiffs will also be advancing and proving the claims and rights of absent class members.

194.    There are no antagonistic interests between plaintiffs and the absent members of the class, and the equitable relief sought by the named plaintiffs will benefit the class generally.

195.    Furthermore, the named plaintiffs are represented by Mountain State Justice, Inc., a non-profit, public interest legal services firm with long and substantial expertise in class litigation on behalf of low-income West Virginians. Counsel for the putative class are knowledgeable about the Medicaid program, and are skilled in conducting civil rights litigation in the federal courts, including the prosecution and management of class action litigation.

196.    DHHR has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final equitable relief with respect to the class as a whole.

## STATEMENT OF FACTS

**A.  General Program Framework**

197.    The Medicaid program, established by Title XIX of the Social Security Act, 42 U.S.C. §1396 et seq., is a cooperative federal-state program to enable the states to furnish medical assistance to individuals who are unable to meet the cost of necessary medical services. Costs of the program are shared by the federal and state governments, with the federal government contributing approximately 75% of the cost of services in West Virginia.

198.    States are not obligated to participate in the Medicaid program. If a state chooses to participate, however, it must operate its program in compliance with federal statutory and regulatory requirements.

199.    West Virginia has chosen to participate in the Medicaid Program.

200.    Medicaid requires certain core services that are mandatory for any participating state. In addition, states may choose to cover federally recognized/optional services, including intermediate care level services for individuals with intellectual/developmental disabilities (ICF/IID). Once a state chooses to provide an optional Medicaid service, it must comply with all federal requirements for that service.

201.    West Virginia has chosen to include ICF/IID services in its Medicaid state plan.

**B.     The ICF/IID Medicaid Option**

202.    The ICF/IID Program is an optional Medicaid service authorized by Title XIX of the Social Security Act, 42 U.S.C. § 1396d (a)(15). ICF/IID provides residential, health, and rehabilitative services for individuals with intellectual and developmental disabilities. *See* 42 U.S.C. § 1396d (d).

203.    Since August 1989, there has been a moratorium on the development of any

additional ICF/IID institutional beds in West Virginia. *See* W. Va. Code §16-2D-5(h). There are

approximately 509 total ICF/IID beds in West Virginia and no large-scale institutions for those

with intellectual disabilities.

204.    Under West Virginia's current Medicaid State Plan, the named plaintiffs and the

absent members of the plaintiff class are entitled to services at the same level of care provided at

an ICF/IID, but have the right to receive those services in a community-based, integrated setting

instead, through West Virginia's Home and Community-Based Waiver Program.

205.    Both the ICF/IID program and the Home and Community-Based Waiver program

are "public services" subject to Title II of the Americans with Disabilities Act, 42 U.S.C. §§

12161-12165.

**C.    The Home and Community-Based Waiver Program**

206.    The Home and Community-Based Waiver program (waiver program) was

established by Congress so that individuals who would otherwise require care in the segregated

environment of a nursing home or ICF/IID facility could receive needed services in their own

homes and/or in home-like settings. 42 U.S.C. § 1396n. *See* Senate Report No. 97-139 and

House Conference Report No. 97-208, 1981 *U.S. Code Cong. & Admin. News* 396.

207.    Waiver program regulations provide that "the Act permits states to offer, under a

waiver of statutory requirements, an array of home and community based services that an

individual needs to avoid institutionalization."   42 C.F.R. § 441.300.

208.    West Virginia's waiver program is now known as the Intellectual Disabilities and

Developmental Disabilities Waiver Program (I/DD Waiver Program).

209.    The I/DD Waiver Program "reimburses for services to instruct, train, support, supervise, and assist individuals who have intellectual and/or developmental disabilities in achieving the highest level of independence and self-sufficiency possible. . .The I/DD Waiver Program provides services in natural settings, homes and communities where the member resides, works and shops." *West Virginia Title XIX I/DD Waiver Home and Community-Based Services Program Operations Manual* (I/DD Op. Man.) at Chapter 513.2 (Jan. 1, 2013).

210.    I/DD Waiver Program funds may not be used for services to individuals who reside in hospitals, nursing homes, or ICF/IIDs. *See* 42 C.F.R. § 441.301(b)(1)(ii), 42 U.S.C. §1396n. These are all considered to be institutional settings.

211.    Federal law caps the state-wide average per person cost for community-based waiver services at the average per person cost for the same level of services provided in facilities or institutions. 42 U.S.C. § 1396n (c)(2)(D).

212.    According to DHHR, the 2014 state-wide average cost of providing needed health and care services to an individual in a segregated ICF/IID institution in West Virginia was $173,000 per year. The 2014 average state-wide cost of providing all needed health and care services to a waiver recipient in an integrated community-setting was no more than $85,000 per year.

213.    More than 4,400 West Virginians are currently eligible for and receiving community-based services through West Virginia's I/DD Waiver Program.

**D.    Waiver Program Renewal Process**

214.    West Virginia must submit an I/DD Waiver Program renewal proposal for federal approval every five years.

32

215.    The most recent waiver renewal application was submitted to the federal Center for Medicare and Medicaid Services (CMS) for approval in or about May 2015. It has not been approved at the time of this filing.

216.    Publically, DHHR has sought to justify proposed waiver benefit cuts on the basis that current levels of waiver program services exceed DHHR's budget for those services.

217.    A May 5, 2015 DHHR press release on this subject stated: "modifications were made to the Waiver with the main objectives to help the program operate within its budget and offer services to some of the more than 1,000 West Virginians on the waiting list, many of whom have been waiting for three years."

218.    For political reasons, DHHR has chosen not to request the West Virginia Legislature to appropriate additional funds for the I/DD Waiver Program over many state budget cycles, even though each extra dollar appropriated would bring in about $3.00 of federal matching funds to boost West Virginia's economy.

219.    The political decision to cut needed services to the most vulnerable West Virginians rather than ask the Legislature for increased funding has prompted a backlash, including a letter from members of the West Virginia Legislature outraged at DHHR's failure to request the funding necessary to sustain the program in its current form. *See* Exhibit 5, attached and incorporated here by reference.

**E.    Administration of the I/DD Waiver Program in West Virginia**

220.    DHHR, through its Bureau for Medical Services (BMS), is responsible for the administration of the I/DD Waiver program in West Virginia.   I/DD Op. Man. at Chapter 513.2.

221.    However, for several years DHHR has contracted with Innovative Resources

Group LLC, d/b/a APS Healthcare, Inc. (APS), a New York-based company, for the day-to-day operation of the I/DD Waiver Program under DHHR supervision and responsibility.   *Id.* at 513.14.

222.    Matters delegated to and performed for DHHR by APS include "processing initial applications, investigating complaints, assessing waiver members' needs, functionality and supports and determining an individualized budget."   *Id.* at 513.1.

223.    APS is also responsible for providing "authorization for services that are based on the member's assessed needs."   *Id.* at 513.2.1 & 513.4.1.

224.    Waiver services are actually provided to individual recipients through contracts with local service provider agencies.   I/DD Op. Man. at 513.2.1.

225.    Each year, I/DD Waiver program recipients undergo a functional assessment by APS. That assessment supposedly reviews standardized measures of adaptive behavior in six major life areas to ensure continued medical eligibility for the I/DD Waiver Program.   I/DD Op. Man. at Chapter 513.4.1.

226.    If the recipient has continued medical and financial eligibility for Medicaid Waiver services, an interdisciplinary team put together by the local service provider agency develops an Individualized Program Plan (IPP) for that recipient.   *Id.* at 513.8.

227.    The IPP sets forth specific details of the individual member's actual care needs and proposed care plan for the upcoming year; in other words "what needs to be done, by whom, when and how."   *Id.*

228.    "The content of the IPP must be guided by the member's needs, wishes, desires and goals *but based on the member's assessed needs*."   I/DD Op. Man. at 513.1 (emphasis

added).

229.    In creating an IPP, the interdisciplinary team considers the array of services available through the I/DD Waiver Program, and creates a plan detailing the amount of each type of service needed to meet that recipient's individually-assessed safety, health, and care needs. I/DD Op. Man. at 513.8.

**F.    Determination of Individual Annual Budgets**

230.    The amount of waiver benefits received by an individual recipient is equal to the recipient's total authorized budget in a budget year.

231.    The I/DD Waiver Operations Manual does not explain how APS assigns an initial amount of waiver benefits for each recipient. *C.f.,* I/DD Op. Man. Chapter 513.1 through 513.14.

232.    Upon information and belief, APS uses a proprietary computer algorithm to set waiver benefit levels for West Virginia waiver program recipients.

233.    APS keeps that algorithm secret. It is not known what facts or legal elements the algorithm factors; the comparative weights given any element; the manner in which the algorithm determines need; how or whether the algorithm takes into account the level of benefits authorized in previous years, changes or the absence of changes in recipient circumstances, or an increased risk of recipient institutionalization.

234.    After APS began using this secret algorithm to set waiver benefit levels in or around the fall of 2011, service providers working with I/DD waiver program recipients began to notice changes in the benefit amounts as previously set by DHHR.

235.    For example, on information and belief, providers began seeing a substantial number of recipients assigned annual budgets far in excess of amounts needed or historically

expended to meet their care needs.

236.    Many were under eighteen years, so that their care needs were met or subsidized through separate educational programs not funded through Medicaid.

237.    But others were adults living at home, suddenly assigned annual budgets in amounts never previously expended or required to fully meet actual needs.

238.    Arbitrary benefit levels established without meaningful reference to or reconciliation with the actual benefit amounts previously spent to meet a recipient's unchanged needs obscure the determination of actual program costs, and result in longer waiting list delays for those seeking waiver benefits.

239.    Arbitrariness also effected many adult recipients to whom the algorithm assigned budgets substantially smaller than the total benefits received and authorized in prior years as needed to meet the recipient's care needs, in the absence of any DHHR showing that those needs had significantly decreased.

240.    However, upon information and belief, between 2011 and late 2014, when the APS algorithm assigned an initial waiver benefit allotment insufficient to meet individualized needs, that recipient's service coordinator could routinely contact APS, submit documentation of unmet need and the total of expenditures authorized to meet those needs in the immediately prior year, and request authorization of additional waiver benefits, over and above the algorithm-assigned budget, so as to meet the recipient's actual needs.

241.    Prior to the fall of 2014, APS would routinely authorize benefits at the approximate level of the prior year's benefit level when these submissions showed unchanged circumstances and a continuing need for the same level of services.

242.    At one time or another, all the named plaintiffs received authorization for and waiver benefits in amounts significantly in excess of their algorithm-calculated initial waiver benefit allotment through this process.

243.    In each case, this happened because APS agreed the algorithm-assigned benefit level did not adequately cover the plaintiffs' actual need for services.

244.    However, APS's explicit authorization of continued benefits at levels of prior years, as required to serve that individual's actual needs, had no discernible impact on the initial benefit amount its algorithm spit out for that recipient the following year.

245.    For some plaintiffs therefore, this "authorization" process was a yearly event.

**G.    DHHR's New Policy**

246.    Upon information and belief, in or about the fall of 2014, DHHR officials instructed APS not to authorize any waiver benefits over and above the algorithm-set benefit level, regardless of need, amount of waiver benefits previously authorized, or the absence of proof of any meaningful change in that recipient's circumstances.

247.    As a result, the named plaintiffs and the members of the plaintiff class have unjustifiably and wrongly suffered, or are in imminent threat of unjustifiably and wrongly suffering, substantial reductions in previously-authorized waiver benefits and termination of needed services (i) without an individualized determination of need or proof of a change in circumstances as required by under the laws and rules actually governing benefit eligibility; (ii) without first being afforded the rights guaranteed them by due process and regulations governing notice and hearing rights in Medicaid programs; and (iii) in violation of their rights under the ADA and Section 504 of the Rehabilitation Act.

248.    Since then, at DHHR's direction, APS has rejected all requests to increase the algorithm-assigned benefit level, for the stated reason that "individual program budgets cannot be exceeded."

249.    Upon information and belief, pursuant to DHHR's challenged policy, on or about June 10, 2015, BMS issued a memorandum to I/DD waiver service providers who manage individual recipient IPPs and provide care to meet that individual's actual needs. The memorandum stated that DHHR would not approve *any* requests for new or additional services needed by I/DD waiver program recipients "UNTIL the cost of all services requested are at or below the individualized Waiver budget." *See* June 10, 2015 Memo from DHHR's Tanuia Hardy, attached as Exhibit 6, incorporated here by reference.

## H.    The Effect of DHHR's New Policy - The Plaintiffs

250.    Each of the named plaintiffs began their 2015 waiver budget year around or shortly after the beginning of calendar year 2015.

251.    In budget year 2014, each of the named plaintiffs were authorized by APS to receive waiver benefits in amounts substantially in excess of the 2014 algorithm-assigned benefit level, after APS agreed that level was not sufficient to meet their individual needs.

252.    APS's 2015 determinations of the amount of waiver benefits to be provided the named plaintiffs documented no significant change in the named plaintiffs' abilities, functioning level, or health or care service needs since the 2014 budget year.

253.    In truth, no meaningful improvement occurred in any of the circumstances of the named plaintiffs relevant to their physical or medical needs or the type and amount of services needed to meet those needs in the period between APS's authorization of a total benefit level for

2014 and the beginning of the 2015 budget period.

254.    Nonetheless, each of the named plaintiffs received an algorithm-assigned benefit level substantially less than the benefit level authorized by APS and received in 2014 and prior years.

255.    No explanation was provided as to how that budget was calculated or why APS reduced the amount of waiver benefits the named plaintiffs had been previously receiving. *See* notices attached as Exhibit 1.

256.    As in years past, the named plaintiffs' service coordinators independently submitted requests to restore waiver benefits in line with the benefit amounts authorized in prior years, providing documentation showing why that continuing level of benefits was necessary to meet the individual needs of the named plaintiffs.

257.    This year, APS (pursuant to DHHR's new policy) wrongly refused to restore the same level of waiver benefits previously received by the named plaintiffs, though DHHR had no proof that the named plaintiffs' actual needs or overall circumstances had changed in any significant way such that the same level of benefits were no longer needed.

258.    In fact, APS' assessment of Jeremy C. established his circumstances had significantly worsened, mitigating toward a need for additional benefits, not reduced benefits.

259.    Moreover, in implementing the new policy, DHHR and APS have failed to provide adequate prior notice and meaningful opportunity for a timely due process hearing and a decision based on the controlling law, as required by the Constitution and the fair hearing regulations of the Medicaid Act.

260.    For instance, DHHR's standard form notices to plaintiffs and the members of the

plaintiff class, exemplars of which attached here as Exhibit 1, constitute the written notice class members received that DHHR was reducing their waiver benefits below those previously authorized for and received by that person.

261.    These form notices do not explain that DHHR is actually proposing to cut the recipient's benefits; do not specify the amount of the proposed cut; do not explain the reasons for the reduction of waiver benefits or the specific laws justifying the reduction; do not explain how a person might object to the proposed reduction, or why objection might be necessary to protect the recipient's right to continue to receive needed services; do not explain the recipient's right to have benefits continue at the previously-authorized level pending any appeal, etc. *Cf, e.g.*, 42 C.F.R. §431.210; §438.404.

262.    Additionally, anecdotal reports are consistent that many family members representing waiver recipients have been dissuaded to appeal, or persuaded to drop appeals previously filed, by DHHR and/or APS representations that an unsuccessful appeal will result in loss even of the recipient's approved level of benefits.

263.    Many adult waiver recipients – especially older persons without family support – have legal guardians or Health Surrogates employed in DHHR's Office of Adult Protective Services, as overseen by APS.

264.    These appointees owe fiduciary responsibilities to the waiver recipients they represent, and are required to act and make decisions to assert and protect the best interests of their wards.

265.    However, on information and belief, the employees of DHHR's Office of Adult Protective Services acting as legal guardian or Health Surrogates for waiver recipients have been

instructed by DHHR not to object to the benefit reductions suffered by those to whom they owe fiduciary duties because of the challenged policy.

266.    Consequently, DHHR has guaranteed that waiver recipients similarly situated to plaintiff Michael T. have no meaningful ability to contest these benefit reductions.

267.    Moreover, even for those who seek administrative review, the DHHR fair hearing process for contesting these reductions is an illegal, arbitrary, and unconstitutional sham.

268.    APS, BMS, and every state actor in the appeal process, including the Board of Review, has undertaken to work in concert with DHHR to support and implement this new policy by rejecting arbitrarily any challenge to benefit reductions or terminations, based on application of the very policy being challenged, and not the laws and rules that actually govern eligibility.

269.    For instance, APS for months has been rejecting service coordinator requests to restore waiver benefits to previously received levels as required for needed services not because of a change in the recipient's circumstances or evidence of reduced need, but simply because "assigned budgets cannot be exceeded."

270.    Second level appeals to BMS disputing the benefit reductions and terminations in individually-needed services imposed by the challenged policy are likewise summarily rejected not because of a change in the recipient's circumstances or evidence of reduced need. The sole announced justification is that DHHR's policy does not allow assigned budgets to be exceeded. *See* exemplars of BMS second level decisions gathered in Exhibit 2.

271.    Waiver recipients who seek a Medicaid fair hearing within 13 days are entitled to continue to receive benefits at the previous year's level until the appeal is finished.

272.    Waiver recipients timely requesting Medicaid fair hearing on waiver benefit reduction appeals are commonly being denied those continuing benefits, so that the contested benefit cuts are imposed even when timely appeals have been filed.

273.    The West Virginia Board of Review has denied opportunity for any fair hearing at all to at least one waiver recipient contesting his benefit reduction. That recipient's appeal was summarily dismissed, the Board of Review stating it lacked power to hear it because restoring benefits would exceed the algorithm-assigned budget, and state policy was that the budget could not be exceeded. *See* April 21, 2015 Order of Dismissal, Action No. 15-BOR-1518, a true but redacted copy of which is attached as Exhibit 7, incorporated by reference.

274.    Other recipients have been granted fair hearings, and given opportunity to present evidence showing receipt of authorized waiver benefits in greater amounts in prior years, and a continuing need for that level of waiver benefits.

275.    Even though DHHR presented no proof of any meaningful change in these recipients' circumstances, or any reduction in the need for benefits at the level previously received, the Board of Review nonetheless routinely and arbitrarily rejects these appeals, without consideration of governing rules, regulations and laws, because DHHR has instructed it that "individual budgets cannot be exceeded." *See* Exhibits 3 and 4, incorporated here by reference.

276.    Each of the named plaintiffs is suffering irreparable harm and now faces a heightened risk of institutionalization as the result of DHHR's illegal, discriminatory, and unconstitutional policy that has reduced their waiver benefit levels below the amounts for which they are lawfully eligible.

277.    As a result, DHHR has failed and refused, without justification, to operate and

administer the I/DD waiver program so as to allow "the most integrated setting appropriate" to the needs of qualified individuals with disabilities.

## CLAIMS FOR RELIEF

### COUNT I
### (42 U.S.C. §1983 and Due Process)

278.    DHHR may not reduce or terminate the amount of waiver benefits provided plaintiffs and the absent members of the plaintiff without first providing adequate prior notice and opportunity for a meaningful hearing at which a decision will be rendered in conformity with the laws and regulations actually governing eligibility.

279.    DHHR may not reduce or terminate the amount of waiver benefits provided plaintiffs and the absent members of the plaintiff class unless and until DHHR first establishes that a change has occurred in the recipient's medical or financial circumstances which justifies the reduction or termination. *See, e.g., Hardy v. B.H.*, 228 W. Va. 334, 719 S.E.2d 804 (2011).

280.    DHHR must use reasonable, ascertainable, non-arbitrary standards and procedures for determining the amount of waiver benefits provided to plaintiffs and the absent members of the class, and must do so in accordance with the laws and regulations governing the waiver program.

281.    The APS benefit calculation algorithm utilizes secret, unpublished, non-legislatively adopted, arbitrary standards, factors, or other bases that fail to give required weight to an individual's actual need for waiver services, the level of benefits previously approved, the lack of any change in the recipient's circumstances, or the laws and regulations governing eligibility.

282.    Consistent with due process, DHHR may not establish, reduce or terminate the

amount of waiver benefits provided plaintiffs and the absent members of the plaintiff class based on secret, non-legislatively enacted, or arbitrary criteria.

283.   Through the actions complained of above, and by official custom and policy, DHHR has employed a secret algorithm and unpublished policy to arbitrarily, unreasonably, and unfairly deprive plaintiffs and the members of the plaintiff class of the Medicaid waiver services they need, and which they have been receiving, in the absence of proof of any relevant change in the recipient's circumstances, and without adequate prior notice or timely, meaningful hearing and a reasoned decision based on the governing law.

284.   As a result, defendant Secretary Bowling, under color of state law, custom, or usage, has subjected or caused plaintiffs and the absent members of the plaintiff class to be subjected to deprivation of rights, privileges, or immunities secured to them by the due process clause of the United States Constitution, to their continuing and irreparable injury without adequate remedy at law.

**COUNT II**
**(42 U.S.C. § 1983 and Medicaid Act Notice and Fair Hearing Requirements)**

285.   Under the federal Medicaid Act, West Virginia must afford proper, prior notice and opportunity for hearing to individuals whose claim for medical assistance is denied, reduced, terminated, or not acted upon with reasonable promptness. 42 U.S.C. § 1396a(a)(3).

286.   As set forth above, as a matter of policy and custom, DHHR has implemented and enforced the challenged policy in violation of the Medicaid Act by failing to provide proper notice, or to grant the opportunity for fair hearing as required by law, to

plaintiffs and the members of the plaintiff class whose claims for medical assistance have been denied, reduced, terminated, or not acted upon with reasonable promptness.

287.   As a result, defendant Secretary Bowling, under color of state law, custom, or usage, has subjected, or caused plaintiffs and the absent members of the plaintiff class to be subjected, to deprivation of rights, privileges, or immunities secured to them by law, to their continuing and irreparable injury without adequate remedy at law.

## COUNT III
### (Americans with Disabilities Act)

288.   Title II of the ADA, 42 U.S.C. §12132, provides:

"no qualified individual with a disability shall, by reason of disability, be excluded from any participation in or be denied the benefits of the servicers, programs, or activities of a public entity, or be subject to discrimination by such entity."

289.   Regulations implementing the ADA, including 28 C.F.R. §35.130(d), require that public entities like DHHR administer services, programs, and activities to allow "the most integrated setting appropriate" to the needs of qualified individuals with disabilities.

290.   Under §35.130(b), the following constitute unlawful acts of discrimination:

(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided

to others; . . . .

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. . . .

(5) A public entity, in the selection of procurement contractors, may not use criteria that subject qualified individuals with disabilities to discrimination on the basis of disability. . . . .

(7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

291.   In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the United States

Supreme Court held that a public entity violates the "integrated setting" mandate of

Title II when it administers programs in a way that unjustifiably results in a

heightened risk that individuals with disabilities will be forced into segregated

institutionalization.

292.   The named plaintiffs and the absent members of the plaintiff class are qualified

persons with disabilities protected against discrimination because of their disabilities

by the Americans with Disability Act.

293.   DHHR is a public entity whose operation and administration of West Virginia's

I/DD Waiver program is subject to and governed by the "integration mandate" and other requirements and prohibitions of Title II of the ADA.

294.  Through the policy and actions complained of above, DHHR has discriminated and continues to discriminate against plaintiffs and the absent members of the plaintiff class in violation of 42 U.S.C. §12132, the "most integrated setting appropriate" mandate, and other substantive requirements and prohibitions of the ADA and its implementing regulations at 28 C.F.R. §35.10, so as to unjustifiably heighten their risk of institutionalization, to their continuing and irreparable injury.

## COUNT IV
### (Section 504 of the Rehabilitation Act of 1973)

295.    The I/DD Waiver program DHHR operated in West Virginia is a "program or activity" subject to the requirements and prohibitions of Section 504 of the Rehabilitation Act of 1973. *See* 29 U.S.C. §794(b).

296. 29 U.S.C. §794(a) provides in pertinent part:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .

297.  Plaintiffs and the members of the plaintiff class are qualified individuals with disabilities entitled to the protections of Section 504, including but not limited to its similar "most integrated setting appropriate" requirement.

298.  Through the policy and actions complained of above, DHHR has discriminated and continues to discriminate against plaintiffs and the absent members of the plaintiff class in violation of 29 U.S.C. §794, the "most integrated setting appropriate" mandate, and other substantive requirements and prohibitions of Section 504 and its

implementing regulations, so as to unjustifiably heighten their risk of

institutionalization, to their continuing and irreparable injury.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a)    Appoint a guardian ad litem to represent and protect the interest of plaintiff

Michael T. during the pendency of this action;

(b)    Certify the class pursuant to Federal Rule of Civil Procedure 23(b)(2);

(c)    Declare Defendant in violation of the Constitution and federal laws as explained

above;

(d)    Issue without bond a preliminary and permanent injunction enjoining Defendant:

(i)    to restore lost benefits and to enjoin Defendant from continuing the policy

of reducing I/DD waiver program benefits to any recipient from previously authorized amounts

without due process or without DDHR's proof of a change in the individual recipient's

circumstances reducing her or his actual needs;

(ii)    from failing or refusing to provide waiver benefits at a level consistent

with the recipient's needs, as computed by a fair, public, legislatively-established, and non-

arbitrary formula complying with the law which gives appropriate weight to the recipient's

actual circumstances, needs, and previous benefit levels;

(iii) to end and prevent current and future discrimination in the administration of

DHHR's waiver program by enjoining DHHR from implementing any future reductions,

terminations, or other adverse changes in waiver program benefit levels save in conformity with

a comprehensive, publicly developed, properly implemented, and effective *Olmstead* plan

approved by this Court;

      (e)    Award plaintiffs their costs and reasonable attorney's fees in accordance with 42

U.S.C. §1988; and

      (f)    Grant such other and further relief to which plaintiffs or the class members may

be entitled in law or equity.

**MICHAEL T., by his next friend, CHERYL HERDMAN, ERIC D., by his guardian, CONNIE D., SARA F., by her guardians REBECCA F. and DAVID F., JEREMY C., by his guardian, JO C., and TARA R., by her guardian HARV CHRISTIAN R., on their own behalf and on behalf of and all other similarly situated,**
**By Counsel.**

/s/ Gary M. Smith
Gary M. Smith (WV Bar # 12602)
    gary@msjlaw.org
Lydia C. Milnes (WV Bar # 10598)
    lydia@msjlaw.org
Bren J. Pomponio (WV Bar ID # 7774)
    bren@msjlaw.org
MOUNTAIN STATE JUSTICE, INC.
1031 Quarrier St, Suite 200
Charleston, WV   25301
T:  (304) 344-3144
F:  (304) 344-3145
Counsel for Plaintiffs