IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MICHAEL T., et al.,

                            Plaintiffs,

v.                                         CIVIL ACTION NO.   2:15-cv-09655

KAREN BOWLING, in her official capacity
as Secretary of the WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES,

                            Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction.   (ECF No. 28.) For the reasons provided herein, the Court **GRANTS IN PART** Plaintiffs' Motion for Preliminary Injunction to the extent that Plaintiffs request preliminary injunctive relief pertaining to the named Plaintiffs.

### *I.  Background*

This case involves an action by recipients of West Virginia's Intellectual/Developmental Disability Home and Community Based Services waiver program (the "I/DD Waiver Program") who are challenging reductions in their benefits that began in 2015.

**A.**      **Medicaid and the I/DD Waiver Program**

"Medicaid is a cooperative federal-state program that provides health care to low-income families and individuals."   (ECF No. 54 at 7.)   "The program is administered by the States and

1

overseen by the federal Centers for Medicare & Medicaid Services . . . ."   (*Id.* at 7–8.)   "Costs of the [Medicaid] program are shared by the federal and state governments . . . ."   (ECF No. 14 ¶ 222.)   "States are not obligated to participate in the Medicaid program."   (*Id.* ¶ 223.)   "If a state chooses to participate, however, it must operate its program in compliance with federal statutory and regulatory requirements."   (*Id.*)

"West Virginia has chosen to participate in the Medicaid [p]rogram."   (*Id.* ¶ 224.)   The Bureau for Medical Services ("BMS"), a part of the West Virginia Department of Health and Human Resources, "is the state agency responsible for administering the Medicaid program in West Virginia."   (ECF No. 54 at 8.)

"Medicaid identifies certain core services that are mandatory for any participating state." (ECF No. 14 ¶ 225); *see, e.g.*, 42 U.S.C. § 1396a(a)(10)(A); 42 C.F.R. § 440.210.   "In addition, states may choose to cover federally recognized . . . optional services . . . ."   (ECF No. 14 ¶ 225.) Once a state elects to provide an optional service, it must adhere to the pertinent federal statutes and regulations.   (*See id.*)

One optional Medicaid program is "intermediate care level services for individuals with intellectual/developmental disabilities" (the "ICF/IDD Program").   (*Id.*)   The ICF/IDD Program "provides residential, health, and rehabilitative services."   (*Id.* ¶ 226.)   In other words, the ICF/IDD Program provides "[i]nstitutions for individuals with intellectual disabilities."   (ECF No. 54 at 9); *see also* 42 U.S.C. § 1396d(d) (providing that the term "intermediate care facility for the mentally retarded" means, in part, "an institution . . . for the mentally retarded or persons with related conditions if . . . the primary purpose of such institution . . . is to provide health or rehabilitative services for mentally retarded individuals").

2

"West Virginia has chosen to include" an ICF/IDD Program "in its Medicaid state plan." (ECF No. 14 ¶ 227.)   However, "West Virginia has capped the number of individuals who can receive services" through the ICF/IDD Program "at 509 since 1989."   (ECF No. 54 at 9.)

Another optional Medicaid service—which is the subject of the instant litigation—is the I/DD Waiver Program.   This program is an alternative to the ICF/IDD Program and provides home and community based services "for individuals with intellectual and developmental disabilities who would be eligible to receive care" through the ICF/IDD Program.   (ECF No. 54 at 10.)   The I/DD Waiver Program provides "an array of . . . services that an individual needs to avoid institutionalization."   42 C.F.R. § 441.300; (*see also* ECF No. 54 at 10 (providing a list of services included in the I/DD Waiver Program).)   "Many I/DD Waiver [Program] members live in the homes of family members," and "[s]ome . . . members live in an '[i]ntensively [s]upported [s]etting' . . . , which is a residential home shared by one to four . . . members."   (ECF No. 54 at 11; *see also* ECF No. 115 at 76 (providing the testimony of Patricia Nisbet, the Director of the Office of Home and Community Based Services in BMS, in which she states that "[a]pproximately 75 percent" of "waiver members live in family homes" and the remaining "[a]pproximately 25 percent" of "members live in [intensively supported settings] or group homes").)

West Virginia has included the I/DD Waiver Program in its state Medicaid plan.   (*See, e.g.*, ECF No. 14 ¶ 232; ECF No. 54 at 10.)   The I/DD Waiver Program currently "provides 4,534 . . . program . . . slots . . . for West Virginians who are eligible for and receiving community-based services."   (ECF No. 14 ¶ 238.)   There is also a waiting list of over 1,100 eligible individuals awaiting a slot in the I/DD Waiver Program.   (*Id.* ¶ 239.)

"BMS contracts with an administrative services organization, APS Healthcare Inc.," ("APS"), "to help administer the I/DD Waiver [Program]."   (ECF No. 54 at 10–11.)   Under their agreement, BMS delegates numerous tasks to APS, such as "monitoring the member's health and safety," (*id.* at 11), "[e]nsuring each [I/DD Waiver Program] participant's medical eligibility is initially established and reestablished on an annual basis," and conducting an "annual assessment of each program participant's abilities and needs," (ECF No. 28, Ex. 3 at 7).   "Waiver services are [ultimately] provided to individual recipients through contracts with local service provider agencies."   (ECF No. 14 ¶ 252.)

**B.      The Annual Authorization and Appeals Processes**

Each I/DD Waiver Program member's "annual service authorization begins with APS's calculation of the member's 'budget.'"   (ECF No. 54 at 14.)   To determine each member's budget, APS conducts an "annual assessment" for each I/DD Waiver Program participant, which includes, in part, (1) conducting an interview with members, their legal representatives, their case managers, and other interested parties, (*see* ECF No. 28, Ex. 3 at 73); and (2) "compil[ing] comprehensive data pertaining to participants' abilities, strengths, and support needs," (*id.* at 7; *see also* ECF No. 54 at 14–15 (providing Defendant's assertion that, as part of its assessment, "APS uses standard assessment tools (the Inventory for Client and Agency Planning and the Adaptive Behavior Assessment System) commonly used in other States to analyze the functionality of individuals receiving long-term supports and services")).

"APS then applies a multi-variable statistical analysis" (the "APS Algorithm"), "which it . . . conduct[s] based on data specific to West Virginia, to the results of each member's functional assessment to produce a . . . budget . . . ."   (ECF No. 54 at 15; *see also* ECF No. 14 ¶ 265 (providing

Plaintiffs' assertion that APS began using the APS Algorithm to determine individualized budgets "in or around the fall of 2011").)   The APS Algorithm is proprietary to APS and, as such, the exact factors it considers, the weight it accords to each factor, and its overall methodology in determining each member's budget are not publicly available information.   (*See, e.g.*, ECF No. 115 at 145–50; *see also id.* at 145 (providing the testimony of Patricia Nisbet, in which she states that "different variables that have been determined statistically significant" are included in the APS Algorithm, as well as the member's "age, . . . where they live, and if they're in school or not," but that she did not "know specifically" what factors are input into the APS Algorithm).)   Once APS determines each I/DD Waiver Program member's budget, it sends a letter to the member notifying them of their budget amount.   (ECF No. 54 at 15.)   Those communications do not provide any information regarding how APS reached the individualized budget determination. (*See, e.g.*, ECF No. 108, Exs. 3–4, 9, 13–14, 20.)

After the member is notified of their individualized budget, "the member's interdisciplinary team . . . meets to develop an [i]ndividualized [p]rogram [p]lan."   (ECF No. 54 at 15.  *See generally* ECF No. 51, Ex. 1 ¶ 19 (stating that the interdisciplinary team "includes the member and a representative from the provider agency, and it may also include the member's guardian(s) and health care professionals").)   "In creating [the plan], the interdisciplinary team considers the array of services available through the I/DD Waiver Program, and creates a plan detailing the amount of each type of service needed to meet that recipient's individually-assessed safety, health, and care needs."   (ECF No. 14 ¶ 257; *see also* ECF No. 54 at 15 (stating that the individual member's plan "details" the "member's care needs, how much of each waiver service the member will purchase, and the schedule for receiving those services").)   The interdisciplinary

team "has wide discretion in how it chooses to allocate funding" to various available services. (ECF No. 54 at 15.)

Once the individualized program plan "is complete, APS reviews the [plan] to ensure it complies with BMS policies and addresses the member's health and safety and the provider agency requests APS approval of the service levels in the [plan]." (*Id.* at 16.) "If the service costs in the [plan] are within the APS-calculated budget and otherwise comply with [the pertinent] policies, APS will approve service authorization requests consistent with the [plan]." (*Id.*)

The impetus for the present action is what occurs if the individualized program plan submitted by the member's interdisciplinary team exceeds the member's APS-determined budget. If the interdisciplinary team "determines funding in excess of the APS-calculated budget is necessary, the service coordinator submits requests for authorization of services to APS that exceed[] the budget." (ECF No. 51, Ex. 1 ¶ 21.) Prior to September 2014, APS made independent determinations to grant or deny these requests for funds in excess of the budget and "routinely approved" such "service authorization requests." (*Id.* ¶ 22; *see, e.g.*, ECF No. 14 ¶ 272 ("Prior to the fall of 2014, APS routinely authorized additional benefits to reinstate the approximate level of the prior year's benefit level when submissions showed unchanged circumstances and a recipient's continuing need for the same level of services."). *See generally* ECF No. 115 at 195 (providing the testimony of Patricia Nisbet, in which she states that "APS was still approving some people in 24-hour settings over the budget" until March 2015).)

In September 2014, employees of BMS discovered that the I/DD Waiver Program was exceeding its budget, (ECF No. 115 at 94–96), and that APS was "approving" individualized plans "with service costs in excess of the budgets," (ECF No. 51, Ex. 1 ¶ 22.) BMS then "instructed

APS to cease unilaterally approving" plans "with service costs that exceeded the APS-calculated budget." (*Id.*) "From that point forward, all requests for service funding in excess of the APS-calculated budget were required to be approved" by BMS, (*id.*), through a "second level negotiation," (*id.* ¶ 21. *See generally id.* (providing Patricia Nisbet's statement that, "[i]f BMS determines that funding in excess of the budget is necessary to protect the member's health and safety in the community, it will authorize service costs in excess of the member's APS-calculated budget")). At this second-level negotiation, employees of BMS review the member's file, any materials attached to the request for additional funds, a recommendation from APS, and, if requested, meets with the member or other interested parties and then makes the determination whether to grant or deny the request for funding. (*See* ECF No. 115 at 88–89.)

"[I]n calendar year 2014, 1,962 I/DD Waiver [Program] members were approved for funding for services in excess of their APS-calculated budgets." (ECF No. 51, Ex. 1 ¶ 23.) However, "[i]n calendar year 2015," a significantly smaller number of individuals—466 members—"were approved for funding for services in excess of their APS-assigned" budgets. (*Id.*)

If BMS denies the request for funding in excess of the budget at the second-level stage, it sends the member "a denial notice with appeal rights." (ECF No. 54 at 16.) The waiver member may then request a "fair hearing" before the state Board of Review to appeal the second-level denial of additional funds. (*See* ECF No. 115 at 91–92; *see also* ECF No. 54 at 16 ("A [s]tate [h]earing [o]fficer hears all appeals).) At the fair hearing, BMS and the I/DD Waiver Program member present arguments and, potentially, documentation supporting their respective positions. (*See* ECF No. 115 at 92–94.) Following the fair hearing, the state hearing officer will issue their

decision either affirming or reversing BMS's second-level determination.   (*See id.* at 94.)   If the member is dissatisfied with the state hearing officer's decision, their final direct appeal option is to a state circuit court.   (*Id.*)

## C.   The Named Plaintiffs

Prior to 2015, APS granted Plaintiffs' requests for funding in excess of their individualized budgets.   (*See, e.g.*, ECF No. 51, Ex. 1 ¶¶ 27, 35, 43, 52, 63.)   However, following BMS's decision to make these second-level determinations in the fall of 2014, BMS denied Plaintiffs' requests for funding that exceeded their budgets.   (*See, e.g.*, *id.* ¶¶ 31–32, 38–39, 45–46, 54–55, 65–66.)   These denials resulted in substantial decreases from 2014 to 2015 in the total benefits Plaintiffs received through the I/DD Waiver Program, even though Plaintiffs' need for services did not diminish during this time period.   (*See, e.g.*, *id.* ¶¶ 27–32, 35–39, 43–46, 52–55, 63–66.) This lower funding correspondingly results in a reduction of the services Plaintiffs can purchase. (*See, e.g.*, ECF No. 30, Ex. 1 ¶ 36; *id.*, Ex. 2 ¶¶ 53–57; *id.*, Ex. 3 ¶¶ 47, 57–60; *id.*, Ex. 4 ¶¶ 39, 43–44.)

All of the named Plaintiffs appealed BMS's adverse second-level decisions to the fair-hearing stage.   (*See, e.g.*, ECF No. 51, Ex. 1 ¶¶ 33, 40, 47, 56, 68.)   As of the preliminary injunction hearing in this case, most of the named Plaintiffs were still receiving their pre-reduction benefit levels because they were awaiting a final determination at the fair-hearing stage.   (*See, e.g.*, ECF No. 30, Ex. 1 ¶¶ 44–45; *id.*, Ex. 3 ¶ 62; ECF No. 51, Ex. 1 ¶¶ 68–69.)

Plaintiffs Sara F. and Tara R. are the only named Plaintiffs who were able to complete the fair-hearing stage.   (*See* ECF No. 30, Ex. 2 ¶ 52; *id.*, Ex. 4 ¶ 42.)   Both of these Plaintiffs received an adverse decision from the state hearing officer.   (*See, e.g.*, *id.*, Ex. 2 ¶ 52; *id.*, Ex. 4 ¶ 42.)

8

Plaintiff Sara F. now receives her current, lower benefits level.   (*See, e.g.*, *id.*, Ex. 2 ¶¶ 53–57; ECF No. 51, Ex. 1 ¶¶ 47–48.)   Plaintiff Tara R. would have similarly received her lower benefits level.   However, subsequent to her fair-hearing decision, Plaintiff Tara R. moved from her home-based setting into an intensively supportive setting, which requires more funding.   (*See, e.g.*, ECF No. 30, Ex. 4 ¶¶ 43–50.   *See generally* ECF No. 51, Ex. 1 ¶ 58 (noting that the "natural support[] from her father and stepmother are" no longer available to Tara R. with her "move to an" intensively supportive setting).)   As such, Plaintiff Tara R.'s APS-calculated budget for fiscal year 2016 is greater than the amount she received prior to 2015, but she no longer lives with her family. (*See, e.g.*, ECF No. 51, Ex. 1 ¶¶ 52, 58–59.)

## D.       Procedural Posture

On September 28, 2015, Plaintiffs filed the operative First Amended Complaint for Injunctive and Declaratory Relief (the "Complaint").   (ECF No. 14.)   The Complaint includes allegations on behalf of a purported class of similarly-situated plaintiffs.   (*See, e.g.*, *id.* ¶¶ 210–21.)   The Complaint includes the following claims: (1) Count I—a Section 1983 due process claim under the Fourteenth Amendment, (*see id.* ¶¶ 315–22); (2) Count II—a Section 1983 claim alleging that Defendant violated the Medicaid Act notice and fair hearing requirements, (*see id.* ¶¶ 323–25); (3) Count III—a claim that Defendant violated the Americans with Disabilities Act, (*see id.* ¶¶ 326–32); and (4) Count IV—a claim that Defendant violated Section 504 of the Rehabilitation Act of 1973, (*see id.* ¶¶ 333–36).   Plaintiffs request in the Complaint that the Court certify a plaintiff class, grant preliminary and permanent injunctive relief, and award Plaintiffs attorney's fees and costs.   (*See id.* at 59–60.)

On November 12, 2015, Plaintiffs filed their Motion for Preliminary Injunction. (ECF No. 28.) Defendant filed her opposition to this motion on January 8, 2016, (ECF No. 54), and Plaintiffs filed their reply in support of this motion on January 25, 2016, (ECF No. 66).[1] Subsequently, on March 11, 2016, the Court held a hearing on Plaintiffs' Motion for Preliminary Injunction during which both parties had the opportunity to present testimony and enter exhibits into the record.[2]  (*See* ECF No. 98; *see also* ECF No. 115 (constituting the transcript of the March 11, 2016 hearing).)  As such, Plaintiffs' Motion for Preliminary Injunction has been fully briefed and argued by the parties and is ready for disposition.

## II.  Legal Standard

"Rule 65 of the Federal Rules of Civil Procedure provides for the issuance of preliminary injunctions as a means of preventing harm to one or more of the parties before the court can fully

---

[1] By its order entered on December 14, 2015, the Court extended the deadline for Defendant to file her opposition to Plaintiffs' Motion for Preliminary injunction to January 8, 2016.  (ECF No. 46.)  Similarly, by its order entered on January 14, 2016, the Court extended the deadline for Plaintiffs to file their reply in support of this motion to January 25, 2016.  (ECF No. 57.)  As such, both Defendant's opposition brief and Plaintiffs' reply brief were timely filed.

[2] The Court **DENIES AS MOOT** Plaintiffs' Motion to Strike, (ECF No. 94), and Defendant's Motion to Quash Subpoena, (ECF No. 96), as the parties withdrew both of these motions during the March 11, 2016 preliminary injunction hearing.  The Court further **DENIES AS MOOT** Defendant's Motion to Dismiss Plaintiffs' Complaint, which Defendant filed prior to Plaintiffs filing the currently operative Complaint.  (ECF No. 10.)

Additionally, for good cause shown, the Court **GRANTS** Plaintiffs' November 12, 2015 Motions for Leave to File under Seal, (ECF Nos. 24 & 30), and **GRANTS IN PART** Defendant's January 8, 2016 Motion for Leave to File under Seal, (ECF No. 51) to the extent that the Declaration and Addendum contain protected health and other confidential information of the Plaintiffs. Within Exhibit 2, Ms. Nisbet's Declaration, pages one through nine shall be made public, (ECF No. 51-1 at 1–9, ¶¶ 1–24). These paragraphs include information regarding public services and information available through the West Virginia Department of Health and Human Resources. Additionally, they address certain processes and data that do not involve Plaintiffs' information. The rest of Exhibit 2, which deals with specific Plaintiffs and their confidential information, shall remain filed under seal, (ECF No. 51-1 at 9–20, ¶¶ 25–70). Furthermore, pages 142–4 of the Addendum to the Declaration shall be made public, (ECF No. 51-2 at 154–6). These pages include a blank hearing request form and general instructions, and none of Plaintiffs' information is compromised by releasing these pages. The rest of the Addendum contains records, letters, and notes, relating to specific Plaintiffs and shall remain under seal, (ECF No. 51-2 at 1–153). For these reasons, the Court **ORDERS** the Clerk to **UNSEAL** and **DOCKET** pages 1–9, ¶¶ 1–24, of Exhibit 2 (Nisbet Declaration), and pages 142–4 of its Addendum, attached to Defendant's January 8, 2016 Motion for Leave to File under Seal, (ECF No. 51-1 at 1–9, ¶¶ 1–24; ECF No. 51-2 at 154–6).

Finally, the Court notes that Plaintiffs' Motion for Class Certification, (ECF No. 26), and Defendant's Motion to Dismiss Counts III and IV and to Dismiss the Claims of Plaintiffs Michael T. and Eric D., (ECF No. 16), are both fully briefed.  However, the Court shall not rule on these two motions in the instant opinion.

adjudicate the claims in dispute." *Fred Hutchinson Cancer Research Ctr. v. BioPet Vet Lab, Inc.*, 768 F. Supp. 2d 872, 874 (E.D. Va. 2011). "A preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial." *Real Truth About Obama, Inc. v. FEC* (*Real Truth I*), 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010), *reissued as to Parts I & II*, *Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010). "The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."[3] *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to

---

[3] The parties disagree as to whether Plaintiffs request a prohibitory or mandatory preliminary injunction. (*See* ECF No. 54 at 18; ECF No. 66 at 3.) "A preliminary injunction may be characterized as being either prohibitory or mandatory." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014). "[A] preliminary injunction's tendency to preserve the status quo determines whether it is prohibitory or mandatory." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).

"Mandatory injunctive relief . . . alters the status quo by commanding or requiring a party to perform a positive act." *Perry v. Judd*, 840 F. Supp. 2d 945, 950 (E.D. Va. 2012). "Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) (citation omitted).

On the other hand, "[p]rohibitory preliminary injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *Pashby*, 709 F.3d at 319. "The status quo to be preserved by a preliminary injunction . . . is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the 'last uncontested status between the parties which preceded the controversy.'" *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (quoting *Stemple v. Bd. of Educ. of Prince George's Cty.*, 623, F.2d 893, 898 (4th Cir. 1980)). "'To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions,' but . . . '[s]uch an injunction restores, rather than disturbs, the status quo ante.'" *Id.* (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004)). "Thus, courts of equity have long issued preliminary injunctions requiring parties to *restore* the status quo ante." *O Centro*, 389 F.3d at 1013 (citations omitted).

In this case, Plaintiffs do not seek to alter the status quo, but, rather, to restore the status quo present prior to Defendant's alteration to the second-level approval procedures in the fall of 2014. (*See, e.g.*, ECF No. 14 at 59–60.) As Plaintiffs seek only to restore the status quo to the last uncontested status between the parties which preceded the instant controversy, the Court finds that Plaintiffs seek a prohibitory injunction. *See, e.g.*, *Aggarao*, 675 F.3d at 378. The Court shall therefore employ the standard applicable to prohibitory injunctions when addressing Plaintiffs' Motion for Preliminary Injunction.

preserve the relative positions of the parties until a trial on the merits can be held."). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395. "A party thus is not required to prove his case in full at a preliminary-injunction hearing[,] and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id.* (citations omitted).

"The Supreme Court established the standard for imposing a preliminary injunction in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 . . . (2008)." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). "That case requires parties seeking preliminary injunctions to demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." *Id.* (citing *Winter*, 555 U.S. at 20). "[C]ourts considering whether to impose preliminary injunctions must separately consider each *Winter* factor," *Id.* at 320, and "[a]ll four elements must be established by a 'clear showing' before the injunction will issue," *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 868 (S.D. W. Va. 2014) (quoting *Real Truth I*, 575 F.3d at 346). "The party seeking the injunction bears the burden of providing a sufficient factual basis" for issuance of an injunction "by offering some proof beyond the unverified allegations in the pleadings." *Id.* at 868–69 (citations omitted). *See generally G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016) ("[A]dmissible evidence may be more persuasive than inadmissible evidence in the preliminary injunction context . . . ."); *Imagine Medispa*, 999 F. Supp. 2d at 869 ("[T]he weight to be accorded affidavit testimony is within the

12

discretion of the court, and statements based on belief rather than personal knowledge may be discounted." (citation omitted)).  Preliminary injunctions involve "the exercise of very far-reaching power" and are "to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).

## III. Discussion

Plaintiffs argue that each of the *Winter* factors are satisfied in this case and request that the Court enter preliminary injunctive relief.  (*See* ECF No. 29 at 17–44; ECF No. 66.)  Defendant, for her part, contests each of the *Winter* factors.  (*See* ECF No. 54 at 18–41.)  For the reasons that follow, the Court finds that each of the *Winter* factors weighs in favor of granting a preliminary injunction in this matter.[4]

---

[4] The Court notes that, while not addressed by the parties, this case potentially raises a ripeness issue insofar as Plaintiffs have not completed the full four-step administrative process to challenge their benefits determinations.  In particular, while all Plaintiffs challenged BMS's second-level determination, (*see, e.g.*, ECF No. 51, Ex. 1 ¶¶ 33, 40, 47, 56, 68), only Plaintiffs Sara F. and Tara R. have received a decision following a fair hearing, (*see* ECF No. 30, Ex. 2 ¶ 52; *id.*, Ex. 4 ¶ 42).  The remaining Plaintiffs are still awaiting their fair hearing and currently receive their previous, higher benefits levels.  (*See, e.g.*, *id.*, Ex. 1 ¶¶ 44–45; *id.*, Ex. 3 ¶ 62; ECF No. 51, Ex. 1 ¶¶ 68–69.)  Additionally, the record does not reflect that any Plaintiffs have appealed an adverse fair-hearing decision to the final appeals step before a state circuit court.

Of course, "[a] plaintiff . . . lacks standing if his claim is not ripe."  *Pashby v. Delia*, 709 F.3d 307, 317 (4th Cir. 2013); *cf. Prestera Ctr. for Mental Health Servs., Inc. v. Lawton*, 111 F. Supp. 2d 768, 782 (S.D. W. Va. 2000) (stating that the Fourth Circuit "has held that there is no requirement for exhaustion of state administrative remedies in Medicaid suits brought under § 1983" (citing *Talbot v. Lucy Corr Nursing Home*, 118 F.3d 215, 220 (4th Cir. 1997))).  "The ripeness doctrine aims to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'"  *Pashby*, 709 F.3d at 317 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'"  *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)).

"In determining ripeness, we balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration."  *Id.* (citation omitted); *cf. Pashby*, 709 F.3d at 317 ("For a claim to be ripe, 'it must involve an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties.'" (alteration in original) (quoting *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 665 (4th Cir. 1997))).  "The fitness prong prevents a court from considering a controversy until it is presented in 'clean and concrete form.'"  *King v. Sebelius*, 997 F. Supp. 2d 415, 424–25 (E.D. Va. 2014) (quoting *Doe*, 713 F.3d at 758).  "The hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiff."  *Id.* (citing *Doe*, 713 F.3d at 758).  "In considering the hardship to be balanced against the fitness of the issues for review, [courts] may consider the cost to the plaintiff of delaying review."  *Doe*, 713 F.3d at 759 (citation omitted).

### A.    Likelihood of Success on the Merits

Under the first *Winter* factor, "plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Although this inquiry requires plaintiffs seeking injunctions to make a clear showing that they are likely to succeed at trial, plaintiffs need not show a certainty of success." *Id.* (citations omitted). Nonetheless, "[m]erely showing that 'grave or serious questions are presented for litigation' will not suffice." *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 871 (S.D. W. Va. 2014) (quoting *Real Truth I*, 575 F.3d 342, 346–47 (4th Cir. 2009)).

Plaintiffs argue that they are likely to succeed on the merits on each of their four counts in the Complaint. (*See* ECF No. 29 at 17–42.) For purposes of the instant opinion, the Court shall focus on Plaintiffs' claim under 42 U.S.C. § 1983 that Defendant violated Plaintiffs' procedural due process rights by employing the APS Algorithm when determining Plaintiffs' benefits. (*See, e.g.*, *id.* at 25; *see also* ECF No. 14 ¶¶ 315–322.)

---

In the present case, Plaintiffs are challenging Defendant's current benefits-determination process, including Defendant's decision in the fall of 2014 to place the second-level negotiation authority in BMS and the subsequent denial of Plaintiffs' requests for additional benefits at this stage. (*See* ECF No. 14 ¶¶ 315–36 (providing Plaintiffs' due process, Medicaid Act, Americans with Disabilities Act, and Rehabilitation Act of 1973 claims in the Amended Complaint).) While none of the named Plaintiffs have completed the full four-stage administrative appeal process and most Plaintiffs still receive their pre-reduction budgets, Defendant has nonetheless made its determinations that Plaintiffs' benefits will be reduced and Plaintiffs face the imminent threat of reduced budgets. *Cf. Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (stating that "[a]n allegation of future injury may suffice" to satisfy the "injury in fact" requirement of standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur" (citation omitted)). Furthermore, if Plaintiffs waited until after the reductions in benefits went into effect, they would face reduced services and potentially institutionalization while the litigation proceeded. (*See, e.g.*, ECF No. 30, Ex. 1 ¶¶ 40–51; *id.*, Ex. 2 ¶¶ 53–65; *id.*, Ex. 3 ¶¶ 47, 56–66; *id.*, Ex. 4 ¶¶ 39–49; ECF No. 51, Ex. 1 ¶¶ 63–66.) As Defendant has made the relevant determinations at the second-level stage and Plaintiffs face the real risk of imminent potential hardship, the Court finds that this matter satisfies the ripeness requirement. *See, e.g.*, *Pashby*, 709 F.3d at 317 (finding that the plaintiffs' claims were ripe and the plaintiffs had standing where the plaintiffs contested a particular policy of the North Carolina Department of Health and Human Services, "which [was] certainly a formalized administrative decision with concrete effects").

"Section 1983 is a codification of § 1 of the Civil Rights Act of 1871," *Kalina v. Fletcher*, 522 U.S. 118, 123 (1997), and provides the following, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.   "To remedy ongoing violations of federal law, § 1983 permits an individual to obtain injunctive relief under *Ex parte Young*, 209 U.S. 123 . . . (1908)." *Pressley Ridge Sch., Inc. v. Stottlemyer*, 947 F. Supp. 929, 938 (S.D. W. Va. 1996) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72 n.16 (1996)).   "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "To maintain a § 1983 action, [a plaintiff] must show that: (1) he has been deprived of a right secured by the Constitution and the laws of the United States, and (2) that the defendants deprived him of this right while acting under 'color of any [law].'" *Tincher v. Fink*, No. Civ. A. 2:03-0030, 2005 WL 1845319, at *3 (S.D. W. Va. Aug. 2, 2005) (second alteration in original) (citation omitted); *see also Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997) ("Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law.").   It is uncontested in this action that Defendant acted under color of law when determining Plaintiffs' funding level for their I/DD Waiver Program benefits.   As such, the focus of the instant query is whether Defendant deprived Plaintiffs of their procedural due process rights when employing the APS Algorithm in determining Plaintiffs' budgets.

15

The Fourteenth Amendment to the United States Constitution provides, in pertinent part, that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "In order to state a claim for a violation of due process, 'a plaintiff must allege sufficient facts to support a finding that the [plaintiff was] deprived of life, liberty, or property, by government action.'" *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 79 (4th Cir. 2016) (alteration in original) (quoting *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011)); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."). "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citation omitted). "Only after finding the deprivation of a protected interest do [courts] look to see if the State's procedures comport with due process." *Id.* (citation omitted).

"Property interests, of course, are not created by the Constitution." *Roth*, 408 U.S. at 577. "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* "For a property interest in a certain government benefit, 'a person must have more than an abstract need or desire for it.'" *Kerr*, 824 F.3d at 79 (quoting *Mallette v. Arlington Cty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996)). "He must have more than a unilateral expectation of it." *Roth*, 408 U.S. at 577. "He must, instead, have a legitimate claim of entitlement to it." *Id.* "It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily

16

lives, reliance that must not be arbitrarily undermined."   *Id.*

The Supreme Court has found that public assistance "benefits are a matter of statutory entitlement for persons qualified to receive them" and "[t]heir termination involves state action that adjudicates important rights."   *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *see also K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 972 (9th Cir. 2015) ("It is well settled that a person can have a property interest in continuing to receive government benefits." (citations omitted)).   "Such entitlements are appropriately treated as a form of 'property' protected by the Due Process Clause . . . ."   *Atkins v. Parker*, 472 U.S. 115, 128 (1985).

In this case, it is uncontested that Plaintiffs qualify for benefits through the I/DD Waiver Program.   The Court therefore finds that Plaintiffs have a protected property interest in continuing to receive those benefits.   *See, e.g.*, *Roth*, 408 U.S. at 576 ("[A] person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process." (citing *Goldberg*, 397 U.S. 254)).   "Thus, Plaintiffs can prevail on this claim if they can demonstrate that they have been denied due process."   *Mayer v. Wing*, 922 F. Supp. 902, 910 (S.D.N.Y. 1996).

"For procedural due process claims, 'the deprivation by state action of a constitutionally protected interest in life, liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*.'"   *Kerr*, 824 F.3d at 80 (alteration in original) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). "Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate."   *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 149 (4th Cir. 2014) (citing *Zinermon*, 494 U.S. at

125).  "Procedural due process is simply a guarantee of fair procedures—typically notice and an opportunity to be heard."  *Mora v. City of Gaithersburg, Md.*, 519 F.3d 216, 230 (4th Cir. 2008) (citations omitted); *see, e.g.*, *Snider Int'l Corp.*, 739 F.3d at 146 ("At bottom, procedural due process requires fair notice of impending state action and an opportunity to be heard." (citations omitted)).  "Above that threshold, due process has no fixed content; it is 'flexible and calls for such procedural protections as the particular situation demands.'"  *Mallette*, 91 F.3d at 640 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  "What process is warranted in a given case depends on the balancing of," *id.*, the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976) (citing *Goldberg*, 397 U.S. at 263–71).

In the instant matter, it is undisputed that Plaintiffs are intellectually or developmentally disabled individuals and some of the most vulnerable members of society.  If Plaintiffs do not receive sufficient funding through the I/DD Waiver Program, they may receive inadequate medical and other services and potentially face the risk of institutionalization.  The Court therefore finds that the private interest of Plaintiffs in receiving appropriate benefits is both substantial and self-evident.  *Cf. Mallette*, 91 F.3d at 640 (noting that "the strength of an incapacitated employee's interest in retirement disability benefits is self-evident").

As to the second *Matthews* factor, the procedures currently employed by Defendant present a serious risk of erroneous deprivations of Plaintiffs' interest in their benefits.  The APS Algorithm that ultimately determines waiver recipient's individualized budgets is proprietary to

18

APS, so the factors incorporated into the APS Algorithm, the weight accorded to each factor, and the methodology of calculating each recipient's benefits is unclear.   (*See, e.g.*, ECF No. 115 at 150.)   The record reflects only that the APS Algorithm determines individualized budgets for waiver recipients based on "assessment tools," "answers to questions" by waiver recipients and their guardians, and "a statistical analysis of services used by waiver members with similar characteristics in 2010."   (ECF No. 101 ¶ 6; *see also id.* ¶ 7 (providing that the "contract between the State and APS contemplates that APS will develop the 'process for independently assessing . . . needs and determining a budget' using the assessment tools," as well as "'[a] process to determine a waiver service allowance allocated to the member' (i.e., the budget) for purchasing waiver services that 'takes into account the service and the supports that will be needed by the member'" (alteration in original)); ECF No. 54, Ex. 2 ¶ 16 (providing the declaration of Patricia Nisbet, in which she states that the individualized budget is "based on the member's functionality and family supports" and "standard assessment tools," to which APS then "applies an algorithm . . . based on data specific to West Virginia").)   The record does not indicate what specifically is included in either the "assessment tools" or the "statistical analysis."   Patricia Nisbet—the Director of the Office of Home and Community Based Services in BMS—testified that "different variables that have been determined statistically significant" are included in this "computer mathematical equation," as well as the recipient's "age, . . . where they live, and if they're in school or not."   (ECF No. 115 at 145.)   Again, however, the record does not provide what these "statistically significant" variables include, and Ms. Nisbet testified that she does not "know specifically" what factors are incorporated into the APS Algorithm.   (*Id.*; *see also id.* at 83 (providing Ms. Nisbet's testimony that she is aware of "a very broad overview" of the APS

Algorithm, "but [she] do[es] not know the individual variables and how they are weighted").)

The Court concludes that the APS Algorithm used by Defendant when determining Plaintiffs' individualized budgets does not employ ascertainable standards.   The record provides no information as to what factors are incorporated into the APS Algorithm, how each factor is weighted, or the overarching methodology APS utilizes in the APS Algorithm to create each I/DD Waiver Program member's individualized budget.   In short, there is simply no way to determine how the APS Algorithm generates each waiver recipient's individualized budget.   Further, absent some indication of the basis for each Plaintiffs' benefits determination, Plaintiffs cannot meaningfully challenge this determination.   Indeed, in the letters APS sends to recipients notifying them of their individualized budget, APS provides only the budget amounts and does not include any individualized rationale for the recipient's budget allocation.   (*See, e.g.*, ECF No. 108, Exs. 3–4, 9, 13–14, 20.)   Thus, Plaintiffs have a high likelihood of success in demonstrating that these budget determinations by APS present a serious risk of resulting in erroneous determinations and deprivations of Plaintiffs' property interest in their benefits.   *See, e.g.*, *Prestera Ctr. for Mental Health Servs., Inc. v. Lawton*, 111 F. Supp. 2d 768, 779 (S.D. W. Va. 2000) ("Due process further requires that decisions regarding entitlements to government benefits must be made according to 'ascertainable standards' that are applied in a rational and consistent manner." (quoting *Pressley Ridge Sch., Inc. v. Stottlemyer*, 947 F. Supp. 929, 940 (S.D. W. Va. 1996))); *M.A. v. Norwood*, 133 F. Supp. 3d 1093, 1098 (N.D. Ill. 2015) ("To ensure fairness and to prevent arbitrary decision making, due process requires eligibility for government assistance programs to be determined according to articulated standards." (citations omitted)).

Defendant nonetheless argues that the procedures utilized subsequent to the individualized

budget determination provide adequate procedures under the Due Process Clause.   In particular, Defendant asserts that, if a benefits recipient challenges their budget determination, Defendant "will make exceptions" and increase a recipient's budget "where additional services are necessary to keep individuals safe and healthy in the community, and out of institutions."[5]   (ECF No. 101, Ex. 1 ¶ 8; *see also* ECF No. 54, Ex. 2 ¶ 21 (providing the declaration of Patricia Nisbet, in which she states that "[i]f BMS determines that funding in excess of the budget is necessary to protect the member's health and safety in the community, it will authorize service costs in excess of the member's APS-calculated budget").)

However, the record does not support Defendant's assertion that, in practice, BMS follows this approach at the second-level stage.   For example, the policy manual for the I/DD Waiver Program provides that recipients must purchase services within the budget.   (*See, e.g.*, ECF No. 115 at 138 (providing the testimony of Patricia Nisbet that it is "in every single definition of every single service in our manual . . . that services have to be purchased within the assessed budget"); ECF No. 14, Ex. 1 at 23 (constituting the March 9, 2015 Decision of State Hearing Officer for Tara R. at the fair hearing stage, in which the officer states that "pursuant to policy, the amount of services . . . cannot exceed the member's individualized budget").)   The record also includes evidence that BMS rejects any requests for funding beyond an individual recipient's budget unless there is a change in the recipient's need for benefits that occurs *after* APS makes the budget determination.   (ECF No. 14, Ex. 1 at 20–24 (constituting the March 9, 2015 decision of the state

---

5 Following the evidentiary hearing, Defendant filed a Motion for Leave to File the Declaration of Cynthia Bean. (ECF No. 101.)   The Court notes that this motion was untimely for the reasons more fully stated on the record during the March 11, 2016 hearing.   Nonetheless, as discussed herein, the evidence presented in this declaration does not alter the Court's determination regarding Plaintiffs' likelihood of success on their procedural due process claim, as it relates to the APS Algorithm.   The Court therefore **GRANTS** Defendant's Motion for Leave to File the Declaration of Cynthia Bean.   (*Id.*)

hearing officer following Tara R.'s fair hearing in which the hearing officer upheld BMS's decision to deny Tara R.'s request for additional funds and states that "[p]olicy provides that an individual's annual budget can be adjusted (increased or decreased), however, budget modifications can only occur if there is a change in the individual's assessed needs"); ECF No. 108, Ex. 8 at 3 (providing the April 1, 2015 decision of the state hearing officer following Sara F.'s fair hearing in which the hearing officer (1) states that "without a documented change in [Sara F.'s] assessed needs, her individualized budget cannot be exceeded;" and (2) upheld BMS's determination on the basis that "the information submitted failed to support a change in [Sara F.'s] assessed needs").)

Furthermore, in letters sent to some Plaintiffs notifying them of the denial of their request for additional benefits at the second-level stage, BMS provides only one reason for the denial of Plaintiffs' request for additional funds—that the request would exceed Plaintiffs' individualized budget.  (*See* ECF No. 14, Ex. 1 at 7 (providing the April 15, 2015 letter from BMS denying Eric D.'s second-level request for additional funds); *id.* at 11 (constituting the January 9, 2015 letter from BMS denying Sara F.'s second-level request for additional funding); ECF No. 108, Ex. 16 (providing the March 16, 2015 letter from BMS denying Jeremy C.'s second-level request for additional funds); *see also* ECF No. 14, Ex. 1 at 39 (constituting an April 21, 2015 order of dismissal from a state hearing officer of the West Virginia Department of Health and Human Resources Board of Review regarding an individual who is not a named Plaintiff, in which the hearing officer states that, under "West Virginia Medicaid Policy §§ 513.9.10.1 and 513.9.8.1," the "amount of service is limited by the member's individualized budget," "the issue being appealed is the member's desire for more services than [the individual's] annual budgetary services

units," and this issue "is one of policy, which the Board of Review has no authority to change");
*cf.* ECF No. 108, Ex. 19 (providing a February 17, 2016 letter from BMS to an unnamed recipient
in which BMS states that the reason for its denial of additional funding is that the recipient's
"assessed annual budget would have been exceeded or has been exceeded, and you have not shown
that funds in excess of the budget are necessary to ensure your health and safety in the
community"); ECF No. 107, Ex. 7 ¶¶ 32, 39, 46, 55, 66 (providing the declaration of Patricia
Nisbet, in which she states that BMS denied the requests for additional funding from Plaintiffs
"because the request[s] required funding for services in excess of the APS-calculated budget" and
"the additional funding was not necessary to purchase clinically appropriate services required to
ensure [Plaintiffs'] health and safety in the community").)    This evidence indicates
that—regardless of whether Defendant has a stated policy to increase benefits at the second-level
review stage to keep individuals safe and healthy in the community—Defendant nonetheless
eschews this policy in favor of affirming the recipient's budget, as determined by the APS
Algorithm.[6]

    To be clear, the Court is not stating that the substance of the benefits determinations for
Plaintiffs is impermissible under the Due Process Clause.   However, in the present case, the lack
of transparency surrounding the proprietary APS Algorithm renders Defendant's individualized

----

[6] During the preliminary injunction hearing on March 11, 2016, Patricia Nisbet testified that BMS has been affirmed
at "everyone one" of the fair-hearing appeals during the 2015-2016 fiscal year.   (*See* ECF No. 115 at 187–88.)   Based
on the record available in this case, this outcome is not surprising.   In particular, the available decisions by the Board
of Review following fair hearings indicate that if BMS denies a recipient's request for additional funds at the second-
level review, the Board of Review will affirm this decision so long as the recipient's needs did not change following
the budget determination.   (*See, e.g.*, ECF No. 14, Ex. 1 at 16 & 23.)   Additionally, during a fair hearing on
November 4, 2015, counsel for Defendant asserted that the Board of Review did not have the authority, as a matter of
"policy," to "look behind . . . the actual establishment or approval of the individual budget allocation because that is
something that's solely the responsibility of . . . BMS."   (ECF No. 23, Ex. 3 at 70.)   In short, if BMS denies a
recipient's request for additional funding in excess of the budget and the recipient does not have a subsequent change
in need for services, the recipient has little to no likelihood of success at the fair hearing stage.

budget determinations potentially—if not effectively—standardless. Such a potentially rudderless determination creates a high risk of arbitrary and erroneous benefits determinations and, as such, is impermissible under the Due Process Clause. *See, e.g.*, *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 792 (2005) (Stevens, J., dissenting) ("At the very least, due process requires that the relevant state decisionmaker *listen* to the claimant and then *apply the relevant criteria* in reaching his decision. The failure to observe these minimal procedural safeguards creates an unacceptable risk of arbitrary and 'erroneous deprivation[s].'" (alteration in original) (quoting *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976))).

Turning to the third *Matthews* factor—"the government's interest and the additional burdens that [an alternative] process would entail," *Richardson v. Town of Eastover*, 922 F.2d 1152, 1161 (4th Cir. 1991)—there is little evidence in the record that Defendant would face any form of undue burden by employing ascertainable standards when determining each waiver recipient's budget. Undoubtedly, the State of West Virginia currently faces challenging financial times. (*See, e.g.*, ECF No. 112, Ex. 1 at 39.) However, the record does not reflect that remedying the procedural deficiencies embodied in the APS Algorithm by providing ascertainable standards in making the individualized budget determinations would impose any form of increased fiscal or administrative burden on Defendant or the State of West Virginia.[7] The Court therefore finds that Defendant does not have a legitimate interest in continuing to use the APS Algorithm, rather than

---

[7] The Court recognizes that the immediate effect of remedying Defendant's deficient procedures will have an impact on the budget allocations for Plaintiffs. Nonetheless, that impact will be short-lived and only survive until the procedures comply with the requirements of the Due Process Clause.

In an unrelated section of her briefing, Defendant also asserts that Plaintiffs' requested injunctive relief "would fundamentally alter the I/DD Waiver [P]rogram" by "transform[ing] the program into one in which the waiver members are entitled to whatever service funding is requested by the member and the IDT." (ECF No. 54 at 35–36.) However, the Court's instant opinion addresses only the procedures utilized by Defendant when creating individualized budgets and, in particular, the APS Algorithm. This opinion has no bearing on the substance of Defendant's ultimate budget determinations, nor does it divest Defendant of the authority to make this determination.

an alternative process that employs ascertainable standards and, as such, complies with the Due Process Clause.

For these reasons, the Court finds that each of the *Matthews* factors weighs in favor of a finding that Defendant's procedures in utilizing the APS Algorithm do not satisfy the requirements of procedural due process. The Court therefore finds that Plaintiffs have made a sufficient showing that they have a high likelihood of success in their claim that Defendant infringed on their procedural due process rights by employing the APS Algorithm to determine Plaintiffs' individualized budgets. The Court now turns to the remaining preliminary injunction factors.

**B.    Likelihood of Irreparable Harm**

To receive a preliminary injunction, Plaintiffs must next demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). *See generally Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 872 (S.D. W. Va. 2014) ("As a general matter, temporary, episodic injuries that can be compensated by the award of money damages are not considered irreparable harms." (citing *A Helping Hand, LLC v. Balt. Cty.*, 355 F. App'x 773, 776 (4th Cir. 2009))). In the context of public assistance benefits, "beneficiaries . . . may demonstrate a risk of irreparable injury by showing that enforcement of a . . . rule may deny them needed medical care." *Pashby v. Delia*, 709 F.3d 307, 329 (4th Cir. 2013) (citation omitted). Additionally, "numerous federal courts have recognized that the reduction or elimination of public medical benefits irreparably harms the participants in the programs being cut." *Peter B. v. Sanford*, Civil Action No. 6:10–767–JMC–BHH, 2010 WL 5912259, at *9 (D.S.C. Nov. 24, 2010) (collecting cases). "In other words, institutionalization, as a result of a denial of benefits, constitutes, legally speaking, the kind of

harm which equitable relief is suited to enjoin." *Id.*; *see also M.R. v. Dreyfus*, 697 F.3d 706, 729 (9th Cir. 2011) (finding that a regulation that "reduc[ed] the number of compensated hours of assistance" for an individual with "numerous mental and physical disabilities" would "exacerbate" the "risk of institutionalization" and "therefore inflicts cognizable irreparable injury for purposes of a preliminary injunction").

In the present matter, the parties submitted contradictory evidence on the issue of whether Plaintiffs are likely to suffer irreparable harm if they do not receive preliminary injunctive relief. Plaintiffs submitted detailed factual declarations from Plaintiffs' parents describing the limitations faced by each Plaintiff and the reasons why Plaintiffs' current budgets based on the APS Algorithm will deprive Plaintiffs of needed services and create a risk of institutionalization.[8]   (*See* ECF No. 30, Exs. 1–4.)   Additionally, during the preliminary injunction hearing, parents of two Plaintiffs provided testimony supporting these assertions.   (*See* ECF No. 115 at 9–17, 27–34, 37–44, 55–57.)

Defendant, for her part, submitted the declaration of Patricia Nisbet—the Director of the Office of Home and Community Based Services in BMS.   (*See* ECF No. 51.)   In this declaration, Ms. Nisbet describes in fairly general terms why each Plaintiff did not require additional funds beyond their APS-determined budget to remain safe and healthy in the community.   (*See* ECF No. 51, Ex. 1 ¶¶ 31–32, 38–39, 45–46, 54–55, 65–66.)   Ms. Nisbet also provided testimony during the preliminary injunction hearing, in which she asserted in broad terms the bases for Defendant's decision to deny Plaintiffs' requests for additional funds.   (*See* ECF No. 115 at 99–104, 113–16.)

---

[8] The Court notes that Plaintiffs did not submit a declaration from a parent or caregiver for Plaintiff Michael T. However, it is uncontested that Michael T. will receive substantially less funding under Defendant's current policy, which will correlate into an alteration to the services he may purchase.   (*See, e.g.*, ECF No. 51, Ex. 1 ¶¶ 63–66.)

At this preliminary stage, the Court finds that Plaintiffs' claims regarding the likelihood of irreparable harm are more credible for three reasons.   First, Plaintiffs' allegations that they require services above their individualized-budget amounts to stay healthy and safe in the community are supported by APS's repeated decisions—prior to the fall of 2014 when Defendant withdrew APS's second-level decision-making authority—to grant Plaintiffs' requests for funding above their budgets.   (*See, e.g.*, ECF No. 115 at 94–97 (providing the hearing testimony of Patricia Nisbet, in which she notes that, prior to the fall of 2014, APS "approved services, the cost of which exceeded a member's budget").)   The Court finds that these prior determinations by APS—which Defendant hired to assist in making individualized-need determinations—provide substantial support in favor of Plaintiffs' arguments regarding the likelihood of irreparable harm.   (*See, e.g.*, ECF No. 115 at 182–85 (providing the hearing testimony of Patricia Nisbet, in which she states that, prior to 2015, Defendant "delegate[d]" the authority to APS to approve funds above the individualized budgets); *cf.* ECF No. 101, Ex. 1 ¶ 12 (providing the declaration of Cynthia Beane, the Acting Commissioner of BMS, in which she states that she does "not believe that APS's approval of requests for services in excess of the budget reflected a determination by APS that those services were, in fact, necessary to keep the waiver member safe and healthy in the community").   *See generally id.* ¶¶ 6–8 (providing Ms. Beane's description of the contract between West Virginia and APS).)

Second, Plaintiffs' declarations and oral testimony are based on the daily, first-hand knowledge of caregivers for Plaintiffs.   By comparison, Defendant's contrary evidence is based on an administrative review of Plaintiffs' files and, potentially, discussions with interested parties, and *not* the reviewer's personal, daily interaction with Plaintiffs.   (*See, e.g.*, ECF No. 115 at 89

(providing the hearing testimony of Patricia Nisbet, in which she describes the materials BMS reviews when making the second-level determination).)  At the present preliminary injunction stage, the Court shall accord greater weight to Plaintiffs' evidence based on first-hand knowledge and experience.  *Cf. Imagine Medispa*, 999 F. Supp. 2d at 869 ("[T]he weight to be accorded affidavit testimony is within the discretion of the court, and statements based on belief rather than personal knowledge may be discounted." (citation omitted)); *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001) ("[A]ffidavits based on personal knowledge are accorded more weight than affidavits based upon mere belief or hearsay." (citation omitted)).

Finally, the Court heard testimony from two parents of named Plaintiffs during the preliminary injunction hearing, as well as testimony from Patricia Nisbet on behalf of Defendant. For purposes of the instant motion, the Court finds that Plaintiffs' testimonial evidence on the issue of likelihood of irreparable harm is more credible than Ms. Nisbet's testimony based on the first-hand and intensely personal experiences of the parents.  *See generally Sunoco, Inc. (R & M) v. LSAA, Inc.*, No. 3:05CV239-MU, 2005 WL 2076442, at *4 n.5 (W.D.N.C. Aug. 26, 2005) ("When ruling upon a motion for preliminary injunction, the court may make credibility determinations with regard to the witnesses." (citation omitted)); 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2949 (3d ed.) ("If there is a factual controversy, . . . oral testimony is preferable to affidavits because of the opportunity it provides to observe the demeanor of the witnesses."). As such, the Court finds that the testimonial evidence during the hearing favors Plaintiffs' assertions regarding the likelihood of irreparable harm.

For these reasons, the Court finds that Plaintiffs have demonstrated that Defendant's second-level denial of funds above each Plaintiff's individualized budget may deprive Plaintiffs

of needed services and, potentially, result in institutionalization.  The Court therefore finds that Plaintiffs have adequately demonstrated that they are likely to suffer irreparable harm in the absence of preliminary relief.

## C.    The Balance of Hardships

Plaintiffs must also demonstrate "that the balance of equities tips in [their] favor" to obtain a preliminary injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

Defendant argues that "[r]everting back to . . . 2014 service authorization levels would" impose a burden on taxpayers and harm the I/DD Waiver Program by threatening West Virginia's "ability to continue to offer" enrollment to eligible individuals.  (ECF No. 54 at 40.)  Plaintiffs, in turn, argue that they are "the neediest, most vulnerable of West Virginia's citizens" who are currently denied the support they require and "[v]ague fiscal complaints" do not outweigh the hardships faced by Plaintiffs.  (ECF No. 29 at 43.)  The Court agrees with Plaintiffs' position.

As discussed at length above, Plaintiffs have adequately demonstrated that their current individualized budgets deprive them of needed services and create the potential for institutionalization.  While Defendant notes that increasing Plaintiffs' budgets to their pre-2015 levels may impose a financial burden on taxpayers and the I/DD Waiver Program, West Virginia's "financial problems [do] not outweigh [Plaintiffs'] health concerns even when the state's financial situation threaten[s] to cause the end of other Medicaid services."  *Pashby v. Delia*, 709 F.3d 307, 329 (4th Cir. 2013) (citation omitted); *see also M.R. v. Dreyfus*, 697 F.3d 706, 737 (9th Cir. 2011)

("[T]he balance of hardships favors beneficiaries of public assistance who may be forced to do without needed medical services over a state concerned with conserving scarce resources." (citation omitted)).   West Virginia "is free to exercise its considered judgment and reduce" I/DD Waiver Program benefits, but "it may not do so for purely budgetary reasons."   *Pashby*, 709 F.3d at 329 (citation omitted).

The Court is certainly sympathetic to the State's current budgetary woes.   Nonetheless, Plaintiffs are some of the most vulnerable members of society and the reduction in their services corresponding to their reduced individualized budgets must outweigh the State's financial considerations.[9]   *See id.*   The Court therefore finds that the harm to Plaintiffs' health and safety outweighs West Virginia's financial concerns.   Accordingly, the Court finds that Plaintiffs have demonstrated that the balance of the hardships weighs in favor of preliminary injunctive relief.

## D.     The Public Interest

Finally, Plaintiffs must demonstrate that the "injunction is in the public interest" to obtain preliminary injunctive relief.   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."   *Id.* at 24 (quoting *Weinberger v. Romero-Barcelo*, 465 U.S. 305, 312 (1982)).

This case presents conflicting public-interest considerations.   On the one hand, "there is a robust public interest in safeguarding access to health care for those eligible for Medicaid."

---

[9] Defendants also argue that "[r]everting to 2014 service authorization levels would . . . hurt the hundreds of waiver members who are currently authorized for funding that exceeds the funding for which they were authorized in 2014." (ECF No. 54 at 40.)   However, the instant preliminary injunction analysis pertains solely to the named Plaintiffs and any forthcoming injunctive relief would apply only to these individuals.   As such, those waiver recipients whose funding was increased between 2014 and 2015 would not be impacted by such a preliminary injunction.

30

*Pashby*, 709 F.3d at 330 (citation omitted).   On the other hand, "[f]ederalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities."   *Horne v. Flores*, 557 U.S. 433, 448 (2009).   "State and local governments have limited funds" and "[w]hen a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs."   *Id.* (citation omitted).

Nonetheless, "[s]tate budgetary concerns cannot . . . be the conclusive factor in decisions regarding Medicaid."   *Pashby*, 709 F.3d at 331 (alterations in original) (quoting *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009), *vacated and remanded on other grounds*, 132 S. Ct. 1204 (2012)).   When faced with these competing public interest considerations in a similar Medicaid case, the Fourth Circuit found that the public interest weighed in favor of safeguarding the public health over a state's fiscal considerations.   *See id.* ("Although we understand that the North Carolina legislature must make difficult decisions in an imperfect fiscal climate, the public interest in this case lies with safeguarding public health rather than with assuaging North Carolina's budgetary woes.").   The Court similarly finds that the public interest in safeguarding Plaintiff's access to healthcare and needed services outweighs West Virginia's fiscal considerations, as well as the corresponding federalism interests.   Accordingly, the Court finds that Plaintiffs have demonstrated that the public interest factor weighs in favor of preliminary injunctive relief.

In summary, the Court finds that Plaintiffs have demonstrated that they are likely to succeed on the merits of their procedural due process claim relating to the APS Algorithm, they are likely to suffer irreparable harm, the balance of hardships tips in their favor, and a preliminary injunction is in the public interest.   The Court therefore finds that Plaintiffs have satisfied each of

the requirements for a preliminary injunction, *see Winter*, 555 U.S. at 20 (citations omitted), and this extraordinary equitable relief is warranted in this case.[10]

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** Plaintiff's Motion for Preliminary Injunction, (ECF No. 28), to the extent Plaintiffs request a preliminary injunction restoring the named Plaintiffs' 2014 individualized waiver benefits.[11]  Accordingly, the Court **PRELIMINARILY ENJOINS AND ORDERS** Defendant to reinstate the named Plaintiffs' individualized I/DD Waiver Program budgets to the amounts Plaintiffs received in 2014, but only for those Plaintiffs that received a reduction in their individualized budgets after 2014.   The Court **ORDERS** that this preliminary injunction shall remain in force and effect pending the outcome of this action.

Further, for the reasons stated in footnote 1, the Court **ORDERS** the Clerk to **UNSEAL** and **DOCKET** the following pages within Exhibit 2 (Nisbet Declaration) and its Addendum

---

[10] As the Court finds that a preliminary injunction is warranted in this case, the final outstanding issue is the determination of the appropriate bond.  Federal Rule of Civil Procedure 65(c) provides, in pertinent part, that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (citations omitted).

In the present matter, Plaintiffs request that the Court waive the Rule 65(c) bond requirement.  (ECF No. 29 at 44–45.)  It is uncontested that Plaintiffs are some of the most vulnerable members of society who qualify for and receive benefits under the I/DD Waiver Program.  Additionally, Defendant does not challenge Plaintiffs' request for the Court to waive this requirement.

Given these circumstances and the public interest in favor of a preliminary injunction, the Court finds that it is appropriate to waive the Rule 65(c) bond requirement for the present equitable relief.  Accordingly, the Court **ORDERS** that the Rule 65(c) bond requirement is **WAIVED** as to the preliminary injunction provided herein.

[11] Plaintiffs also request that the Court grant "class-wide preliminary injunctive relief."  (ECF No. 29.)  In conjunction with this request, Plaintiffs filed a Motion for Class Certification.  (ECF No. 26.)  However, in the instant opinion, the Court only addresses the merits of preliminary injunctive relief as to the named Plaintiffs and does not reach Plaintiffs' Motion for Class Certification, nor Plaintiffs' request for class-wide injunctive relief.

attached to Defendant's January 8, 2016 Motion for Leave to File under Seal: ECF No. 51-1 at 1–9, ¶¶ 1–24; ECF No. 51-2 at 154–6.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.


ENTER:          September 13, 2016


_____

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE


33