# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

MICHAEL T., et al.,

               Plaintiffs,

v.                                     CIVIL ACTION NO.  2:15-cv-09655

BILL J. CROUCH, in his official capacity
as Secretary of the WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES,

               Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Motion to Vacate or Modify Preliminary Injunction Order.  (ECF No. 155.)  For the reasons stated herein, the Court **GRANTS IN PART** the motion to the extent Defendant requests that the Court modify its previous memorandum opinion and order entered on September 13, 2016, to lift the injunction and allow DHHR to begin implementing the proposed service authorization system as to the named Plaintiffs.

### I.  BACKGROUND[1]

Plaintiffs in this case are recipients of West Virginia's Intellectual/Developmental Disability Home and Community Based Services waiver program ("I/DD Waiver Program") and are challenging reductions in their benefits beginning in 2015.  Within West Virginia's Medicaid

---

[1] The factual and procedural backgrounds of this case were thoroughly explained in this Court's memorandum opinion and order entered on September 13, 2016.  (*See* ECF No. 122 at 1–10.)  This section summarizes the background of the parties' dispute from the Court's previous iteration.

plan, administered by the West Virginia Department of Health and Human Resources' ("DHHR") Bureau for Medical Services ("BMS"), the "intermediate care level services for individuals with intellectual/developmental disabilities" program ("ICF/IDD Program") is an included program from the federally recognized optional services. (ECF No. 14 at 36 ¶ 225.) The ICF/IDD Program provides for individuals with intellectual disabilities institutions that offer residential, health, and rehabilitative services. (*Id.* at 36–37 ¶ 226; ECF No. 54 at 9.) *See also* 42 U.S.C. § 1396d(d). In part because West Virginia has capped participation in the ICF/IDD Program at 509 individuals since 1989, (ECF No. 54 at 9), the state implements an alternative option for individuals otherwise eligible for the ICF/IDD Program to receive home and community based services instead. This alternative program—the I/DD Waiver Program—is the subject of the current litigation.

The I/DD Waiver Program provides "an array of . . . services that an individual needs to avoid institutionalization." 42 C.F.R. § 441.300. (*See also* ECF No. 54 at 10.) Many of the individuals enrolled in the program live with family members in their homes while others live in an "[i]ntensively [s]upported [s]etting," which involves one to four program members living together in a residential or group home. (*See id.* at 11; ECF No. 115 at 76.) The I/DD Waiver Program currently provides open slots for 4,534 eligible West Virginians and has a waiting list of over 1,100 eligible individuals. (ECF No. 14 at 38–39 ¶¶ 238–239; *see also* ECF No. 155-2 at 2 ¶ 2.) BMS, as the program's administrator, contracts with APS Healthcare Inc. ("APS")[2] to help administer the I/DD Waiver Program. (ECF No. 54 at 10–11.) BMS delegates various tasks to APS, including "monitoring the member's health and safety," (*id.* at 11), "[e]nsuring each [I/DD Waiver Program] participant's medical eligibility is initially established and reestablished on an

---

[2] According to the briefing, APS now operates under the corporate name Kepro. (*See* ECF No. 155-2 at 4 ¶ 7.) APS will still be named throughout this memorandum opinion and order's background section in reference to the old authorization system while Kepro will be named when referring to DHHR's newly proposed authorization system.

annual basis," and conducting an "annual assessment of each program participant's abilities and needs," (ECF No. 28-3 at 7). Contracted local service provider agencies ultimately provide individual recipients with their waiver services. (ECF No. 14 at 41 ¶ 252.)

At the time the Court issued the current injunction in this case, an I/DD Waiver Program recipient's annual service authorization began with a calculation of their individual "budget" by APS. (ECF No. 54 at 14.) APS would conduct an "annual assessment" for participants, which included, in part, an interview with program members, their legal representatives, their case managers, and other interested parties, (*see* ECF No. 38-3 at 73), and a compilation of data regarding each participant's "abilities, strengths, and support needs," (*id.* at 7; *see also* ECF No. 54 at 14–15). APS applied a proprietary algorithm to the assessment's results, producing an individual budget from a multi-variable statistical analysis. (ECF No. 54 at 15; *see also* ECF No. 14 at 43 ¶ 265.) Due to the proprietary nature of the algorithm, "the exact factors it consider[ed], the weight it accord[ed] to each factor, and its overall methodology in determining each member's budget [were] not publicly available information." (ECF No. 122 at 5 (citing ECF No. 115 at 145–50).) After a recipient's individual budget was determined, APS would send a letter to that member notifying him or her of the budget amount without explanation as to how that number was determined. (ECF No. 54 at 15; *see, e.g.*, ECF No. 108, Exs. 3, 4, 9, 13, 14, 20.)

Once notification of an individual's budget was received, the member's "interdisciplinary team" ("IDT"), consisting of the member, a representative from the provider agency, and possibly "the member's guardian(s) and health care professionals," met to create an "Individualized Program Plan" ("IPP"). (ECF No. 51-1 at 8 ¶ 19; ECF No. 54 at 15.) The IPP detailed "each type of service needed to meet that recipient's individually-assessed safety, health, and care needs." (ECF No. 14 at 42 ¶ 257; *see also* ECF No. 54 at 15.) APS reviewed the completed IPP to ensure

compliance with BMS policies, and if the costs of the requested services fell within the APS-calculated budget and complied with BMS policies, then "APS [would] approve service authorization requests consistent with the [IPP]." (ECF No. 54 at 16.)

If an IPP determined that necessary services cost in excess of the APS-determined budget, however, then "the service coordinator submit[ted] requests for authorization of services to APS . . . ." (ECF No. 51-1 at 9 ¶ 21.) Before September 2014, "APS made independent determinations to grant or deny these requests for funds in excess of the budget and 'routinely approved' such 'service authorization requests.'" (ECF No. 122 at 6 (citing ECF No. 51-1 at 9–10 ¶ 22; ECF No. 14 at 44 ¶ 272).) Once BMS discovered in September 2014 that the I/DD Waiver Program was exceeding its budget and that APS was "approving" IPPs "with service costs in excess of the budgets," (ECF No. 115 at 94–96; ECF No. 51-1 at 9 ¶ 22), BMS instructed APS to "cease unilaterally approving" IPPs that included service costs in excess of the APS-calculated budget. (*See* ECF No. 51-1 at 9 ¶ 22.) Thereafter, requests for funding in excess of the APS-calculated budget required approval by BMS through a "second[-]level negotiation." (*Id.* ¶ 21.) This second-level negotiation involved BMS employees reviewing the recipient's file, attached materials, and an APS recommendation, as well as, if requested, meeting with the recipient and interested parties before deciding whether to grant or deny the funding request.[3] (ECF No. 115 at 88–89.)

Upon denial of a request for funding in excess of the APS-calculated budget via the second-level negotiation, BMS sent the member a notice containing appeal rights. (ECF No. 54 at 16.) To exercise his or her right to appeal the second-level denial, the member could request a fair

---

[3] To highlight the effect that the second-level negotiation had on the number of approved IPPs when requested services cost more than the APS-calculated budget, Patricia Nisbet, BMS Director of the Office of Home and Community Based Services, provided in a declaration that 1,962 I/DD Waiver Program members were approved under these circumstances in 2014 while only 466 similarly were approved in 2015. (ECF No. 51-1 at 10 ¶ 23.)

hearing before West Virginia's Board of Review. (ECF No. 115 at 91–92; *see also* ECF No. 54 at 16.) The BMS and I/DD Waiver Program member could present arguments at the fair hearing as well as any supporting documentation. (*See* ECF No. 115 at 92–94.) The Board of Review then issued its decision affirming or reversing the second-level determination by BMS. (*Id.* at 94.) If dissatisfied with that decision, the member retained the option of filing a final direct appeal to a state circuit court. (*Id.*)

## II. CURRENT INJUNCTION

Before addressing the legal standard under which Defendant's motion must be analyzed, the Court first will reflect on the current injunction's purpose and the injustice that it was intended to prevent. This Court's memorandum opinion and order entered on September 13, 2016, granted Plaintiffs' request for a preliminary injunction and ordered Defendant "to reinstate the named Plaintiffs' individualized I/DD Waiver Program budgets to the amounts Plaintiffs received in 2014, but only for those Plaintiffs that received a reduction in their individualized budgets after 2014." (ECF No. 122 at 32.) In that memorandum opinion's discussion, the Court found that each of the *Winter* factors weighed in favor of granting the preliminary injunction.[4] (*See id.* at 14–32.) For the purposes of the first *Winter* factor related to whether Plaintiffs were likely to succeed on the merits, the Court focused on "Plaintiffs' claim under 42 U.S.C. § 1983 that Defendant violated Plaintiffs' procedural due process rights by employing the APS Algorithm when determining Plaintiffs' benefits." (*Id.* at 14.) The Court found that Plaintiffs have a protected property interest in continuing to receive benefits from the I/DD Waiver Program and that "the procedures currently

---

[4] As explained in the memorandum opinion, the current standard for imposing a preliminary injunction was established by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and requires a party seeking this extraordinary relief to demonstrate that "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." (ECF No. 122 at 12 (quoting *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citing *Winter*, 555 U.S. at 20)).)

employed by Defendant present a serious risk of erroneous deprivations of Plaintiffs' interest in their benefits." (*See id.* at 17–20.)

Specifically, the Court emphasized the most significant due process concerns related to the APS Algorithm in the following passage:

> The Court concludes that the APS Algorithm used by Defendant when determining Plaintiffs' individualized budgets does not employ ascertainable standards. The record provides no information as to what factors are incorporated into the APS Algorithm, how each factor is weighted, or the overarching methodology APS utilizes in the APS Algorithm to create each I/DD Waiver Program member's individualized budget. In short, there is simply no way to determine how the APS Algorithm generates each waiver recipient's individualized budget. Further, absent some indication of the basis for each Plaintiff[']s] benefits determination, Plaintiffs cannot meaningfully challenge this determination. Indeed, in the letters APS sends to recipients notifying them of their individualized budget, APS provides only the budget amounts and does not include any individualized rationale for the recipient's budget allocation. Thus, Plaintiffs have a high likelihood of success in demonstrating that these budget determinations by APS present a serious risk of resulting in erroneous determinations and deprivations of Plaintiffs' property interest in their benefits.

(*Id.* at 20.) Beyond the secrecy surrounding the APS Algorithm and its inputs, the Court also addressed concerns with the way BMS handled a recipient's challenge to his or her budget determination. (*See id.* at 20–24 ("This evidence indicates that—regardless of whether Defendant has a stated policy to increase benefits at the second-level review stage to keep individuals safe and healthy in the community—Defendant nonetheless eschews this policy in favor of affirming the recipient's budget, as determined by the APS algorithm.").) Ultimately, the Court found that "the lack of transparency surrounding the proprietary APS Algorithm renders Defendant's individualized budget determinations potentially—if not effectively—standardless." (*Id.* at 23–24.)

After finding that the procedure used by Defendant presented substantial due process concerns, the Court went on to find little evidence "that Defendant would face any form of undue

burden by employing ascertainable standards when determining each waiver recipient's budget" and that Defendant did not have a legitimate interest in further use of the APS Algorithm. (*Id.* at 24.) As to the remaining *Winter* factors, the Court found that (1) Plaintiffs were likely to suffer irreparable harm in the absence of an injunction, (2) "the harm to Plaintiffs' health and safety outweigh[ed] West Virginia's financial concerns," and (3) "the public interest in safeguarding Plaintiff[s'] access to healthcare and needed services outweigh[ed] West Virginia's fiscal considerations" and federalism interests. (*See id.* 25–32.) Thus, Plaintiffs adequately demonstrated a need for the preliminary injunction, and the Court ordered the extraordinary equitable relief. (*Id.* at 31–32.)

Defendant filed the current motion on May 12, 2017, based on a change in circumstances after developing a new service authorization system. (ECF No. 155.) Plaintiffs responded on May 31, 2017, pursuant to a Court order extending the deadline to file a response, (ECF No. 163), and Defendant filed his reply brief on June 7, 2017, (ECF No. 167). As such, the motion is fully briefed and ripe for adjudication.

## III. LEGAL STANDARD

The prospective features of an injunction entered by a district court may be modified under Federal Rule of Civil Procedure 60(b).[5] *See, e.g., Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 380–93 (1992); *see also Dombrowski v. Pfister*, 380 U.S. 479, 492 (1965) (citations omitted) ("[T]he settled rule of our cases is that district courts retain power to modify injunctions in light of changed circumstances."); *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 825–

---

[5] Rule 60(b) allows for relief from a judgment where "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable . . . ." Fed. R. Civ. P. 60(b)(5). As the Supreme Court noted in *Horne v. Flores*, the "[u]se of the disjunctive 'or' makes it clear that each of the provision's three grounds for relief are independently sufficient and therefore that relief may be warranted even if petitioners have not 'satisfied' the original order." 557 U.S. 433, 454 (2009). The rule also allows for relief based on "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

26, 830 (4th Cir. 2005). Pursuant to Rule 60(b)(5), which encompasses courts' "inherent authority to modify a consent decree or other injunction,"[6] *see Thompson*, 404 F.3d at 826, 830, a court may find that the injunction's purpose and prospective application may no longer be equitable given a "significant change in circumstances," whether those be factual or legal changes. *Rufo*, 502 U.S. at 380, 383 (noting that this standard is "less stringent" and "more flexible" than the Court's previous iterations of the rule for modifying injunctions). The Fourth Circuit has long held that "an injunctive order may be modified or dissolved in the discretion of the court when conditions have so changed that it is no longer needed or as to render it inequitable." *Tobin v. Alma Mills*, 192 F.2d 133, 136 (4th Cir. 1951) (citations omitted); *see also Alexander v. Britt*, 89 F.3d 194, 197 (4th Cir. 1996) ("[A] district court's task is to determine whether it remains equitable for the judgment at issue to apply prospectively and, if not, to relieve the parties of some or all of the burdens of that judgment on 'such terms as are just.'"). "A court errs when it refuses to modify an injunction or consent decree in light of such changes." *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (citation omitted); *see also Nelson v. Collins*, 700 F.2d 145, 146–47 (4th Cir. 1983) (citations omitted) ("Because the district court substantially modified the original injunction without finding that any change had occurred, we must vacate its order . . . . If the state fails to prove such changes, the original injunction may not be disturbed.").

Determining a change in circumstances necessitating relief from an existing injunction involves a flexible test, and the party seeking relief bears the burden of showing such a change.

---

[6] The Fourth Circuit noted in the following passage from *Thompson* that "[t]he hallmark of equity, of course, is its flexibility:"

> The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action. Equitable remedies must be flexible if these underlying principles are to be enforced with fairness and precision.

404 F.3d at 830 (quoting *Freeman v. Pitts*, 503 U.S. 467, 487 (1992)) (citation omitted).

*See Horne v. Flores*, 557 U.S. 433, 450 (2009). District courts consider several factors when deciding whether to modify or dissolve an injunction, including the following:

> (1) the circumstances leading to entry of the injunction and the nature of the conduct sought to be prevented; (2) the length of time since entry of the injunction; (3) whether the party subject to its terms has complied or attempted to comply in good faith with the injunction; (4) the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction; (5) whether the moving party can demonstrate a significant, unforeseen change in the facts or law and whether such changed circumstances have made compliance substantially more onerous or have made the decree unworkable; and (6) whether the objective of the decree has been achieved and whether continued enforcement would be detrimental to the public interest.

*Crutchfield v. U.S. Army Corps. of Eng'rs*, 175 F. Supp. 2d 835, 844 (E.D. Va. 2001) (citing *Alexander*, 89 F.3d at 197; *Bldg. & Constr. Trades Council of Phila. & Vicinity v. NLRB*, 64 F.3d 880, 888 (3d Cir. 1995); 42 Am. Jur. 2d § 312 (Injunctions); 12 James Wm. Moore et al., *Moore's Federal Practice* § 60.47[2][c] (3d ed. 1999)). The consideration of public interest may be heightened in cases of public institutional reform. *See Rufo*, 502 U.S. at 392; *see also Horne*, 557 U.S. at 448 ("Such litigation commonly involves areas of core state responsibility . . . . Federalism concerns are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities."). While some courts have emphasized the importance of judgment finality, most agree that this is more important in private litigation than institutional reform cases. *See* 12 James Wm. Moore et al., *Moore's Federal Practice* § 60.47[2][c] (3d ed. 2017) (collecting cases); *see also Rufo*, 502 U.S. at 381 (noting that "the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions").

The factors considered by a district court may vary depending on whether the relief sought is a complete dissolution of the injunction or only a modification of the injunction. *See* 12 James

Wm. Moore et al., *Moore's Federal Practice* § 60.47[2][c] (3d ed. 2017). For example, if a party is seeking modification of an injunction, relief may be justified on a wide variety of circumstances and should be "tailored to resolve the problems created by the change in circumstances." *Rufo*, 502 U.S. at 391. Otherwise, if a party is seeking to set aside an injunction, then it must show that the decree has served its purpose and that there is no longer any need for the injunction. *See Bd. of Educ. v. Dowell*, 498 U.S. 237, 247 (1991) (noting that a finding that the school district "was being operated in compliance with the commands of the Equal Protection Clause . . . and that it was unlikely that the school board would return to its former ways" meant that the litigation's purposes "had been fully achieved"). Notably, simple compliance with an injunction's terms, even for an extended period, is not alone sufficient to justify the injunction's termination. *See SEC v. Coldicutt*, 258 F.3d 939, 941–45 (9th Cir. 2001) (finding that nine years of full compliance with the injunction coupled with evidence that the defendant's trading licenses expired and that she had left the securities field did not amount to a change in circumstances requiring relief from the district court's injunction).

In addition to the standard set forth in subsection (5) of Rule 60(b), subsection (6) provides that the Court may grant relief for "any other reason that justifies relief." This catchall provision "may be invoked in only 'extraordinary circumstances' when the reason for relief from judgment does not fall within the list of enumerated reasons given in Rule 60(b)(1)–(5)." *Aikens v. Ingram*, 652 F.3d 496, 500 (4th Cir. 2011) (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 n.11 (1988)). "[I]t provides the court with a grand reservoir of equitable power to do justice in a particular case and vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice where relief might not be available under any other clause in 60(b)." *Compton v. Alton S.S. Co., Inc.*, 608 F.2d 96, 106–07 (4th Cir. 1979).

Pursuant to this standard, the question before the Court becomes whether the injunction entered on September 13, 2016, has outlasted its efficacy and purpose. In other words, the Court must determine whether DHHR's proposed authorization system, which the agency is prepared to begin implementing, removes the necessity for the previously ordered immediate and equitable relief.

## IV. DISCUSSION

### A. Defendant's New Proposal

Defendant has notified the Court and carefully explained in Exhibit One attached to the current motion that DHHR developed a "new service authorization system" set for implementation that it believes satisfies the Court's concerns expressed in the previous memorandum opinion and order granting the preliminary injunction. (*See* ECF No. 155-1; ECF No. 156 at 6–12.) The changes to the service authorization system include replacement of the proprietary algorithm with matrices employing a number of clearly identified variables based on a combination of a member's living situation and answers to specific questions during the member's annual assessment. (*See* ECF No. 156 at 7.) In addition to the development of this matrix model, Defendant avers that individual members will be able to review and check the accuracy of answers used in calculating where they fall within the "budget matrix." (*See id.* at 8.) Further, DHHR has updated its Budget Letter that informs members of an "individualized rationale for the recipient's budget allocation." (*Id.*) If the member believes there is a mistake in how the budget matrix was applied, then he or she may challenge the calculation first "by bringing the error to DHHR's attention," and further "by requesting a Medicaid Fair Hearing." (*Id.* at 9.) Moreover, Defendant provides that DHHR has created "a new Exceptions Process designed to evaluate and accommodate requests from individuals who believe they require services beyond what can be purchased within the budget." (*Id.*) Lastly, Defendant states that "DHHR has revised and will further clarify its policies to make

clear that services in excess of the budget can be authorized when necessary to avoid a heightened risk of institutionalization." (*Id.* at 11 (citing ECF No. 155-1 at 10–11).)

Defendant states that the newly developed service authorization process, which he insists is transparent, clear, and accurate, is based on an annual assessment conducted for each I/DD Waiver Program member. (*See* ECF No. 155-1 at 2–3.) Kepro, formerly known as APS, will meet with a member's IDT to complete an Inventory for Client and Agency Planning ("ICAP") assessment related to the member's "health, functionality, and behavior." (*Id.* at 3.) That meeting will also involve the completion of an Adaptive Behavior Assessment System II ("ABAS II") form and a "[s]tructured [i]nterview" that is "more robust and detailed" than before. (*Id.* at 3–4.) In terms of how each individual's budget will be calculated, Defendant provides the following:

1. Each year, each member receives a base budget range, determined by the member's setting;

2. Each member will receive additional funding if they exhibit one or more of the traits identified as statistically significant through a regression analysis completed by the Lewin Group.[7] This will be determined by the annual ICAP assessment responses, which is completed by Kepro at the annual assessment, with assistance from the individual's IDT Team and family. The IDT Team and the Family will have the opportunity to review the form before it is used to develop the budget.

(*Id.* at 4.)

Based on the annual assessment and taking into consideration the individual's living situation, he or she is given a base budget range.[8] (*See id.* Table 1.) Defendant states that the

---

[7] Defendant notes that the Lewin Group is a national health care consulting firm that DHHR hired "to analyze the data provided by these annual assessments and actual expenditures for each waiver member in 2016, in order to identify characteristics that are statistically significant drivers of spending." (ECF No. 156 at 6–7 (explaining that "[t]he Lewin Group determined that the statistically significant variables driving spending are: an individual's living situation; Asocial Problem Behaviors; Externalized Problem Behaviors; Adaptive Behaviors for Motor Skills; and Adaptive Behaviors for Personal Living Skills"); *see also* ECF No. 155-1 at 7–8; ECF No. 155-2 at 4 ¶ 7.)

[8] Defendant presents the following table with the currently proposed base budget ranges:

budget ranges will be "based on a matrix that will be publicly available and is easily understandable . . . ." (ECF No. 156 at 5.) The information gained during Kepro's annual assessment allows for various "add-ons" at or below designated maximum amounts within four categories: Externalized Problem Behavior; Asocial Problem Behavior; Adaptive Behavior: Motor Skills; and Adaptive Behavior: Personal Living Skills.[9] (*See* ECF No. 155-1 at 5.) "In order to

| Setting | Base Budget Ranges | Max add-ons | Total Max Budget Ranges |
|---|---|---|---|
| YOUTH (Below 18) Living at Home with Family | $29,643 - $33,081 | $18,895 | $48,538 - $51,976 |
| ADULT: Living at Home with Family | $38,283 - $44,231 | $18,895 | $57,178 - 63,126 |
| ADULT: Individual Support Setting (self-directed services) | $82,519 - $94,830 | $18,895 | $101,414 - $113,725 |
| ADULT: Waiver Group Home 4 People | $78,540 - $85,687 | $18,895 | $97,435 - $104,582 |
| ADULT: Individual Support Setting 3 People | $104,318 - $110,027 | $18,895 | $123,213 - $128,922 |
| ADULT: Individual Support Setting 2 People | $123,279 - $128,562 | $18,895 | $142,174 - $147,457 |
| ADULT: Individual Support Setting 1 Person | $176,731 - $182,507 | $18,895 | $195,626 - $200,952 |

(ECF No. 155-1 at 4.) Defendant notes that these budget ranges, in addition to the add-on values, *see infra* note 9, will be "re-base[d] . . . after the first year of implementation, and then annually or bi-annually thereafter." (*Id.* at 8.) This re-basing serves to "make the model even more accurate over time." (*Id.*)

[9] Defendant explains in Exhibit One attached to the motion how, "of the hundreds of factors [the Lewin Group] analyzed," these four variables were chosen in addition to considering a waiver member's living situation as follows:

> To develop this model, Lewin analyzed spending data collected by DHHR for the 2016 IPP year, and compared each individual's spending with that individual's setting, functionality, and behavioral information, reported through the State's yearly assessment tests. Using this data, Lewin ran several regression models to identify the variables that were statistically significant in explaining members' spending patterns across the program.

(ECF No. 155-1 at 7.) The various add-on amounts available to waiver members are denoted in the following table:

provide full and clear transparency as to how each individual's budget is calculated, DHHR plans to release the base budgets and add-on amounts on its website, along with an explanation for how the budgets are calculated . . . ."  (*Id.* at 8.)

The budget calculated by Kepro may not result in an individual's final budget if the figure is more than 20% above or below the individual's "2016 IPP year's spend."[10]  (*See id.* at 5–6.)

| Variable | Add-On Amount |
|---|---|
| **Externalized Problem Behavior** | |
| Extremely or very serious | $4,287 |
| Moderately serious or slightly serious | $2,968 |
| **Asocial Problem Behavior** | |
| Extremely or very serious | $3,840 |
| **Adaptive Behavior: Motor Skills (0-4)** | |
| Motor skills Level 1 | $1,459 |
| Motor skills Level 2 | $2,918 |
| Motor skills Level 3 | $4,377 |
| Motor skills Level 4 | $5,836 |
| **Adaptive Behavior: Personal Living Skills (0-4)** | |
| Living skills Level 1 | $1,233 |
| Living skills Level 2 | $2,466 |
| Living skills Level 3 | $3,699 |
| Living skills Level 4 | $4,932 |

(*Id.* at 5.)  Employing this chart in addition to the base budget range chart provided above, *see supra* note 8, Defendant provides the following example:

> [A]n individual who lives in a natural family setting, and exhibits "extremely serious externalized problem behavior[]," and has a "motor skills" functioning level of 4, would have a budget equal to: the base budget for living in a family home and the add-on amounts associated with "extremely serious externalized problem behavior[]" and "motor skills Level 4."  This would yield a budget range between $47,087 and $53,035.  A waiver member receiving this budget will be able to spend up to $53,035 in the waiver program, unless the member is authorized to receive additional services through the Exceptions Process . . . .

(ECF No. 156 at 7.)

The Court notes that the calculation in the above example, based on the charts provided, appears incorrect. A budget determined by "the base budget for living in a family home and the add-on amounts associated with 'extremely serious externalized problem behaviors' and 'motor skills Level 4,'" (*id.*), actually yields a budget range between $48,406 ($38,283 + $4,287 + $5,836) and $54,354 ($44,231 + $4,287 + $5,836).  The calculation in Defendant's memorandum of law mistakenly incorporates the add-on amount associated with "moderately serious or slightly serious externalized problem behavior" as opposed to "extremely serious externalized problem behavior." Nonetheless, the example illustrates how an individual's situation is used to calculate his or her base budget under the new system.

[10] Defendant provides data showing that 35.2% of the waiver population will receive budgets under the new model that are greater than 20% above their 2016 IPP spend amount.  (*See* ECF No. 155-1 at 7.)  This percentage of the population would be assigned a budget capped at 120% of their 2016 IPP spend pursuant to the stop-gain policy.

14

This "stop-loss/stop-gain policy" assigns to a member a budget that is 80% of the 2016 IPP year spend amount if the calculated budget would otherwise be less than that amount. (*See id.* at 5.) Similarly, a member's budget will be capped at 120% of the 2016 IPP year spend if the new budget calculation yields an amount higher than that. (*See id.*) The stop-loss/stop-gain policy applies year to year "so long as the member does not change his or her living setting or otherwise ha[s] a significant change in circumstances." (*Id.* at 6.) This policy takes into account the previous year's budget unlike the proprietary algorithm subject to the injunction, which Plaintiffs criticized in their First Amended Complaint ("Complaint") for "ignor[ing] the amount of benefits and services authorized and provided in the immediately preceding budget year . . . ." (*See* ECF No. 14 at 42–43 ¶¶ 262–263, 43–44 ¶¶ 268–269, 45 ¶ 275.)

Once an individual's budget is finalized either by the matrix calculation or by the stop-loss/stop-gain policy, the member will be sent a budget letter that sets out the budget amount and "a short, clear explanation for how the budget was calculated." (ECF No. 155-1 at 6; *see also* ECF No. 155-1 at 13–16; ECF No. 156 at 5 (arguing that "notices will be revised to clearly identify the factors that resulted in the individual's budget").) This budget letter will explain why a budget has changed from the prior year, if it has, and what information from the ICAP assessment led to that change. (ECF No. 155-1 at 6.) The budget letter will also explain the stop-loss/stop-gain policy if it has been applied to a particular member's budget, or it may explain why an individual has become ineligible for the policy based on a changed setting or significant change in health circumstances. (*See id.*) The budget letter will inform the individual that their ICAP assessment is with their service coordinator and that they and their guardian have the right to review that assessment and contact DHHR if they believe the budget determination is inconsistent with their

---

Conversely, the data shows that "6.8% of the population will receive budgets that are 20% or more below their 2016 spend. Any decreases in these members' budgets will be capped at 20% under the stop-loss policy." (*Id.*)

ICAP answers. (*See id.*; ECF No. 156 at 5 (noting that "waiver members, their families or guardians, and service coordinators will have an opportunity to review and confirm the information that was used in determining the budget").) DHHR will retain the ability to "immediately review . . . and correct any errors" brought to its attention by the individual if it agrees the inputs were in error. (ECF No. 155-1 at 6.) This new budget letter appears to alleviate the concerns raised in Plaintiffs' Complaint that the form "do[es] not explain that DHHR is actually cutting the recipient's benefits; do[es] not specify the amount of the proposed cut; do[es] not state the facts allegedly justifying the cuts . . . ; [and] do[es] not explain how a person might object to the proposed reduction . . . ." (ECF No. 14 at 48 ¶ 294.)

After receipt of the budget letter, the process to develop each member's IPP begins. (*See* ECF No. 155-1 at 9.) If the IPP's services are "within budget and otherwise compliant with DHHR policies," then DHHR will authorize the services developed by the IDT and/or member. (*Id.*) The IDT and member must create two IPPs if the team believes that the member needs services in excess of the calculated budget. (*See id.*) The first IPP must be within budget and compliant with DHHR policies while the second should reflect "all the services that the IDT team believes the member needs." (*Id.*) Both IPPs are submitted to Kepro, and DHHR will evaluate requests for specific services that the member may require but are unavailable within their budget. (*See id.*)

Members also may request additional services that they believe are necessary through the "exceptions process." (*See id.*; *see also id.* at 18–25; ECF No. 156 at 5 ("DHHR's waiver policy manual will be revised to clarify and explain that members may receive service[s] in excess of their budget when necessary to avoid institutionalization . . . .").) These requests "will be considered and decided by a panel of at least three individuals employed by DHHR or its contractor" with at least one individual who "will have medical training." (*See* ECF No. 155-1 at

10.) Taking into consideration whether "the services are necessary to keep the member safe and healthy in order to avoid a heightened risk of institutionalization during the IPP year," the panel will consider relevant documentation and rule on the request within fifteen days of submission. (*Id.*)

A denial in whole or in part of services requested through the "exceptions process" will result in a newly developed denial notice. (*See id.* at 27–30.) The notice includes "a specific and individualized explanation for the reason or reasons" for the denial. (*Id.* at 10.) It will detail the documentation reviewed by the panel as well as specific facts relied upon in reaching the decision. (*Id.*) If the denied services were granted during the previous IPP year, then the notice will explain why the current year's decision departs from the previous year's determination. (*See id.*) Lastly, the notice will explain to the member that he or she has a right to appeal the decision through a Medicaid Fair Hearing "and to continue to receive services at the previously-approved levels throughout the appeal process if the request for a hearing is received within 13 days of receipt" of the notice. (*Id.*; *see also id.* at 29–30.) The Medicaid Fair Hearing involves an appellate-type review by the Board of Review, which may review challenges to "an error on the ICAP answers, as input into the Kepro database," or challenges to "the [exceptions process] Panel's denial of an individual's request for additional services in excess of the budget." (*Id.* at 10.) The Board of Review only makes factual determinations; it "does not have the authority to second-guess or overturn policy judgments made by DHHR and BMS . . . ." (*Id.* at 11.)

On September 15, 2017, Defendant's counsel submitted a letter-form status report to the Court informing that DHHR is "mov[ing] ahead with implementation of this new system . . . ." (ECF No. 168.) DHHR provided the following timeline by which it plans to abide:

| Date | Action |
|---|---|
| November 15, 2017 | DHHR issues notice to the public for changes to the I/DD Waiver Policy Manual to implement the proposed new service authorization system |
| December 15, 2017 - January 31, 2018 | DHHR reviews and considers public comments |
| February 1, 2018 | DHHR finalizes and publishes changes to the I/DD Waiver Program Manual |
| February 1 - March 31, 2018 | DHHR works with KEPRO to put in place practices and procedures to implement the new service authorization system |
| April 1, 2018 | DHHR begins evaluating waiver members and calculating their service authorization levels pursuant to the new system, based on anchor dates |
| 90 days after evaluation | Waiver members begin receiving services pursuant to service authorization levels developed under the new system |
| July 1, 2018 | DHHR adds 50 new slots to the I/DD Waiver Program |

(*Id.* at 1–2.)  DHHR recognized its responsibility to continue providing the named Plaintiffs in this case their 2014 service authorization levels, if necessary, pursuant to the current injunction.  (*Id.* at 2.)

### B.   Analysis

A review of the new authorization system reveals that the proposal does not appear to suffer from similar due process infirmities and, therefore, does not promote the injustices that this Court's

injunction was designed to remedy.[11]   The Court found in its prior memorandum opinion that Plaintiffs in this case have both a substantial and self-evident private interest in receiving appropriate benefits through the I/DD Waiver Program.  (*See* ECF No. 122 at 18 (citation omitted).)  The Court further found that "the procedures currently employed by Defendant present a serious risk of erroneous deprivations of Plaintiffs' interest in their benefits" because the factors incorporated into the APS algorithm, including the weight assigned to each factor, and the methodology used in calculating benefits were unclear.  (*See id.* at 18–19 (noting that the record was absent a description of "what specifically is included in either the 'assessment tools' or the 'statistical analysis'" as well as what variables in the algorithm were "statistically significant").)

The authorization system that DHHR now proposes first assigns members a base budget range from a publicly available matrix with defined setting categories and dollar ranges based on answers provided during each member's annual assessment, where the ICAP, the ABAS II, and the structured interview are completed.  (*See* ECF No. 155-1 at 3–4.)  Then, a single dollar amount, up to $18,895, may be added to the base budget range figures according to the add-ons for which the individual qualifies.  (*See id.* at 4–5.)  The categories of available add-ons are derived from the ICAP survey and applied as needed directly based on answers provided by the member, their guardians, and the IDT.[12]   (*See id.*)  The Lewin Group chose these categories as inputs for the add-

---

[11] "[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  "The essential requirements of due process . . . are notice and an opportunity to respond."  *Id.* at 546.

[12] ICAP's website confirmed that the variables included in the add-on chart, *see supra* note 9, are part of the ICAP questionnaire and used to calculate each participant's ICAP Service Score.  *See ICAP Service Score*, Inventory for Client and Agency Planning, http://icaptool.com/icap-information/icap-service-score/ (last visited July 27, 2017).  The website provides the following as to problem behaviors, which discusses the two problem behavior categories within DHHR's "add-ons" chart:

> These four dimensions (the description of specific problem behaviors, frequency of occurrence, severity, and the usual management response by others) represent the primary bases for evaluating the effects of problem behavior on the individual, his/her peers, and his environment. This information is necessary for developing individual plans, as well as for planning service intensity. The ICAP yields normed numeric scores that vary by age for problem behaviors in three areas

ons chart based on a statistical regression analysis; these categories were determined to be the four "statistical drivers of spending" in addition to an individual's setting, which is the basis for the initial base budget range before add-ons.  (*See id.* at 8; ECF No. 156 at 6–7; ECF No. 167 at 7 n.1.)  Unlike before, members will know exactly which statistically significant variables affect their budget level and the dollar amount associated with each variable.  (*Compare* ECF No. 155-1 at 7–8 (detailing why the five variables considered in the budget determination were selected), *with* ECF No. 115 at 83 (providing Patricia Nisbet's testimony that she was unaware of the individual variables considered within the proprietary algorithm or how they were weighted).)

The funding levels denoted in the base budget matrix and the add-ons chart are ascertainable standards that provide Plaintiffs a definitive basis on which to challenge any miscalculation.  *See Prestera Ctr. for Mental Health Servs., Inc. v. Lawton*, 111 F. Supp. 2d 768, 779 (S.D. W. Va. 2000) (citations omitted) ("Due process further requires that decisions regarding entitlements to government benefits must be made according to 'ascertainable standards' that are applied in a rational and consistent manner.").  First, Plaintiffs can establish for themselves based on their setting which base budget range they are eligible to receive.  In turn, they also know how their base budget range will be affected by future setting changes.  While Plaintiffs contest the two inputs considered when determining the base budget level, (*see* ECF No. 163 at 12 ("[I]n actuality, the only individual information DHHR's base budget calculation use[s] to determine the amount of medical assistance benefits a class member will receive is the person's age and the "Setting"

---

(internalized, *externalized*, and *asocial*) as well as a total score.  Scores range from +10 (good) to -74 (extremely serious) with an average of 0 and a standard deviation of 10.

*Id.* (emphasis added).  However, the Court notes that while information is available as to how the adaptive behaviors are assigned, such as the motor skills and personal living skills categories in DHHR's "add-ons" chart, the website did not provide any information related to DHHR's four adaptive behavior sub-category breakdowns.  Presumably, DHHR itself has created the four levels within each of the two adaptive behavior categories by dividing the range of possible scores into the four separate levels, but it is unclear from the record exactly how the assigned level of each individual's adaptive behavior add-ons are determined.  Nevertheless, Plaintiffs do not raise this specific issue in the response.

category in which that person lives.")), they do not argue that they are unable to calculate their own base budget level. In other words, Plaintiffs do not appear to contest that the base budget matrix represents "ascertainable standards."

Moreover, Plaintiffs can determine via their ICAP answers how much additional funding they should be awarded based on three factors: what categories of add-ons they qualify for, the specific dollar amounts associated with each, and the maximum additional funds allowed. Put simply, each Plaintiff, along with his or her guardians and IDT, will have the ability to establish what budget range DHHR should assign before the agency puts a budget letter in the mail.[13] This is remarkably different than Plaintiffs' previous inability to predict what dollar figure would result from a seemingly arbitrary and secret proprietary algorithm for which inputs and methodologies were unknown. For these reasons, the Court does not find support for Plaintiffs' argument that the proposed system "would eschew the legislated and publicly adopted 'person-centered planning process' required by both federal and DHHR regulations, in favor of a bureaucratic construct to prevent class members from receiving Medicaid benefits in the amount, duration, and scope needed to meet their needs and achieve the purpose of the waiver program." (*Id.* at 21.) The setting is selected by the individual from various options, add-ons are determined based on the

---

[13] The Court noted in the previous footnote that the record is not clear how the adaptive behavior ICAP scores within the motor skills and personal living skills categories translate into four different levels, but the Court assumes that DHHR divides the range of possible scores into a distinct range for each of the four levels. Nevertheless, while Plaintiffs challenge the definitions of "extremely or very serious" and "moderately serious or slightly serious" within the problem behavior categories, (*see* ECF No. 163 at 21–22; *see also* ECF No. 163-6 at 2 ¶ 7 ("[T]he factors used to determine eligibility for the 'add-ons' are vague, and thus we cannot be certain that our calculations are accurate at this time. For example, we do not know how DHHR will differentiate between 'extremely or very serious' and 'moderately or slightly serious' with regard to a member's 'externalized problem behavior.'")), they do not challenge how the adaptive behavior scores from the ICAP fit into the four levels associated with motor skills adaptive behavior and personal living skill adaptive behavior. Rather, they generally challenge how the add-ons are determined. (*See* ECF No. 163 at 22 ("The 'add on' proposal does not provide 'ascertainable standards' since one must guess at the meaning and application of it to individual circumstances, and it provides no factual basis by which a recipient may judge whether their exclusion was erroneous.").) Again, Defendant states that the application of the various add-on categories is determined by the individuals' ICAP answers, (*see* ECF No. 155-1 at 4–5), and the Court is not persuaded that the add-on categories are wholly standardless like the previously used algorithm as Plaintiffs argue.

individual's specific ICAP answers, and protocols are in place for participants to register grievances or complaints regarding the way the individual budget is determined.

In addition to the procedure for initially calculating each individual's budget level, the proposed method for challenging that budget level appears to comport with the requirements of due process and affords Plaintiffs the opportunity to meaningfully challenge that determination. With regard to the authorization system subject to the Court's injunction, Defendant argued that DHHR would "'make exceptions' and increase a recipient's budget 'where additional services are necessary to keep individuals safe and health in the community, and out of institutions.'" (ECF No. 122 at 21 (citing ECF No. 101-1 at 3–4 ¶ 8; ECF No. 51-1 at 9 ¶ 21).) The Court previously found that the record and, in particular, BMS's second-level review practice did not support that assertion. (*See id.* at 21–22 (noting that the policy manual provided that recipients must purchase services within the budget and that BMS rejected any funding request beyond an assigned budget unless there was a change in circumstances occurring after the budget determination).)

Defendant now represents, and the Court finds, that the proposal remedies this defect in both form and effect. (*See* ECF No. 156 at 9–12; ECF No. 155-1 at 9–11.) Plaintiffs and their IDTs initially can challenge an assigned budget calculation based on factual discrepancies between the member's living situation, ICAP answers, and the actual variables and amounts applied in the calculation. After review of the budget letter, Plaintiffs and their representatives may contact DHHR directly with any disputes. Even beyond this initial procedure, a member requiring services outside the assigned budget may create two IPPs for submission to Kepro and evaluation by DHHR, one of which will reflect all services the individual believes is necessary regardless of the assigned budget.

Further, DHHR plans to implement a new "exceptions process" for individuals "who believe they require services beyond what can be purchased within the budget." (ECF No. 156 at 9.) A member will no longer be required to show "'a change in the recipient's need for benefits that occurs after' the individualized budget determination." (*Id.* at 10 (quoting ECF No. 122 at 21).) The standard used by the three-person exceptions panel will be whether "the services are necessary to keep the member safe and healthy in order to avoid a heightened risk of institutionalization." (*Id.*) This allows exceptions to be made on a case-by-case basis as opposed to the previous practice of not allowing exceptions if the request involved spending more than the individual's allocated budget. Plaintiffs contend that the new "exceptions process" does not allow members to obtain clinically-appropriate services that are medically necessary, (*see* ECF No. 163 at 22, 23), but this argument does not comport with a reading of DHHR's new proposal.[14] (*See* ECF No. 155-1 at 9–10 ("In determining whether to grant additional services as requested, the [exceptions] panel will apply the following standard: are the services [] necessary to keep the member safe and healthy in order to avoid a heightened risk of institutionalization during the IPP year?").) Moreover, if the panel either denies in whole or in part an individual's exceptions request, DHHR will send a revised denial letter with information regarding what documents were considered and a specific and individualized rationale for the decision. (*Compare id.* at 10–11, *with* ECF No. 108-16 (providing a 2015 notice of denial with a blanket explanation: "Your assessed annual budget would have been exceeded or has been exceeded and therefore this request is denied.").) Plaintiffs retain the ability to appeal an unfavorable decision through a Medicaid

---

[14] Plaintiffs also challenge the exceptions process on the ground that it "would *not* allow class member[s] to obtain clinically-appropriate services if doing so would exceed [] across-the-board caps imposed on class members residing in a family home." (ECF No. 163 at 23 (emphasis in original).) As Defendant notes in his memorandum of law in support of the current motion, however, these service caps are specified in DHHR's federally approved 1915(c) waiver application and "are not part of this litigation" as Plaintiffs' Complaint does not challenge them. (*See* ECF No. 156 at 12 & n.1; ECF No. 167 at 21–22 & n.6.)

Fair Hearing.  Finally, "DHHR has revised and will further clarify" policies that allow services in excess of the budget to be authorized "when necessary to avoid a heightened risk of institutionalization."  (ECF No. 156 at 11 (stating that "the Board of Review may grant *specific services* that require funding in excess of the budget if such services are necessary to avoid institutionalization" regardless of the panel's decision at the "exceptions process" stage (emphasis in original)).)

In sum, the Court is convinced that the due process injustices inherent in the old system addressed by the injunction are not repeated in DHHR's proposed authorization system.  Initial budget determinations are individualized and based on transparent and discernible standards in stark contrast to the old system.  Plaintiffs may alert DHHR directly if they notice an error in the budget calculation such as the misapplication of a particular input.  After receiving a detailed budget letter, Plaintiffs may take advantage of the exceptions process if they believe that their required services are not adequately covered by their budget.  Plaintiffs' ability to navigate the exceptions process is open and obvious on many fronts, and there is no evidence that service requests in excess of a base budget will be denied in a blanket manner as in the old system. Moreover, if Plaintiffs receive an unfavorable outcome from the panel that reviewed their case during the exceptions process, Plaintiffs may choose to appeal that decision and request a Medicaid Fair Hearing in front of the Board of Review as detailed in the updated denial notices.  The Board of Review has the authority to overturn factual determinations previously made and to grant services requiring funding beyond an individual's initial budget.  All these procedures are outlined in the letters and notices that DHHR transmits to members as well as DHHR's updated policy manual.  As such, the proposed system does not appear susceptible to the "high risk of arbitrary

and erroneous benefits determinations" that due process forbids. (*See* ECF No. 122 at 23–24 (citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 792 (2005) (Stevens, J., dissenting)).)

While Plaintiffs challenge the proposed authorization system through a due process lens at times, the majority of their response and its attached exhibits seem to dispute the impact of the dollar figures involved in the proposal. The Court understands Plaintiffs' concerns that an overhaul to the I/DD Waiver Program's budget authorization system may lead to decreased budgets for certain individuals within the program. However, the Court's decision to enjoin Defendant from using the proprietary algorithm and accompanying process did not focus on or consider the budget amounts assigned to the named Plaintiffs in 2015 versus the previous year. (*See* ECF No. 122 at 23 ("To be clear, the Court is not stating that the substance of the benefits determinations for Plaintiffs is impermissible under the Due Process Clause.").) Nor could the Court's decision take into account the dollar figures themselves because the injunction was based on Plaintiffs' likelihood of success on the merits of their procedural due process claim, which "is simply a guarantee of fair procedures—typically notice and an opportunity to be heard." *See Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008) (citations omitted); *see also Matthews v. Eldridge*, 424 U.S. 319, 335 (1976) (citation omitted). Further, the Court is convinced by Defendant's argument that the evidence proffered by Plaintiffs supporting the proposition that the new system will affect significantly and negatively the class members in this case is based partly on statistical flaws that empirical methodologies typically seek to avoid. (*See* ECF No. 167 at 20–21 n.5.)

Nevertheless, the Court emphasizes that its role in analyzing the constitutional adequacy of an institutional process is different from an evaluation of the state agency's reasons for making certain decisions. Due process in this context is concerned with the procedures and not the

substance of the state's decisions. "The quality of an agency's reasoning is decidedly not a process issue." *Lightfoot v. District of Columbia*, 448 F.3d 392, 401 (D.D.C. 2006) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50–51 (1983)). Thus, Plaintiffs' argument that the new authorization system will decrease their I/DD Waiver Program budgets across the board, (*see* ECF No. 163 at 14–15), cannot be the focus—regardless of its truth—in deciding whether to modify or vacate the current injunction, which was based in part on a finding that Plaintiffs were likely to succeed on their claim under procedural due process. As the Supreme Court emphasized in *Horne*, "structural and managerial improvements" may constitute a relevant change in circumstances for purposes of modifying or vacating an injunction because the "adopted policies . . . ameliorated or eliminated many of the most glaring inadequacies discussed by the district court." 557 U.S. at 465–66, 468 (citation omitted). Based on the new authorization system, which DHHR presumably has begun implementing with regard to the unnamed members of the class, (*see* ECF No. 168), the Court finds that the deficiencies discussed within its previous memorandum opinion and order enjoining Defendant do not exist within the new and improved authorization system.

Because the procedural due process concerns addressed by the preliminary injunction have been alleviated, it is no longer equitable based on the reasons stated in the Court's previous memorandum opinion and order to require Defendant to continue providing to the named Plaintiffs the budget amounts they received in 2014 if those Plaintiffs received a budget reduction after that year. Defendant has complied with the injunction to this point, which was put in place over one-and-a-half years ago. There is no indication that the faulty conditions of the old system will recur as the new system is in the process of being implemented for all I/DD Waiver Program members. Thus, continued enforcement of the extraordinary and prospective relief previously ordered is

against the public interest, particularly in light of the fact that continued enforcement will delay or preclude DHHR from adding new slots to the I/DD Waiver Program. (*See* ECF No. 156 at 15.) For those reasons and pursuant to Federal Rule of Civil Procedure 60(b)(5), the Court finds that Defendant has met his burden of showing a change in circumstances necessitating relief from the existing injunction, *see Horne*, 557 U.S. at 450, and grants in part Defendant's motion to modify the previous memorandum opinion and order entered on September 13, 2016, (ECF No. 122), to allow the preliminary injunction to expire for the named Plaintiffs as set forth below. *See Rufo*, 502 U.S. at 380–93; *Dombrowski*, 380 U.S. at 492; *Thompson*, 404 F.3d at 825–26, 830; *see also infra* Section V.

The Court notes that while the discussion has focused on the procedural due process infirmities in the old system—as that was the basis for the injunction—Plaintiffs also argue in the response that the preliminary injunction should remain in place because they are likely to succeed on their claims pursuant to the Americans with Disabilities Act ("ADA") and Rehabilitation Act, even under the new system. The briefing in the record regarding Plaintiffs' claims under the ADA, Rehabilitation Act, and other federal statutes and regulations only analyzes the likelihood of success on those claims under the old system that DHHR has abandoned. Consequently, the record is undeveloped as to whether it would remain equitable for the injunction to apply prospectively based on Plaintiffs' likelihood of success on the merits of their other claims. Because the Court has modified its previous memorandum opinion and order in a way that leaves the injunction in place for each named Plaintiff until an adequate annual assessment can be conducted before his or her next anchor date, *see infra* Section V, time remains for Plaintiffs to file a renewed motion for preliminary injunction, if necessary, based on the new system.

## V.  CONCLUSION

For these reasons, the Court **GRANTS IN PART** Defendant's Motion to Vacate or Modify Preliminary Injunction Order, (ECF No. 155), to the extent Defendant requests that the Court lift the injunction to allow DHHR to begin implementing the proposed service authorization system as to the named Plaintiffs.  The motion is otherwise **DENIED**.  The Court further **MODIFIES** its memorandum opinion and order entered on September 13, 2016, (ECF No. 122), as follows: the preliminary injunction will expire individually as to each named Plaintiff on the individual's first anchor date[15] following this memorandum opinion and order's entry unless the anchor date falls within ninety days of entry in which case the preliminary injunction will expire on the individual's second anchor date subsequent to this order's entry.[16]  Defendant is further **ORDERED** to provide the Court with an updated status report as to the new system's implementation within thirty days of this memorandum opinion and order's entry.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:  March 26, 2018

_____

THOMAS E. JOHNSTON, CHIEF JUDGE

---

[15] A recipient's "anchor date" is "the anniversary of that recipient's admission to the program."  (ECF No. 29 at 11.)

[16] According to Defendant's description of the new system, Kepro will conduct an annual assessment of each individual approximately ninety days before his or her anchor date.  (*See* ECF No. 155-1 at 3.)  Therefore, the nature of the expiration ensures that a named Plaintiff will continue receiving the benefits of the preliminary injunction until Kepro, the member, and his or her IDT have had adequate time to conduct the annual assessment prior to the anchor date.