**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

MICHAEL T., et al.,

                Plaintiffs,

v.                              CIVIL ACTION NO.   2:15-cv-09655

BILL J. CROUCH, in his official capacity
as Secretary of the WEST VIRGINIA
DEPARTMENT OF HEALTH AND HUMAN
RESOURCES,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 182), and Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, (ECF No. 179).   For the reasons stated herein, the Court **DENIES** Plaintiffs' motion, (ECF No. 182), and **GRANTS IN PART** and **DENIES IN PART** Defendant's motion, (ECF No. 179).

*I.     BACKGROUND*

This case has an intricate history revolving around West Virginia's Intellectual/Developmental Disability Home and Community Based Services waiver program ("I/DD Waiver Program") and benefit reductions suffered by program recipients beginning in 2015.   The West Virginia Department of Health and Human Resources' ("DHHR") Bureau for Medical Services ("BMS") administers the State's Medicaid plan, which includes the

1

"intermediate care level services for individuals with intellectual/developmental disabilities" program from the federally recognized optional services. (ECF No. 14 at 36 ¶ 225.) This program provides for individuals with intellectual disabilities institutions that offer residential, health, and rehabilitative services, (*id.* at 36–37 ¶ 226; ECF No. 54 at 9), known as Intermediate Care Facilities for Individuals with Intellectual Disabilities ("ICF/IIDs"). (ECF No. 179-2 (Nisbet Third Dec.) at 2.) *See also* 42 U.S.C. § 1396d(d). West Virginia implements an alternative option for individuals otherwise eligible for an ICF/IID to receive home- and community-based services instead because, in part, the State has capped the number of ICF/IID beds. The cap is currently set at 533, "and there are no large or state-run ICF/IIDs in West Virginia." (ECF No. 180 at 7; ECF No. 179-2 (Nisbet Third Dec.) at 3 (noting that "[a]n ICF/IID is the least common service setting for individuals with intellectual disabilities").) This alternative program—the I/DD Waiver Program—is the subject of the current litigation.

As detailed in this Court's previous memorandum opinion and orders, the I/DD Waiver Program provides "an array of . . . services that an individual needs to avoid institutionalization." 42 C.F.R. § 441.300. (*See also* ECF No. 122 at 1–10; ECF No. 170 at 1–5.) Many individuals enrolled in the program live with family members in their homes while others live in an "[i]ntensively [s]upported [s]etting," where one to four program members live together in a residential or group home. (*See* ECF No. 54 at 11; ECF No. 115 at 76.) West Virginia's I/DD Waiver Program currently provides services to 4,684 individuals while over 1,300 individuals remain on the program's waiting list. (ECF No. 179-2 (Nisbet Third Dec.) at 1 (noting that "DHHR added 50 additional slots to the program in July 2018").) BMS contracts with Kepro f/k/a APS Healthcare Inc. ("APS") to assist in the I/DD Waiver Program's administration, such

as "monitoring the member's health and safety," (ECF No. 54 at 10–11), "[e]nsuring each [I/DD Waiver Program] participant's medical eligibility is initially established and reestablished on an annual basis," and conducting an "annual assessment of each program participant's abilities and needs," (ECF No. 28-3 at 7). Local service provider agencies ultimately receive contracts to provide individual recipients with their waiver services. (ECF No. 14 at 41 ¶ 252.)

At the time Plaintiffs filed this lawsuit, an I/DD Waiver Program recipient's annual service authorization began with a calculation of their individual "budget" by APS. (ECF No. 54 at 14.) This involved the completion of an "annual assessment," which included, in part, an interview with program members, their legal representatives, their case managers, and other interested parties, (*see* ECF No. 38-3 at 73), and a compilation of data regarding each participant's "abilities, strengths, and support needs," (*id.* at 7; *see also* ECF No. 54 at 14–15). Importantly, APS applied a proprietary algorithm to the assessment's results, producing an individual budget from a multi-variable statistical analysis. (ECF No. 54 at 15; *see also* ECF No. 14 at 43 ¶ 265.) The algorithm was secret in that "the exact factors it consider[ed], the weight it accord[ed] to each factor, and its overall methodology in determining each member's budget [were] not publicly available information." (ECF No. 122 at 5 (citing ECF No. 115 at 145–50).)

After APS notified individuals—without explanation—of their budget amount, the member's "interdisciplinary team" ("IDT"), consisting of the member, a representative from the provider agency, and possibly "the member's guardian(s) and health care professionals," met to create an "Individualized Program Plan" ("IPP"). (ECF No. 51-1 at 8 ¶ 19; ECF No. 54 at 15.) The IPP detailed "each type of service needed to meet that recipient's individually-assessed

safety, health, and care needs." (ECF No. 14 at 42 ¶ 257; *see also* ECF No. 54 at 15.) If the costs of the requested services fell within the APS-calculated budget and complied with BMS policies, then "APS [would] approve service authorization requests consistent with the [IPP]." (ECF No. 54 at 16.)

Nevertheless, if a recipient's IPP resulted in the need for services costing more than the APS-determined budget, then "the service coordinator submit[ted] requests for authorization of services to APS . . . ." (ECF No. 51-1 at 9 ¶ 21.) Prior to September 2014, "APS made independent determinations to grant or deny these requests for funds in excess of the budget and 'routinely approved' such 'service authorization requests.'" (ECF No. 122 at 6 (citing ECF No. 51-1 at 9–10 ¶ 22; ECF No. 14 at 44 ¶ 272).) After BMS discovered that the I/DD Waiver Program was exceeding its budget and that APS was "approving" IPPs "with services costs in excess of the budgets," (ECF No. 115 at 94–96; ECF No. 51-1 at 9 ¶ 22), BMS instructed APS in September 2014 to "cease unilaterally approving" IPPs that included service costs in excess of the APS-calculated budget. (*See* ECF No. 51-1 at 9 ¶ 22.) Thereafter, requests for funding in excess of the APS-calculated budget required BMS approval through a "second[-]level negotiation," (*id.* ¶ 21), which involved BMS review of the recipient's file, attached materials, and an APS recommendation, as well as, if requested, a meeting with the recipient and interested parties prior to deciding whether to grant the funding request. (ECF No. 115 at 88–89.)

After denying a second-level negotiation request for funding in excess of the APS-calculated budget, BMS sent the member a notice containing appeal rights. (ECF No. 54 at 16.) To exercise the right to appeal the second-level denial, the member could request a fair hearing before the State's Board of Review. (ECF No. 115 at 91–92; *see also* ECF No. 54 at

16.)  The BMS and I/DD Waiver Program member could present arguments as well as any supporting documentation at the hearing.  (*See* ECF No. 115 at 92–94.)  The Board of Review then issued its decision affirming or reversing the second-level determination by BMS.  (*Id.* at 94.)  If dissatisfied with the decision, the member retained the option of filing a final direct appeal to a state circuit court.  (*Id.*)

The operative pleading in this action is Plaintiffs' First Amended Complaint for Injunctive and Declaratory Relief ("Complaint"), filed on September 28, 2015, which addresses the alleged infirmities within DHHR's old authorization system.[1]  (ECF No. 14.)  The Complaint includes the following four causes of action against the old system: (I) violation of procedural due process; (II) violation of the federal Medicaid Act; (III) violation of the Americans with Disabilities Act ("ADA"); and (IV) violation of the Rehabilitation Act of 1974 ("Rehab Act").  (*Id.* at 53–59 ¶¶ 315–336.)  Plaintiffs request injunctive and declaratory relief against Defendant regarding the allegedly discriminatory former system.  (*Id.* at 59–60.)

On September 13, 2016, this Court granted Plaintiffs' request for a preliminary injunction and ordered Defendant "to reinstate the named Plaintiffs' individualized I/DD Waiver Program budgets to the amounts Plaintiffs received in 2014, but only for those Plaintiffs that received a reduction in their individualized budgets after 2014."  (ECF No. 122 at 32.)  The decision was based in part on the Court's finding that Plaintiffs were likely to succeed on the merits of their "claim under 42 U.S.C. § 1983 that Defendant violated Plaintiffs' procedural due process rights by employing the APS Algorithm when determining Plaintiffs' benefits."  (*Id.* at 14; *see also* ECF No. 170 at 5–7.)

---

[1] Despite the subsequent modifications to the system challenged within the Complaint, Plaintiffs have never moved to amend the Complaint in the three years since it was filed.

Subsequent to the preliminary injunction's entry, DHHR developed a new service authorization system to ameliorate the Court's concerns regarding the previous system's constitutionality.[2]  Specifically, the new authorization system replaced the proprietary algorithm with a budget matrix employing a number of clearly identified variables based on a combination of a member's living situation and answers to specific questions during the member's annual assessment.  (*See* ECF No. 156 at 7.)  Further, DHHR updated its budget letter, created an exceptions process "designed to evaluate and accommodate requests from individuals who believe they require services beyond what can be purchased within the budget," (*id.* at 9), and refined policies "to make clear that services in excess of the budget can be authorized when necessary to avoid a heightened risk of institutionalization," (*id.* at 11 (citing ECF No. 155-1 at 10–11)).[3]

---

[2] A detailed description of the new authorization system was attached to Defendant's previously filed Motion to Vacate or Modify the Preliminary Injunction Order.  (ECF No. 155-1.)  The Court heavily relied on that description when granting Defendant's motion and modifying the preliminary injunction in this case.  (*See generally* ECF No. 170.)  In conjunction with Defendant's pending Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, Defendant filed a Statement of Undisputed Facts that relies in part on the previously filed Description of New Service Authorization Process.  (*See* ECF No. 179-1 at 13–23 ¶¶ 49–84, 24–25 ¶¶ 88–90.)

Plaintiffs now move pursuant to Federal Rule of Civil Procedure 56(c)(2) to strike the description of the new service authorization process included in Defendant's statement of facts as it allegedly constitutes inadmissible evidence.  (*See* ECF No. 184.)  They argue that the description is inadmissible hearsay as it relies on information obtained from DHHR's consultant, Lewin Group, and the record contains "no affidavit or testimony from an individual with personal knowledge affirming the information provided by Defendant's consultant, nor has Defendant presented any expert witness testimony regarding this information."  (*Id.* at 2 (citing Fed. R. Evid. 802).)  The Court agrees with Defendant that this information "could be introduced at trial through the direct testimony of an individual from the Lewin Group."  (ECF No. 191 at 3.)  *See Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (noting that on summary judgment a "court may consider materials that would themselves be admissible at trial, and the content or substance of otherwise inadmissible materials where the 'the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form'" (alteration in original) (citation omitted)).  For this reason, the Court **DENIES** the motion to strike, (ECF No. 184), and will consider, to the extent necessary, the information contained in Defendant's description of the new service authorization system.

[3] A more extensive discussion of DHHR's new authorization system is included in the Court's previous memorandum opinion and order entered on March 26, 2018.  (*See* ECF No. 170 at 11–18.)

The Court found on March 26, 2018 that "the due process injustices inherent in the old system addressed by the injunction are not repeated in DHHR's proposed authorization system." (ECF No. 170 at 24.)   The Court summarized the rationale for its conclusion in the following passage:

> Initial budget determinations are individualized and based on transparent and discernible standards in stark contrast to the old system.   Plaintiffs may alert DHHR directly if they notice an error in the budget calculation such as the misapplication of a particular input.   After receiving a detailed budget letter, Plaintiffs may take advantage of the exceptions process if they believe that their required services are not adequately covered by their budget. Plaintiffs' ability to navigate the exceptions process is open and obvious on many fronts, and there is no evidence that service requests in excess of a base budget will be denied in a blanket manner as in the old system.   Moreover, if Plaintiffs receive an unfavorable outcome from the panel that reviewed their case during the exceptions process, Plaintiffs may choose to appeal that decision and request a Medicaid Fair Hearing in front of the Board of Review as detailed in the updated denial notices.   The Board of Review has the authority to overturn factual determinations previously made and to grant services requiring funding beyond an individual's initial budget.   All these procedures are outlined in the letters and notices that DHHR transmits to members as well as DHHR's updated policy manual.   As such, the proposed system does not appear susceptible to the "high risk of arbitrary and erroneous benefits determinations" that due process forbids. (*See* ECF No. 122 at 23–24 (citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 792 (2005) (Stevens, J., dissenting)).)

(*Id.* at 24–25.)

Accordingly, the Court found that Defendant met his burden of showing a change in circumstances under Federal Rule of Civil Procedure 60(b)(5) necessitating relief from the preliminary injunction.   (*Id.* at 26–27.)   The Court modified its previous memorandum opinion and order to allow the injunction to expire individually as to each named Plaintiff on that individual's first anchor date following the order's entry unless the anchor date fell within ninety days of entry in which case the injunction would expire on the individual's second anchor date after the order's entry.   (*Id.* at 28.)   The Court held a telephonic status conference on May 7,

2018, during which it set dispositive motions deadlines for this matter. (*See* ECF Nos. 173, 174.)

On July 2, 2018, in accordance with the Amended Scheduling Order entered on May 10, 2018, (ECF No. 174), Defendant filed his Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, (ECF No. 179), and Plaintiffs filed their Motion for Partial Summary Judgment, (ECF No. 182).[4]   The parties filed responses to the cross-motions on July 31, 2018, (ECF Nos. 186, 188),[5] and replies were filed on August 15, 2018, (ECF Nos. 192, 194).   As such, the motions are fully briefed and ripe for adjudication.

## II.   *LEGAL STANDARD*

It is well settled that "[f]ederal courts have no power to hear moot cases, and . . . a case can become moot at any time . . . ."   *Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006) (citing *Mellen v. Bunting*, 327 F.3d 355, 363–64 (4th Cir. 2003)); *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 288–89 (1982).   One way in which a case can become moot is by a change in factual circumstances if the change renders the issues in the case no longer "live." *See Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (citations omitted); *see also Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) ("Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies.").   However, "[a] case is not moot . . . if a party can demonstrate

---

[4] In conjunction with Plaintiffs' motion, they filed a Motion for Leave to File Response Memorandum in Support of Partial Motion for Summary Judgment of No More than Twenty-Five Pages in Length.   (ECF No. 181.)   For good cause shown, and in accordance with Local Rule of Civil Procedure 7.1(a)(2), the Court **GRANTS** the motion and will consider Plaintiffs' supporting memorandum in full.

[5] While Plaintiffs' response to Defendant's motion is well over the page limit set forth in Local Rule of Civil Procedure 7.1(a)(2), the response was not accompanied by a motion for leave to exceed that limit.   Nevertheless, on August 8, 2018, Plaintiffs filed a Motion for Leave *Nunc Pro Tunc* to File Memorandum [sic] Forty-Five Pages in Length in Response to Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 190.)   Despite the belated filing of the motion, the **GRANTS** the motion after finding good cause and will consider Plaintiffs' response memorandum in full.

that the apparent absence of a live dispute is merely temporary abeyance of a harm that is 'capable of repetition, yet evading review.'" *Brooks*, 462 F.3d at 348 (quoting *Mellon*, 327 F.3d at 364).

If a defendant voluntarily ceases challenged conduct, the Court may nonetheless "exercise its power to enjoin the defendant from renewing the practice . . . ." *City of Mesquite*, 455 U.S. at 289. The Supreme Court has announced a "stringent" test for determining whether a defendant's voluntary conduct is sufficient to moot a case:

> A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (alteration omitted) (internal quotation marks omitted) (citations omitted); *see also Grutzmacher v. Howard Cty.*, 851 F.3d 332, 349 (4th Cir.), *cert. denied*, 138 S. Ct. 171 (2017); *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001) (noting that "defendants face a heavy burden to establish mootness in such cases because otherwise they would simply be free to return to [their] own ways after the threat of a lawsuit has passed" (internal quotation marks omitted) (citation omitted)). The Fourth Circuit has held that this burden is met and "a governmental entity's change of policy renders a challenge moot when the governmental entity 'has not asserted its right to enforce [the challenged policy] at any future time.'" *Porter v. Clarke*, 852 F.3d 358, 360, 364 (4th Cir. 2017) (alteration in original) (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir. 1989)).

The exception to the mootness doctrine, as suggested above, involves the following type of cases:

> [Those that] fall[] within a special category of disputes that are "capable of repetition" while "evading review."  A dispute falls into that category, and a case based on that dispute remains live, if "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again."

*Turner v. Rogers*, 564 U.S. 431, 439–40 (2011) (first and second alterations added) (citations omitted); *Marietta Mem'l Hosp. v. W. Va. Health Care Auth.*, No. 2:16-cv-08603, 2017 WL 5559926, at *2 (S.D. W. Va. Nov. 17, 2017).  "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alteration omitted) (internal quotation marks omitted) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)).

## III.  DISCUSSION

The Complaint challenges an allegedly "unpublished, unfiled, and unlawful policy eliminating any method of obtaining reasonable accommodation, as implemented beginning in late 2014 by defendant Secretary Bowling in her capacity as the executive head of the [DHHR]."[6]  (ECF No. 14 at 3 ¶ 10.)  That policy, detailed above and in this Court's previous memorandum opinion and orders, (*see* ECF No. 122 at 4–8; ECF No. 170 at 1–5), was the subject of the earlier preliminary injunction that has since been effectively dissolved by the Court, (*see* ECF No. 170 at 5–7, 18–28 (modifying the Court's previous ruling enjoining Defendant)).  The Plaintiffs' individual harms, as alleged in the Complaint, were directly caused by the application of the policy that went into effect in September 2014 and resulted in

---

[6] The Court entered an order on April 26, 2017 substituting the current Defendant, Bill J. Crouch, as the named Defendant in his official capacity as Secretary of DHHR after his appointment in January 2017.  (ECF No. 151.)

"massive reductions and terminations of the waiver benefits and services needed by plaintiffs and the class . . . ."   (ECF No. 14 at 5 ¶ 21.)

Defendant first argues in his motion that the old authorization system affected by the previous injunction no longer exists as of the new system's implementation and that "[t]here is no reasonable likelihood that DHHR will return to the prior system that the Plaintiffs challenge in the Amended Complaint."   (ECF No. 180 at 12.)   Defendant states that there is no plausible rationale for returning to the old system given that DHHR undertook the following steps to transition away from the old system: "significant policy work by DHHR staff; hiring an outside consultant (Lewin Group) to conduct an actuarial analysis of prior I/DD waiver funding levels; changing the I/DD Waiver Manual (subject to notice and public comment); drafting new notice documents; and extensive training for stakeholders."   (*Id.* (citing ECF No. 179-1 at 12 ¶ 47).) Thus, Defendant avers that his agency "could not undo [the new policy] as a practical matter without deploying significant resources."   (*Id.*)   This position is supported by the third declaration of Patricia Nisbet ("Ms. Nisbet"), Director of BMS, whose testimony provides that "BMS has no intention to return to its previous service authorization system and to do so would be an incredible financial and administrative burden."   (*Id.* (citing ECF No. 179-1 at 12 ¶ 47 (citing ECF No. 179-2 at 7 ¶ 17)).)

Alternatively, but related to mootness, Defendant argues that Plaintiffs' challenges to the new authorization system in the briefing are not properly before the Court as the operative Complaint "does not contain a single factual allegation relating to the new service authorization system."   (*Id.* at 13.)   According to Defendant, DHHR has begun implementing a "substantially different" system, which requires any challenge to it to take place "in a subsequent

lawsuit."  (*Id.* at 14 (citing *Valdivia v. Brown*, 956 F. Supp. 2d 1125, 1137 (E.D. Cal. 2013)).)
Ultimately, Defendant notes that while Plaintiffs had the opportunity to amend the Complaint to
give Defendant fair notice of claims related to the new authorization system, they did not do so
and cannot rely on the Complaint any longer as the system it addresses is no longer in effect.
(*Id.* at 13–14.)

Plaintiffs' response to this argument suggests that they are still suffering under the new
authorization system and that the Court is capable of granting their originally requested relief "to
require [D]efendant to return to the more ADA-compliant, less discriminatory, more
individual-need focused Medicaid waiver benefit granting processes and levels the state
provided" in 2014.  (ECF No. 188 at 5.)  Because Plaintiffs claim a continued interest in
returning the I/DD Waiver Program to its pre-September 2014 version, they argue that this case
is not moot.  (*Id.* at 6.)  Further, Plaintiffs argue that the new system "incorporated many of the
same unconstitutional practices DHHR employed at the time this action was filed" and that the
matter, therefore, is still live.[7]  (*Id.* at 7.)  They further note that this Court's most recent
memorandum opinion and order only evaluated the new authorization system through a
procedural due process lens as that was the basis for the preliminary injunction.  (*Id.*)  Thus,

---

[7] For example, Plaintiffs point to the fact that in the new system DHHR is "restrict[ing] the total Medicaid benefits
available to I[/]DD waiver recipients *as a class* to no more than the amount of waiver expenditures the state
approved in 2016 . . . ."  (ECF No. 188 at 8 (emphasis in original).)  The Court's memorandum opinion and order
enjoining Defendant from calculating the named Plaintiffs' budgets using the APS algorithm if it resulted in a
smaller budget than Plaintiffs enjoyed in 2014 focused on DHHR's policy as it existed in 2016.  Thus, Plaintiffs
argue that the old policy, as it is challenged in the Complaint, has been used, in part, to create the new authorization
system that Defendant argues cannot properly be challenged in this action.  (*See id.* at 8–9 ("Consequently, the new
system 'bakes in' injuries inflicted by the contested processes, and assures the class will continue to suffer adversely
from the consequences of those illegal practices for several years yet to come.  The continuing 'brooding presence'
of the arbitrary KEPRO algorithm, the absence of any meaningful process by which class members could seek and
obtain reasonable accommodation of DHHR budget policy to their individual needs, and the absence of adequate
notice and a meaningful opportunity to contest denial of benefits, means a new system that continues and extends
that injury does not moot the harm to the plaintiff class.").)

they argue that the class' other claims in Counts II, III, and IV of the Complaint related to Medicaid fair hearing regulations, the ADA, and the Rehab Act are not moot. (*Id.*)

In response to Ms. Nisbet's testimony that DHHR does not plan on reverting back to the old authorization system, Plaintiffs argue that her declaration "is immaterial and also entitled to no weight." (*Id.* at 9.) They aver that it "is irrelevant since the prior system continues to harm the plaintiff class, and the new system does not afford plaintiffs the relief they sought, including relief under Counts II, III, and IV of the Amended Complaint." (*Id.* at 10.) As stated by Plaintiffs, Ms. Nisbet's assertion is an attempt at avoiding judicial review and should not be considered as DHHR could easily resume the prior practice at any point in the future. (*See id.* at 10–11 ("Ms. Nisbet's position grants her neither personal knowledge of the State's future intentions nor authority to bind the future acts of BMS, DHHR, or the State of West Virginia, on any matter or in any fashion.").) As for Defendant's related but alternative argument that Plaintiffs' current claims challenging the new authorization system are not properly before the Court, Plaintiffs dispute this view on the basis that "the class members continue to suffer present, future, and collateral harm" as about ninety-two percent of the I/DD Waiver Program members continued to receive benefits under the old system at the time their response to Defendant's motion was filed. (*See id.* at 7–8.)

Defendant's reply provides that "[t]here is no dispute that Defendant is transitioning away from the service authorization system challenged in Plaintiffs' Complaint." (ECF No. 192 at 10 (citing ECF No. 189 at 27–29 ¶¶ 47–48).) He highlights testimony on the record from Cynthia Beane, BMS Commissioner, and Ms. Nisbet providing that "BMS is terminating the old system and implementing a new one." (*Id.* (citing ECF No. 155-2 at 4 ¶ 8; ECF No.

179-2 at 7 ¶ 17).)    Therefore, Defendant avers that this testimony "is sufficient to overcome the 'voluntary cessation' exception to mootness."    (*Id.* (citing *Grutzmacher*, 851 F.3d at 349).)

As a preliminary matter, the Court agrees with Defendant that *Lamar Advertising of Penn, LLC v. Town of Orchard Park*, a case from the Second Circuit, is instructive under these circumstances.    *See* 356 F.3d 365 (2d Cir. 2004).    In that case, the plaintiff advertising company filed suit challenging as unconstitutional a local ordinance that governed the erection and maintenance of signs in the town.    *Id.* at 367.    The plaintiff moved for summary judgment, but before the motion's filing, the town amended the ordinance to address some, but not all, of the plaintiff's claims.    *Id.*    The district court denied the plaintiff's motion for summary judgment and dismissed as moot those claims brought against the amended portions of the sign ordinance.    *Id.* at 367–68.    Of importance to the court, the plaintiff did not amend its complaint to lodge claims against the amended ordinance but instead relied on its previously filed complaint.    *See id.* at 368.    The Second Circuit's opinion, authored by now-Justice Sotomayor, agreed with the district court that the claims asserted against the amended ordinance were moot. *Id.*    It noted that any claims on appeal challenging the amended ordinance were "not properly before [the court] as [plaintiff] never amended its complaint below to include claims against the amended ordinance."    *Id.*; *cf. Ctr. for Individual Freedom, Inc. v. Ireland*, No. 1:08-00190, 2008 WL 4452659, at *2 (S.D. W. Va. Sept. 29, 2008) ("[T]he doctrine of mootness, to which a great deal of the parties' case law authority is directed, is not at issue here because plaintiff filed an amended complaint challenging the statutes as amended." (citation omitted)).

Similarly, in *Valdivia v. Brown*, also cited by Defendant, the State of California began enacting legislation that significantly altered its criminal justice system, including its parole

revocation system. *See* 956 F. Supp. 2d at 1126. The plaintiffs originally challenged the parole revocation system as it existed before the legislation's enactment. The district court placed emphasis on the fact that the legislation "established a fundamentally different parole system than the one that the [] plaintiffs challenged" and did not simply "tweak[] features of the then-existing system . . . ." *Id.* at 1135. The court found that "[t]he magnitude of the change [was] significant enough" that it could not "simply identify those components of the old system that recur in the new system" and that whether the new system met due process requirements "must be demonstrated in practice, without untoward judicial interference until the need for intervention is clear." *Id.* at 1136–37. For those reasons, the court held that challenges to the new system had to be addressed in a subsequent lawsuit. *See id.* at 1137.

Further, the Fourth Circuit addressed this concept of mootness just last year in *Grutzmacher*. There, the plaintiff, a former paramedic in the Howard County, Maryland Department of Fire and Rescue Services, was terminated for violating the department's code of conduct and social media guidelines via certain posts, "likes," and replies to comments made on his Facebook page. *See* 851 F.3d at 336–40. The plaintiff sued under 42 U.S.C. § 1983, arguing in part that the code of conduct and social media guidelines "violated the First Amendment by impermissibly restricting Department employees' ability to speak on matters of public concern." *Id.* at 340. Subsequent to the filing of the plaintiff's action, the department replaced the policies with revised versions, "eliminat[ing] many of the earlier version's prohibitions on Department personnel's private use of social media" and amending the code of conduct so it "did not include any of the provisions in the previous version that Plaintiff had challenged." *Id.* at 340–41.

The *Grutzmacher* Court affirmed the district court's decision granting the department's motion to dismiss, noting that the department's fire chief had submitted into evidence a sworn affidavit that he "fully intend[ed] to operate under the newly issued [policies] and d[id] not intend to re-issue the original versions." *Id.* at 349 (second alteration in original). The court "discern[ed] 'no hint' that the Department ha[d] any intention of reinstituting the prior policies" and, thus, found that the department met its "heavy burden of persuad[ing]" the court that it would not revert to the challenged policies." *Id.* (third alteration in original) (internal quotation marks omitted) (quoting *Wall*, 741 F.3d at 497 (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189)); *see also Winsness v. Yocom*, 433 F.3d 727, 736 (10th Cir. 2006) (finding that the alteration of a challenged policy, coupled with sworn testimony that the public officials would not revert to the challenged policy, rendered the plaintiff's challenge moot).

Like those cases, Plaintiffs here amended their Complaint in 2015 to lodge four counts against a policy that no longer exists. (*See* ECF No. 14.) Virtually every aspect of the system has been amended,[8] from the method used to calculate an I/DD Waiver Program member's initial budget, the budget letter notifying members of their budget with an explanation of it, and a new exceptions process. (*See* ECF No. 155-1.) As all parties are aware, DHHR has begun implementing the new system, and some waiver recipients already seem to be benefiting from it.[9]

---

[8] Plaintiffs argue that because DHHR used a figure derived from the old challenged system to initially base the budget matrix within the new system, the new system is inextricably linked with the challenged system. *See supra*, note 7. While this may bind the two systems to a small degree for the moment, DHHR "intends to rebase the budgets every few years, which will further untether the new budget matrix from services authorized under the prior system." (ECF No. 192 at 11.) Therefore, any concern associated with this link is mitigated by the DHHR's method for rebasing the budget matrix in the future.

[9] For example, according to Ms. Nisbet, as of June 29, 2018, after members began assessment under the new system, BMS "received a few requests for services in excess of the budget, and ha[d] already granted three requests for additional services" and "approved in part a fourth request for services in excess of the budget." (ECF No. 179-2 (Nisbet Third Dec.) at 6; *see also* ECF No. 192-1 (Nisbet Fourth Dec.) at 2 (reaffirming the previous declaration regarding the granting of these four exception requests).)

Since Plaintiffs received noticed of the I/DD Waiver Program's complete overhaul, however, they have not moved to amend the Complaint further.

Accordingly, Plaintiffs' Complaint cannot be construed as bringing claims against the new system as the policies involved did not exist at the time the original complaint was previously amended. As Defendant notes, the Complaint never mentions the new system or its components in the factual allegations. Similarly, Plaintiffs cannot allege violations of substantive due process or West Virginia law as they argue in response to Defendant's motion, (*see* ECF No. 188 at 34–38), as those claims are not in the Complaint either. *See Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009) ("[A] plaintiff may not raise new claims after discovery has begun without amending his complaint."); Fed. R. Civ. P. 8(a)(2) (providing that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). To sidestep this procedural problem, Plaintiffs instead attempt to simply advance the claims in the Complaint against a different set of facts than those alleged.

---

The Court further notes that on July 31, 2018, Plaintiffs filed a Motion to Strike Paragraph[s] Fifteen[ ]and Sixteen of the Third Declaration of Patricia S. Nisbet, (ECF No. 185), which contains the information quoted in the preceding paragraph. In accordance with Federal Rule of Civil Procedure 56(c)(2), Plaintiffs argue that the information is inadmissible evidence based on Ms. Nisbet's "fail[ure] to establish that she has personal knowledge about the matters to which she avers" because she "does not identify any personal involvement with the individual cases that she references." (*Id.* at 2–3 (citing Fed. R. Evid. 602).) Further, Plaintiffs aver that the information likely comes from documents and notices related to those individual cases and that those materials, which had not been produced, are the best evidence of the individual cases. (*Id.* at 3 (citing *United States v. Alexander*, 326 F.2d 736, 739 (4th Cir. 1964); Fed. R. Evid. 1002).) Because those two paragraphs in Ms. Nisbet's third declaration are referenced in Defendant's Statement of Undisputed Facts, (*see* ECF No. 179-1 at 23–24 ¶¶ 85–86), Plaintiffs also argue that those references should be stricken, (*see* ECF No. 185 at 3).

As noted by Defendant in his response to this motion, (*see* ECF No. 191 at 4), the record now contains a declaration from Ms. Nisbet testifying to her "personal[] involvement in the evaluation of those [four] requests . . . ." (ECF No. 192-1 at 2 ¶ 2.) Additionally, records of the individual exceptions requests as well as the approval of the requested services are attached to the declaration, (*see id.* at 8–15), and represent the "best evidence" that Plaintiffs argue had not been produced. Because Defendant has cured the deficiencies about which Plaintiffs argued in their motion, the Court **DENIES** the motion to strike, (ECF No. 185), and will consider the information in paragraphs fifteen and sixteen of Ms. Nisbet's third declaration as necessary.

In this endeavor, Plaintiffs now argue that the new authorization system violates Counts II, III, and IV of the Complaint.

Despite Plaintiffs' arguments in the dispositive motions' briefing, the notion that Plaintiffs or other I/DD Waiver Program members will be worse off under the new system is purely speculative at this point. The only evidence Plaintiffs attach to their motion or their response to Defendant's motion of the effect the new authorization system has had on certain class members is declarations from five guardians related to their dependent class members.[10] (*See* ECF Nos. 182-3, 182-4, 182-5, 182-6, 182-11, 189-2, 193-1.) Those declarations purport to show that under the new authorization system, the members are worse off than they were when the policy was changed back in 2014.[11] However, as Ms. Nisbet notes in her fourth declaration,[12] four of those five individuals (Alexa G., Cole J., Bo M., and Christopher B.) have not been assigned budgets under the new system authorization system, and the one individual

---

[10] Plaintiffs also include a declaration from the executive director of a service provider for the I/DD Waiver Program. (ECF No. 182-8 (Walsh Dec.).) That declaration speaks toward the budget of another class member, Mark D. (*See* ECF No. 187-2 (Nisbet Fourth Dec.) at 18 ¶ 69.) However, the information provided only relates to his 2017–2018 budget and does not provide any information regarding his 2018–2019 budget, which presumably is the budget that will be calculated under DHHR's new system. (*See id.* ¶ 70.) Nevertheless, in light of his complaints about last year's provided services, Ms. Nisbet provides that Mark D. never pursued a Medicaid fair hearing, which means he did not exhaust the available resources that may have allowed him to receive additional services. (*Id.*)

[11] One of the declarations by Victoria B. was attached to a motion to seal filed by Plaintiffs on August 15, 2018. (ECF No. 193.) Plaintiffs state that the declaration "includes exhibits that contain protected health information, as defined under the Health Insurance Portability and Accountability Act of 1996 . . . and the Health Information Technology for Economic and Clinical Health Act of 2009," such as "extensive sensitive and personal health information . . . ." (*Id.* at 1–2.) Thus, Plaintiffs aver that redaction is impractical and request that the declaration be sealed "[t]o protect the Plaintiff's privacy and the confidentiality of his protected health information . . . ." (*Id.*) Defendant did not oppose the motion. For the reasons stated by Plaintiffs, the Court **GRANTS** the motion and **DIRECTS** the Clerk to place Exhibit 1 to the motion, (ECF No. 193-1), **UNDER SEAL**.

[12] Defendant moved on July 31, 2018, to seal Ms. Nisbet's fourth declaration and its accompanying attachments. (ECF No. 187.) Defendant states that the declaration "includes exhibits that contain protected health information, as defined under the Health Insurance Portability and Accountability Act of 1996 . . . and the Health Information Technology for Economic and Clinical Health Act of 2009," such as "extensive sensitive and personal health information" of Plaintiffs. (*Id.* at 1–2.) Thus, Defendant avers that redaction is impractical and requests that the declaration be sealed "[t]o protect the Plaintiffs' privacy and the confidentiality of their protected health information . . . ." (*Id.* at 1.) Plaintiffs did not oppose the motion. For the reasons stated by Defendant, the Court **GRANTS** the motion and **DIRECTS** the Clerk to place Exhibit 1 to the motion, (ECF No. 187-2), **UNDER SEAL**.

who has been assessed under the new system (James N.)[13] has not made an exceptions request for services in excess of his budget. Thus, even if Plaintiffs' claims were not moot and they were allowed to go forward on the merits as applied to the new system, those claims would not necessarily be ripe for review. Plaintiffs have not demonstrated that any class member has been assigned a budget under the new system and exhausted the available remedies for seeking services outside the assigned budget.

This case boils down to the fact that the system Plaintiffs originally sought to challenge no longer exists. The Court acknowledges that the parties here have expended immense resources on this case, and nothing in this opinion should be construed to hold that the legality of DHHR's new authorization system is immune from challenge. However, the challenged system has been replaced, and the Court finds that Defendant has met his burden of showing that there is no probability that DHHR will return to the old system and that he has overcome the voluntary cessation exception to mootness. *See Grutzmacher*, 851 F.3d at 349. (*See also* ECF No. 179-2 (Nisbet Third Dec.) at 7 ("BMS has no intention to return to its previous service authorization system and to do so would be an incredible financial and administrative burden.").) Because the system against which the Complaint was lodged has been substantially revised, Plaintiffs' claims against it are moot. *See Phillips v. McLaughlin*, 854 F.2d 673, 677 (4th Cir. 1988) ("A request for prospective relief alone, founded on a challenge to a regulation which no longer applies to plaintiffs, does not present an actual case or controversy."). As such, any challenges to the new system are better addressed in a subsequent lawsuit. *Cf. Valdivia*, 956 F. Supp. 2d at 1137.

---

[13] The Court notes that in Teresa L.'s first declaration, she refers to her son as James M., (ECF No. 182-4 at 1 ¶ 1), but in the second she calls him James N., (ECF No. 189-2 at 1 ¶¶ 1–3). Ms. Nisbet also refers to him as James N., (ECF No. 187-2 at 8 ¶¶ 28–29), so the Court will use that last initial in this opinion.

Even if the case were not constitutionally moot, the Court would elect to use its "discretionary power to withhold injunctive and declaratory relief for prudential reasons . . . ." *See S-1 v. Spangler*, 832 F.2d 294, 297–99 (4th Cir. 1987) (citations omitted).   It has become clear that the specific relief sought by Plaintiffs may no longer be necessary once the named Plaintiffs and class members receive services under the new authorization system.   No Plaintiff or class member has been assigned a budget under the new system and utilized the avenues to obtain services in excess of that budget such as the new exceptions process and a Medicaid fair hearing.   Once the named Plaintiffs receive their services over the next year, they may be in an equal or better position than they were in 2014, so there could be a question as to their standing to seek injunctive and declaratory relief and their ability to represent the defined class.   Further, the claims in Counts II, III, and IV were lodged against the old system, which is being phased out relatively quickly, and the Court believes that based on the evidence provided by Defendant, the allegedly violative procedures and substantive policies in it may have been cured. Nonetheless, the legality of the new system must be demonstrated in practice.   Should unlawful components exist within the new system once it is fully implemented, there are many potential plaintiffs, including those named in the current suit, to challenge it.

## IV.   CONCLUSION

For the reasons above, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 182), and **GRANTS IN PART** Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment insofar as it requests that this Court dismiss Plaintiffs' claims as moot and **DENIES IN PART** the motion insofar as it requests summary

judgment, (ECF No. 179).   The Court further **DISMISSES** this case and **DIRECTS** the Clerk to remove this matter from the Court's docket.

       **IT IS SO ORDERED**.

       The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

            ENTER:      September 25, 2018

_____
THOMAS E. JOHNSTON, CHIEF JUDGE